UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

| | |
|---|---|
| **CONSUMER FINANCIAL PROTECTION BUREAU,** | CASE NO: 9:23-cv-81373-DMM |
| *Plaintiff,* | |
| v. | |
| **FREEDOM MORTGAGE CORPORATION,** | |
| *Defendant.* | |

**DEFENDANT FREEDOM MORTGAGE CORPORATION'S
MOTION TO DISMISS**

By this lawsuit, Plaintiff Consumer Financial Protection Bureau (the "CFPB") is seeking to improperly expand its own enforcement power under the Home Mortgage Disclosure Act ("HMDA") and its implementing regulation, Regulation C.  In a novel but meritless federal court claim, the CFPB alleges that HMDA and Regulation C contain requirements that mortgage lenders, like Defendant Freedom Mortgage Corporation ("Freedom"), must report the data required by HMDA for each of their loans with some level of accuracy that is not specified in either law (or even in any allegation in the CFPB's Complaint).

In doing so, the CFPB is impermissibly attempting to expand the scope of its authority beyond the constraints of HMDA or Regulation C, and it unconstitutionally seeks the power to bring enforcement actions based on arbitrary and unannounced standards for accuracy that are not tethered to any law.  By this Motion to Dismiss, Freedom is seeking this Court's protection from the CFPB's unactionable claims and unconstitutional attempt to read requirements into the law that are not in its text.

## I.

### THE CFPB IMPROPERLY SEEKS TO EXPAND ITS HMDA ENFORCEMENT AUTHORITY

At its root, this lawsuit seeks to impose a standard for the accuracy of data reported pursuant to HMDA that is not present in either that law or its implementing regulation, Regulation C.  HMDA and Regulation C require that mortgage lenders "compile and make available" a plethora of information related to the loans they originate, purchase, and for which they receive applications.  12 U.S.C. § 2803; 12 C.F.R. §§ 1003.4-1003.5; *see* FEDERAL FINANCIAL INSTITUTIONS EXAMINATION COUNCIL, A GUIDE TO HMDA REPORTING: GETTING IT RIGHT! Appx. G (Jan. 9, 2020)[1] (listing 110 categories of data required to be included in the lender's Loan/Application Register for

---

[1] Available at https://www.ffiec.gov/hmda/pdf/2020Guide.pdf (last visited Dec. 18, 2023).

each transaction).  That information is comprised of 110 categories of data, including financial information such as loan amounts and interest rates, property information such as location and construction type, and borrower information such as race and income.  *Id.*  This data is used for government (e.g., oversight and policy planning) as well as public (e.g., non-profit and commercial organizations interested in the residential mortgage business) purposes.  *See* 12 U.S.C. § 2801(b).

Given that mortgage lenders must collect and report such a large array of data for each individual transaction in what is often a significant loan volume (e.g., Freedom had more than 700,000 Covered Loans in 2020 alone, Pl.'s Compl. ¶ 18 (Doc. 1)), it is no surprise that some errors in reporting will occur.  And the CFPB is as aware as anyone of this inevitability.  It acknowledged as much in its comments to Regulation C.  Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,254-55 (Oct. 28, 2015) ("[S]ome errors in data compilation and reporting are difficult to avoid altogether.").  Perhaps even more significantly, the CFPB designed a process by which mortgage lenders may correct errors in the data they report.  CFPB, EXAMINATION PROCEDURES: HMDA RESUBMISSION GUIDELINES (Oct. 2013).[2]

Yet, the CFPB has sued Freedom based entirely on alleged errors in its 2020 HMDA data.  Pl.'s Compl. ¶¶ 20, 32, 35, 40 & 45.  In bringing its claims for these alleged errors, however, the CFPB does not anywhere in its Complaint explain how errors in HMDA data constitute actionable violations of HMDA or Regulation C.  For example, the CFPB does not allege any particular error rate it found in Freedom's HMDA data. *See id.*, generally.  Nor does it point to any particular provision of law—neither in HMDA nor Regulation C nor anywhere else—establishing an error rate (or any other accuracy standard) that would violate those laws.  *See id.*, generally.

---

[2] Available at https://files.consumerfinance.gov/f/201310_cfpb_hmda_resubmission-guidelines_fair-lending.pdf (last visited Dec. 18, 2023).

And if anyone is in a position to point to such a provision of law, it's the CFPB. The CFPB is not only charged with enforcing HMDA and Regulation C, 12 U.S.C. §§ 2804(b)(1)(B) & (d), it is the agency charged with promulgating Regulation C, *id.* § (a).  In that role, however, the CFPB determined that it would not promulgate and publish a standard for accuracy in HMDA data, even in the face of apparent requests to do so from members of the public commenting on the draft regulations:

> The [CFPB] believes that many of the error-related issues raised by commenters would be best addressed through supervisory policy, rather than regulatory language.

> \* \* \* \* \*

> The [CFPB] has concluded that it should not establish in Regulation C global thresholds for the number or percentage of errors in a financial institution's data submission that would trigger compliance or enforcement action.

Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,255.

Instead, the CFPB determined to hold for itself an unconstrained power to determine accuracy requirements in an *ad hoc* fashion—subject only to its own will—emphasizing "flexibility for regulators to exercise judgment in assessing compliance violations":

> Decisions regarding when to pursue an enforcement action or other solution for noncompliance with HMDA or Regulation C are a matter of agency discretion.  Each of the agencies that has authority to enforce HMDA can develop internal procedures and guidelines for citing a financial institution for inaccurate data.

*Id.*

Freedom is a mortgage lender subject to HMDA and Regulation C.  Pl.'s Compl. ¶¶ 10-15.  In 2019, Freedom stipulated to the entry of an administrative order with the CFPB to resolve allegations of HMDA reporting errors in 2014 through 2017

that are unrelated to the allegations in this case.  *Id.* ¶ 17.  That 2019 Order required Freedom to comply with both HMDA and Regulation C.  *Id.*

There is no dispute that Freedom submitted the HMDA data required of it for 2020—first on February 26, 2021, *id.* ¶ 18, and then again with corrections on September 30, 2021, *id.* ¶ 21, as allowed by the CFPB's established procedures, *see* CFPB, Examination Procedures: HMDA Resubmission Guidelines.  There is no allegation that Freedom's corrected data failed to address the inaccuracies in its originally submitted data, and there is no allegation of any other continuing HMDA violation by Freedom.  *See* Pl.'s Compl., generally.

Despite the absence of any alleged failure to comply with the reporting requirements as stated in HMDA and Regulation C, the CFPB is seeking to hold Freedom to a standard that is not only absent from law but also conspicuously absent from the allegations in its Complaint—even in this lawsuit, the CFPB has not stated any standard for accuracy Freedom is alleged to have violated.  *See id.*, generally.  The CFPB's refusal to give notice in its Complaint as to what provision of law Freedom is alleged to have violated does not meet the requirements of Federal Rule of Civil Procedure 8, and the CFPB's refusal to give notice in Regulation C—a law it promulgates—as to what constitutes a violation does not meet the requirements of the Due Process Clause of the Constitution.

For these reasons, as well as because the CFPB seeks to enforce the 2019 Order's legally unenforceable injunction to follow the law, because the CFPB asks this Court to enter an equally unenforceable injunction, and because the CFPB's funding mechanism is unconstitutional, Freedom now asks the Court to dismiss this case in its entirety.

## II.

### The CFPB Has No Viable Claim for Relief for Inaccurate Data Reporting

The Court should dismiss the CFPB's Complaint because it cannot state a claim for relief based on alleged inaccuracies in the HMDA data reported by Freedom—

neither HMDA nor Regulation C contain any requirement that HMDA data be reported with a particular level of accuracy, although the CFPB's comments to Regulation C and its HMDA-related guidance make clear that perfectly accurate data is not required.  If the Court were to reject Freedom's argument and somehow hold that either HMDA or Regulation C contains a requirement as to the accuracy of HMDA data, that requirement would be unconstitutionally vague and therefore void and unenforceable under the Due Process Clause of the United States Constitution.  Whether looking to the text of the law or to the allegations in the CFPB's Complaint, the CFPB does not—and cannot—state a claim upon which the Court may grant relief.

A.   **Allegations of inaccurate HMDA reporting do not state a claim for relief.**

Each of the CFPB's claims should be dismissed because its Complaint only conclusorily alleges that Freedom's collection, recording and reporting of inaccurate data violated HMDA and Regulation C—the CFPB does not show how the alleged inaccurate collection, recording and reporting violate any provision of those laws.  In order to state a plausible claim for relief as required by Federal Rule of Civil Procedure 8, a party's pleading must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Applying that requirement here, the CFPB must plead allegations that allow the court to draw the reasonable inference that Freedom is liable for violations of HMDA.

Importantly, in meeting this pleading burden, the CFPB may not depend on general assertions of wrongdoing against Freedom.  *See id.* (Rule 8 demands more than unadorned accusations of wrongdoing or mere labels and conclusions.).  Where the pleading is "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  In other words, to maintain a HMDA claim against Freedom, the CFPB

must plead allegations that, if true, are sufficient in and of themselves to establish Freedom's liability under that law.

The CFPB's allegations that Freedom collected, recorded and reported inaccurate HMDA data, even if taken as true, do not establish a violation of any requirement of HMDA or Regulation C.  To crystallize this point: neither HMDA nor Regulation C requires the reporting of perfectly accurate data.  In fact, both those laws and the CFPB's regulatory guidance contemplate inaccuracies in reported HMDA data, which is quite reasonable given the massive data sets mortgage lenders are required to collect, record and report.  And yet, each of the three claims the CFPB alleges against Freedom depends—at its root—on the existence of a violation of HMDA and Regulation C based on Freedom's inaccurate reporting.[3]  For this reason, the Court should dismiss the CFPB's entire Complaint.

### 1.	The Complaint shows Freedom complied with HMDA and Reg C.

Freedom submitted all data required by HMDA and Regulation C.  Those laws require that depository and financial institutions "compile and make available" 110 categories of mortgage loan data in a prescribed format.  28 U.S.C. § 2803; 12 C.F.R. §§ 1003.4-1003.5; FEDERAL FINANCIAL INSTITUTIONS EXAMINATION COUNCIL, A GUIDE TO HMDA REPORTING: GETTING IT RIGHT! Appx. G.  The CFPB admits in its Complaint that Freedom submitted all of this data—first on February 26, 2021, ¶ 18, and then again with corrections on September 30, 2021, ¶ 21.  This admission establishes Freedom's compliance with HMDA and Regulation C, and it defeats the CFPB's claims for violations.

---

[3] Count I alleges violations of HMDA and Regulation C.  Pl.'s Compl. ¶¶ 30-32 & 35. Count II alleges violations of a CFPB order requiring Freedom to comply with HMDA and Regulation C.  *Id.* ¶¶ 38-41.  And Count III alleges that by violating HMDA and Regulation C, Freedom also violated the Consumer Financial Protection Act.  *Id.* ¶¶ 43-45.

2. **HMDA and Reg C do not require perfect data.**

In spite of its admission that Freedom submitted the data required by HMDA and Regulation C, the CFPB attempts to manufacture a violation of the law, first by alleging "Freedom is required to collect, record, and report data on Covered Loans in compliance with HMDA and Regulation C." Pl.'s Compl. ¶ 31 (citing 12 U.S.C. § 2803 & 12 C.F.R. §§ 1003.4(a) & 1003.5). Then, instead of explaining how Freedom violated those provisions of law, the CFPB conclusorily alleges "Freedom collected, recorded and reported inaccurate HMDA data in violation of HMDA and Regulation C," *id.* ¶ 32, and "Freedom's 2020 HMDA data contained errors in violation of HMDA," *id.* ¶ 35.

But the CFPB never cites any standard of law that Freedom has allegedly violated. *See id.*, generally. Instead, the CFPB is cavalier with various figures in its allegations. *See id.* For example, although the CFPB's guidance (which is not the same as its regulation or other authority with the power of law) contains more than one type of error rate for HMDA data, each calculated differently, CFPB, EXAMINATION PROCEDURES: HMDA RESUBMISSION GUIDELINES 2, it is unclear what error rate, if any, the CFPB is using in this lawsuit, whether that error rate is for a sample of Freedom's data or for all data submitted for 2020, or how the CFPB alleges that error rate was or should be calculated. *See* Pl.'s Compl. ¶¶ 20-21.

The CFPB's conclusory allegations do not support any cause of action rooted in the requirements of either HMDA, 12 U.S.C. § 2803, or Regulation C, 12 C.F.R. §§ 1003.4(a) & 1003.5, neither of which purports to require the perfectly accurate, error-free submission of 110 categories of data compiled for each of Freedom's more than 700,000 Covered Loans in 2020, Pl.'s Compl. ¶ 18. A requirement for such perfection would be an impossibility. *See* Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,254-55 (The CFPB "accepts that some errors in data compilation and reporting are difficult to avoid altogether.")

Indeed, the CFPB's Complaint itself indicates that perfectly accurate data is not required to comply with HMDA—the Complaint implies that a certain error rate in HMDA data is not significant enough even to require submission of a correction. *See* Pl.'s Compl. ¶ 20 ("The error rates in these fields were significant enough to require Freedom to resubmit its 2020 HMDA data."). This reality—that HMDA reporting errors are common, expected and allowed under the law—is further supported by both the CFPB's comments to Regulation C as well as its published HMDA Resubmission Guidelines. First, the CFPB itself "accepts that some errors in data compilation and reporting are difficult to avoid altogether. . . . [Regulation C] seeks to balance the need for accurate data and the challenge of generating that data." Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,254-55. Second, the CFPB has established— through examination guidelines and not through regulation—acceptable error rates ranging from 2% to 10% before resubmission of corrected data will be required. CFPB, EXAMINATION PROCEDURES: HMDA RESUBMISSION GUIDELINES 2.

Since perfect data is not required by HMDA or Regulation C, the question becomes whether any particular error rate will constitute an actionable violation under the law, and if so, what that error rate is. In answer to this question, the CFPB's Complaint is absolutely silent, providing no information to show its entitlement to relief as required by Rule 8. *See* Pl.'s Compl., generally. The CFPB alleges no legal standard and cites no law establishing what error rate, if any, constitutes an actionable violation of HMDA. *See id.*, generally. Furthermore, the CFPB does not make a specific factual allegation as to the error rate of Freedom's HMDA data or how such an error rate was or should be calculated. *See id.*, generally.

And that's all for good reason—neither HMDA nor Regulation C establishes any error rate for HMDA data that would constitute a violation of law. Indeed, the CFPB actually **refused** to incorporate such a standard into Regulation C: in response to public comments apparently seeking a clear standard for enforcement of HMDA and

8

Regulation C, the CFPB "concluded that it should not establish in Regulation C global thresholds for the number or percentage of errors in a financial institution's data submission that would trigger compliance or enforcement action." Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,255.

Neither HMDA nor Regulation C contains provisions to punish HMDA reporters whose data contain inaccuracies—they require only the collection and reporting of specified data in a specified format, 12 U.S.C. § 2803 & 12 C.F.R. §§ 1003.4(a) & 1003.5, which the CFPB admits Freedom did, Pl.'s Compl. ¶¶ 18 & 21. Accordingly, the CFPB has failed to—and cannot—state a claim upon which the Court can grant relief based on alleged inaccuracies in Freedom's HMDA data; therefore, its Complaint should be dismissed.

**B.      Any accuracy requirement within HMDA or Reg C is unconstitutionally vague.**

If the Court were to determine the CFPB has stated a proper claim for reporting inaccurate HMDA data and deny Freedom's motion to dismiss on that basis, *see* § II.A immediately above, the CFPB's claim would then collide head-on with the constitutional due process requirement that the law must provide a person of ordinary intelligence fair notice of "what is required of them so they may act accordingly" and "precision and guidance . . . so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012); *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Because neither HMDA nor Regulation C meets these constitutional due process requirements with respect to any rule regarding accuracy of data, those provisions are unconstitutionally vague and therefore unenforceable. *See FCC*, 567 U.S. at 253 ("This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment. It requires the invalidation of laws that are impermissibly vague.")

Neither HMDA nor Regulation C provides any indication whatsoever as to what error rate is permissible or how to calculate that error rate—Freedom has no notice as to what level of accuracy the law requires in its HMDA data.  Because the law contains no standard in this regard, the CFPB cannot help but enforce it arbitrarily—there is no basis in the law upon which the CFPB can make its enforcement decisions and therefore it must necessarily resort to its own arbitrary whim.  For these reasons, if the Court will not dismiss the CFPB's Complaint because the CFPB has failed to state a claim for reporting inaccurate HMDA data, it must dismiss the Complaint because any provision of law alleged by the CFPB to require accuracy in Freedom's HMDA data is unconstitutionally vague.

1.      **Any accuracy requirement in the law is impermissibly vague.**

HMDA and Regulation C are each silent as to what level of accuracy, if any, is required by HMDA reporters like Freedom.  This silence violates the due process requirement that the law must provide a person of ordinary intelligence fair notice of "what is required of them so they may act accordingly."  *See FCC*, 567 U.S. at 253; *League of Women Voters*, 66 F.4th at 946 (citing *Hill*, 530 U.S. at 732).  The CFPB has acknowledged this vagueness but insists on maintaining it, officially commenting, "The [CFPB] has concluded that it should not establish in Regulation C global thresholds for the number or percentage of errors in a financial institution's data submission that would trigger compliance or enforcement action."  Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,255.

The CFPB's position here—that it can enforce a provision of law that ***intentionally*** lacks any standard as to what is required—epitomizes unconstitutional facial vagueness, which occurs when a provision of law "is utterly devoid of a standard of conduct so that it simply has no core and cannot be validly applied to any conduct." *League of Women Voters*, 66 F.4th at 946 (quoting *High Ol' Times, Inc. v. Busbee*,

673 F.2d 1225, 1228 (11th Cir. 1982)).  (To be clear, facial vagueness is not limited to those circumstances where the provision of law being enforced is ***intentionally*** vague.)

Without any standard of conduct in HMDA or Regulation C as to what level of accuracy is required in its data, Freedom is uncertain as to either what facts the CFPB must prove against it to prevail in its claims or what facts Freedom could prove to mount its own defense.  This, too, shows that those laws are unconstitutionally vague—the law is unconstitutionally vague when it is unclear what fact must be proved to obtain a conviction or punishment, *FCC*, 567 U.S. at 253.  While it is clear that perfect data accuracy ***is not*** required by HMDA or Regulation C, *see* § II.A.2 at p. 7 above (citing Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,254-55 (acknowledging the impossibility of perfectly accurate reporting) & CFPB, EXAMINATION PROCEDURES: HMDA RESUBMISSION GUIDELINES 2 (establishing varying error rates at which re-submission of HMDA data will be required by CFPB examiners)), it is not clear what level of accuracy ***is*** required to comply with the law and avoid punishment in an enforcement action, *see* 12 U.S.C. § 2803 & 12 C.F.R. §§ 1003.4(a) & 1003.5 (each of which is silent as to the required accuracy of reported HMDA data).  That lack of clarity—i.e., the complete absence of any legal standard of conduct—renders HMDA and Regulation C facially vague on this issue.

A review of two highly publicized cases holding challenged provisions of law to be unconstitutionally vague is illuminating.  First, in *FCC v. Fox*, the Supreme Court determined the Federal Communications Commission's policy on indecency at the time of the broadcasts being challenged gave no notice to the broadcasters "that a fleeting expletive or a brief shot of nudity could be actionably indecent."  567 U.S. at 254; *see also id*. 258.  Due to that lack of fair notice, the Supreme Court held the FCC's standards were unconstitutionally vague, and it set aside the FCC's enforcement orders against the broadcasters based on their broadcasts of foul language and nudity.  *Id*. 258.  Similarly here, neither HMDA nor Regulation C gives Freedom any notice as to what

level of accuracy is required in the HMDA data it reports.  Accordingly, just as the Supreme Court did with the FCC's policy on indecency, *FCC*, 567 U.S. at 258, this Court should hold HMDA and Regulation C to be unconstitutionally vague with respect to their unarticulated requirements that Freedom report accurate data.

Second, in *League of Women Voters v. Florida Secretary of State*, the Eleventh Circuit held a provision of Florida election law prohibiting "engaging in any activity with the effect of influencing a voter" to be facially vague because it "fail[ed] to put Floridians of ordinary intelligence on notice of what acts it criminalizes and encourages arbitrary and discriminatory enforcement."  66 F.4th at 947.  In reaching this holding, the appellate court asked, "How is an individual seeking to comply with the law to anticipate whether his or her actions will have the subjective effect of influencing a voter?" and concluded that it would be impossible for an individual to make such a determination. *Id.*  Likewise, in our case, this Court must ask, "How is Freedom to anticipate whether its reporting will meet the accuracy requirements of HMDA and Regulation C?"  And because those laws contain no standard by which Freedom can determine what error rate is acceptable in its HMDA reporting, they, too, must be held to be unconstitutionally vague with respect to any accuracy requirement.

Because HMDA and Regulation C are each silent as to what level of accuracy, if any, is required in HMDA data, they are unconstitutionally vague as to this requirement.  Accordingly, that requirement must be invalidated.  *See FCC*, 567 U.S. at 253 (Due process "requires the invalidation of laws that are impermissibly vague."). Because neither the CFPB nor this Court can enforce an invalid law, each of the CFPB's claims—all three of which are premised on a requirement that HMDA data be reported with some unannounced level of accuracy—should be dismissed.

2.      **The lack of clear accuracy requirements invites arbitrary enforcement.**

The vagueness (and indeed silence) in HMDA and Regulation C regarding required accuracy of HMDA data necessarily result in arbitrary enforcement—as there is no basis in the laws upon which the CFPB can make its enforcement decisions, it can only resort to its own arbitrary whim.  To satisfy constitutional due process requirements, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC*, 567 U.S. at 253 (2012); *League of Women Voters*, 66 F.4th at 946 (citing *Hill*, 530 U.S. at 732).  Here, there is no "precision and guidance"—HMDA and Regulation C are silent as to any requirement about what level of accuracy is required in reporting HMDA data.

According to the CFPB, that is by design.  In its response to public comment on Regulation C, the CFPB insisted it would implement regulations that, rather than provide constitutionally firm notice as to what is required, would reserve to itself the utmost flexibility in enforcement:

> The [CFPB] believes that many of the error-related issues raised by commenters would be best addressed through supervisory policy, rather than regulatory language.  . . . .  Decisions regarding when to pursue an enforcement action or other solution for noncompliance with HMDA or Regulation C are a matter of agency discretion.  Each of the agencies that has authority to enforce HMDA can develop internal procedures and guidelines for citing a financial institution for inaccurate data.  . . . .  [T]he guidelines can be tailored, adjusted, and applied as appropriate.
>
> * * * * *
>
> The [CFPB] has concluded that it should not establish in Regulation C global thresholds for the number or percentage of errors in a financial institution's data submission that would trigger compliance or enforcement action.

Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66,255.

Instead of establishing clear thresholds for enforcement, the CFPB emphasized "flexibility for regulators to exercise judgment in assessing compliance violations."  *Id.* This is a textbook example of precisely the outcome that the Due Process Clause of the Constitution prohibits—a regulator reserving for itself the flexibility to arbitrarily and without notice determine what is and is not a violation of law subject to punishment. *See FCC*, 567 U.S. at 253-58.  For this reason, the Court should hold the accuracy requirements of HMDA and Regulation C, to whatever extent they exist, as unconstitutionally vague and therefore invalid and unenforceable; and it should dismiss the CFPB's Complaint in its entirety.

## III.

### THE CFPB CAN NEITHER ENFORCE NOR OBTAIN AN OBEY-THE-LAW INJUNCTION

The CFPB has no actionable claim for the alleged violation of an obey-the-law injunction, and this Court is prohibited from entering such an injunction as relief. Federal Rule of Civil Procedure 65 requires that every injunction entered by a court be stated with specificity; and injunctions requiring an enjoined party to "obey the law" are generally unenforceable because they cannot meet that requirement.  *SEC v. Graham*, 823 F.3d 1357, 1362 fn.2 (11th Cir. 2016); *SEC v. Smyth*, 420 F.3d 1225, 1233 fn.14 (11th Cir. 2005) (collecting cases).  For these reasons, the Court should dismiss the CFPB's claim in Count II of its Complaint, which seeks to enforce an unenforceable obey-the-law injunction, and strike the CFPB's request for entry of such an injunction in its prayer for relief.

**A.     The CFPB cannot state a claim for the violation of an unenforceable injunction.**

The injunction in the CFPB's 2019 Order prohibiting Freedom from violating HMDA or Regulation C, Pl.'s Compl. ¶¶ 17 & 39, is legally unenforceable; therefore, an alleged violation of that injunction cannot be the basis of a claim upon which relief may be granted.  Injunctions requiring an enjoined party to "obey the law" are generally

unenforceable. *Graham*, 823 F.3d 1357, 1362 fn.2; *Smyth*, 420 F.3d 1225, 1233 fn.14. Courts may only enforce injunctions that are framed so that the enjoined party knows exactly what specific conduct is prohibited or required and what steps they must take to conform their conduct to the law. *SEC v. Goble*, 682 F.3d 934, 950 & 952 (11th Cir. 2012) (citing *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001) & *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 984-85 (11th Cir. 1983)); *Smyth*, 420 F.3d at 1233 fn.14; *see also Graham*, 823 F.3d at 1362 fn.2. In general, obey-the-law injunctions do not meet this requirement and so cannot be enforced. *See Goble*, 682 F.3d at 950–52; *Smyth*, 420 F.3d at 1233 fn.14; *Graham*, 823 F.3d at 1362 fn.2.

In *SEC v. Smyth*, an Eleventh Circuit case with striking similarities to this one, an individual stipulated with the Securities and Exchange Commission to the entry of a consent decree enjoining him from disobeying the law. 420 F.3d at 1229. Specifically, he agreed to be "permanently enjoined and restrained from violating, directly or indirectly, Section 17(a) of the Securities Act of 1933 . . . ." *Id.* 1229 fn.8. Likewise in our case, Count II of the CFPB's Complaint, ¶¶ 38-41, seeks to enforce the injunction in the 2019 Order prohibiting Freedom from disobeying the law:

> [Freedom] . . . whether acting directly or indirectly, may not violate Section 304(a), (b), or (h) of the Home Mortgage Disclosure Act, 12 U.S.C. § 2803(a), (b), and (h), or Sections 1003.4(a)-(b) or 1003.5(a) of Regulation C, 12 C.F.R. §§ 1003.4(a)-(b), 1003.5(a) . . . .

2019 Order ¶ 29.[4]

The Eleventh Circuit held the *Smyth* injunctions requiring the individual to "obey the law" were unenforceable even when their text "track[ed] the provisions of the statute or regulation the violation of which [was] enjoined." 420 F.3d at 1233 fn.14; *see also Graham*, 823 F.3d at 1362 fn.2 ("an injunction which merely tracks the language of

---

[4] Available at https://files.consumerfinance.gov/f/documents/cfpb_freedom-mortgage-corporation_consent-order_2019-05.pdf (last visited Dec. 14, 2023).

the securities statutes and regulations . . . will not clearly and specifically describe permissible and impermissible conduct").  In another instructive SEC case, the Eleventh Circuit characterized an injunction that "merely cross-reference[d] the relevant statutes and regulations" as "troubling," restating its holding that a person subject to an injunction "'should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing.'"  *Goble*, 682 F.3d at 952 (quoting *Hughey v. JMS Dev. Corp.*, 78 F.3d 1523, 1532 fn.12 (11th Cir. 1996)).  By merely cross-referencing to provisions of statutory and regulatory law, the injunction failed to specifically describe the acts that it required or prohibited, and the court therefore vacated it.  *Id.*

Here, the CFPB's injunction does not even track the text of the law as the SEC's injunction did in the *Smyth* case, 420 F.3d at 1233 fn.14—instead, the CFPB's injunction is of the even more troubling type described in *Goble*, 682 F.3d at 952, in that it "merely cross-reference[s]" to those provisions of law that may not be violated, 2019 Order ¶ 29 (quoted above).  Just as in *Goble*, in order to comply with the CFPB's injunction, Freedom "would need to look beyond the four corners of the" injunction in order to comply with it; "[a]nd without a compendious knowledge of the codes, [Freedom] has no way of understanding [its] obligations under the injunction."  *See* 682 F.3d at 952.  As a result, the CFPB's injunction is not "phrased in terms of objective actions" and does not provide Freedom the requisite notice as to "what [it] is ordered to do or not to do." *See id.*; *see also Smyth*, 420 F.3d at 1233 fn.14 (An injunction must be framed so that those enjoined know exactly what conduct is prohibited and what steps they must take to conform their conduct to the law.)  For this reason, the CFPB's injunction is unenforceable.

Finally, the parties' stipulation, consent or agreement to an otherwise unenforceable obey-the-law injunction does not render it enforceable.  In *Smyth*, the individual consented to the entry of the injunctions barring him from disobeying

16

securities laws, *id.* 1230, but the Eleventh Circuit nonetheless determined that those injunctions were unenforceable, *id.* 1233 fn.14.  So although the CFPB points out that "Freedom stipulated to the entry of the 2019 Order, including Paragraph 29, which specifically prohibited Freedom from violating" those provisions of law as cited in the 2019 Order quoted above, Pl.'s Compl. ¶ 17, that stipulation does not make the injunction enforceable or save the CFPB's claim from dismissal.[5]

Because this injunction is legally unenforceable, the CFPB cannot base its claim on Freedom's alleged violation of it—such a claim would be an improper attempt to enforce what is unenforceable.  As a result, Count II of the CFPB's Complaint, which alleges a violation of the CFPA based on Freedom's violation of the injunction in the 2019 Order requiring it to comply with HMDA and Regulation C, does not state a claim upon which relief may be granted.  It should be dismissed accordingly.

**B.    The Court cannot award an unenforceable obey-the-law injunction as relief.**

For the same reasons as discussed in section III.A. immediately above, this Court cannot enter an unenforceable obey-the-law injunction as relief in this case.  Every order granting an injunction must "state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  Fed. Rs. Civ. P. 65(d)(1)(B)-(C); *see also Graham*, 823 F.3d at 1362 fn.2; *Smyth*, 420 F.3d at 1233 fn.14; *Goble*, 682 F.3d at 950 & 952 (citing *Planetary Motion, Inc.*, 261 F.3d at 1203, & *John H. Harland Co.*, 711 F.2d at 984-85).  And yet—in spite of the fact that it does not allege any continuing violation of HMDA or Regulation C against Freedom, *see* Pl.'s Compl., generally—the CFPB is asking this

---

[5] Furthermore, the nature of the data inaccuracy pursued by the CFPB in the 2019 Order is qualitatively different than that at issue in this case.

Court to enter just such an illegal and unenforceable obey-the-law injunction in this case:

> The [CFPB] requests that the Court
>
> a.   permanently enjoin Defendant from committing future violations of HMDA, 12 U.S.C. §§ 2801-2810, and its implementing regulation, Regulation C, 12 C.F.R. pt. 1003; §§ 1031, 1036(a) of the CFPA, 12 U.S.C. §§ 5531, 5536(a); and any other provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);
>
> b.   require Defendant to take such affirmative steps as may be necessary to prevent the recurrence of any violation of HMDA and Regulation C in the future; [and]
>
> c.   grant additional injunctive relief as the Court may deem just and proper.

Pl.'s Compl. 9.  As recognized by the Eleventh Circuit in the litany of cases brought by other regulators and cited above, Federal Rule of Civil Procedure 65 bars this unspecific injunction, which merely cross-references provisions of law and does not describe in any detail at all what specific acts are required or restrained.  For that reason, this Court should strike the CFPB's request for an injunction from its pleadings.

## IV.

### THE CFPB'S UNCONSTITUTIONAL FUNDING STRUCTURE IS FATAL TO ITS CLAIMS

The CFPB's funding structure is unconstitutional, and it therefore cannot maintain this enforcement action against Freedom.  The Appropriations Clause of the United States Constitution requires that funding for federal programs and agencies be appropriated by law: "No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law; and a regular Statement and Account of the Receipts and Expenditures of all public Money shall be published from time to time."  U.S. CONST. art. I, § 9, cl. 7.  "The Appropriations Clause's 'straightforward and explicit command' ensures Congress's *exclusive* power over the federal purse."  *Cmty. Fin. Servs. Ass'n of Am. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 637 (5th Cir. 2022)

18

(emphasis added) (citing *OPM v. Richmond*, 496 U.S. 414, 424 (1990)), *cert. granted*, 143 S. Ct. 978 (Feb. 27, 2023), & *argument heard*, No. 22-448 (October 3, 2023).  Thus, Congress may not delegate its Appropriations Clause authority and must use it "to maintain the boundaries between the branches."  *Id*.

The CFPB's Congressionally enacted funding scheme violates this constitutional requirement.  The CFPB does not rely on annual appropriations by Congress for funding.  12 U.S.C. § 5497(a).  Instead, the CFPB receives its annual funding from the Federal Reserve, *id.*, which itself is outside the appropriation process, *Cmty. Fin. Servs.*, 51 F.4th at 624.  Moreover, under this funding scheme, the CFPB determines its own annual budget, and the Federal Reserve must provide up to 12% of its total operating expenses to fund that budget.  12 U.S.C. § 5497(a)(2)(A)(iii).  There is no Congressional approval or oversight of these funds before they are spent.  *See id.* § 5497(c)(1).  Through this funding scheme, the CFPB—and not Congress—is unconstitutionally exercising the legislative power over appropriations.

Because its funding structure is unconstitutional, the CFPB's use of funds to bring this enforcement action, and the enforcement action itself, are also unconstitutional.  *See Cmty. Fin. Servs.*, 51 F.4th at 643 ("In other words, without its unconstitutional funding, the [CFPB] lacked any other means to promulgate the rule.  Plaintiffs were thus harmed by the [CFPB]'s improper use of unappropriated funds to engage in the rulemaking at issue.") (citation omitted).  For this reason, the Court should dismiss all of the CFPB's claims against Freedom.

## V.
### THE COURT SHOULD DISMISS THIS LAWSUIT

By this lawsuit, the CFPB seeks to improperly expand its enforcement authority over HMDA.  It has brought claims against Freedom that are not grounded in any requirement of law—at its essence, this lawsuit alleges Freedom is liable under HMDA and its implementing regulation, Regulation C, for inaccuracies in the data Freedom

reported to the CFPB.  But importantly, the CFPB cannot point to any requirement of law establishing what Freedom's obligations are with respect to the acceptable accuracy of its data because there are none.  Furthermore, one of the CFPB's claims seeks to enforce an unenforceable obey-the-law injunction, and one of its requests for relief seeks another unenforceable obey-the-law injunction from this Court.  Finally, the CFPB's funding mechanism is unconstitutional, and it therefore may not pursue this enforcement action against Freedom.

For all of these reasons, Freedom now asks this Court to grant this Motion, dismiss this lawsuit in its entirety, and grant to it all other relief to which it has shown itself justly entitled.

**REQUEST FOR HEARING**

Pursuant to Local Rule 7.1(b)(2), Freedom requests a hearing on this Motion. Freedom believes that a hearing will assist this Court in evaluating the merits of this Motion, including, but not limited to, the legal issues raised by the CFPB's novel claims to enforce an unarticulated HMDA accuracy standard as well as the constitutional issues raised here and in *Cmty. Fin. Services*.  Accordingly, Freedom respectfully requests that this Court schedule a one-hour hearing.

Dated: December 27, 2023            Respectfully submitted,

By: */s/ Herman J. Russomanno III*
Herman J. Russomanno III
Fla. Bar No. 21249
herman2@russomanno.com

RUSSOMANNO & BORRELLO, P.A.
*Local Counsel for Defendant*
*Freedom Mortgage Corporation*
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103

Mitchel H. Kider
Timothy P. Ofak
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036
Tel: (202) 628-2000
Fax: (202) 628-2011
kider@thewbkfirm.com
ofak@thewbkfirm.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 27, 2023, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served this day on any and all counsel of record or pro se parties in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<u>*/s/ Herman J. Russomanno III*</u>

Herman J. Russomanno III