**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

Case No. 9:23-cv-81373- MIDDLEBROOKS-MATTHEWMAN

CONSUMER FINANCIAL PROTECTION BUREAU
Plaintiff,

vs.

FREEDOM MORTGAGE CORPORATION,
Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………...…………ii

INTRODUCTION…………………………………………………………………...………………1

STANDARD OF REVIEW…………………………………………………………………………2

ARGUMENT………………….…………………..…………………………………………………3

    I.    The Bureau's Complaint is Well-Pleaded and Defendant Misstates HMDA's Requirements………………………………………………………………...3

    A.  HMDA Requires the Reporting of Accurate Data……………………………...3

    B.  The Bureau's Well-Pleaded Complaint Sufficiently Alleges that Defendant Reported Inaccurate HMDA Data……………………………………………...4

    C.  The Bureau's Well-Pleaded Complaint Sufficiently Alleges that Defendant's Errors Are Not Bona Fide and Therefore Violate HMDA……………………………...5

    II.    HMDA and Regulation C's Detailed Reporting Requirements Are Not Unconstitutionally Vague………………………………………………………7

    A.  HMDA and Regulation C Give Regulated Entities like Defendant Fair Notice that They Must Report Accurate Mortgage Data………………………………………8

    B.  HMDA and Regulation C's Clear Accuracy Requirements Do Not Invite Arbitrary Enforcement…………………………………………………………..................10

    III.    The Complaint Sufficiently Pleads a Violation of the 2019 Consent Order and Any Challenge to the Bureau's Demand for Relief is Premature………………………12

    A.  The Court Can Hold Defendant Liable for Violating the 2019 Consent Order…...13

    B.  Defendant's Attempt to Dismiss Injunctive Relief as a Remedy is Premature……16

    IV.    The Bureau's Statutory Funding Mechanism is Constitutional and Provides No Grounds for Dismissal…………………………………………………………....17

CONCLUSION………………………………………………………………………..20

TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 2

*Beckles v. United States*, 580 U.S. 256 (2017) ..................................................................... 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ..................................................... 2, 5

*Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) .................................................... 16

*Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39 (D.R.I. 2020)....16, 18

*Burns v. Town of Palm Beach*, 999 F.3d 1317 (11th Cir. 2021) ........................................... 8

*CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174 (2d Cir. 2023), *petition for cert.
   filed* (U.S. June 23, 2023) (No. 22-1233) ................................................................. 18, 19

*Cincinnati Soap Co. v. United States*, 301 U.S. 308 (1937) ................................................ 17

*Clary v. City of Cape Girardeau*, 165 F. Supp. 3d 808 (E.D. Mo. 2016) ........................... 11

*Coates v. Cincinnati*, 402 U.S. 611 (1971) .......................................................................... 10

*Community Financial Services Ass'n of America, Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022) .. 18

*Erickson v. Pardus*, 551 U.S. 89 (2007) ............................................................................... 3

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ..................................... 7, 8, 10

*FTC v. Nat'l Urological Grp., Inc.*, 786 Fed. App'x 947 (11th Cir. 2019) ......................... 14

*Heckler v. Chaney*, 470 U.S. 821 (1985) ....................................................................... 6, 8

*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................................................. 7

*League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023) ...... 7, 9

*Libertarian Party of Ohio v. Husted*, 751 F.3d 403 (6th Cir. 2014) .................................... 11

*McComb v. Jacksonville Paper Co.*, 336 U.S. 187 (1949) ............................................ 13, 14

*OPM v. Richmond*, 496 U.S. 414 (1990) ............................................................................. 17

*Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012) ..................................... 3

*Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc.*, 806 F. Supp. 2d 503, 507
   (D.P.R. 2011) ............................................................................................................... 16

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ................................................................... 13

*SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012) .............................................. 12, 13, 14, 15

SEC v. *Graham*, 823 F.3d 1357 (11th Cir. 2016) .......................................................... 15, 16

*SEC v. Keener*, 644 F. Supp. 3d 1290 (S.D. Fla. 2022) ...................................................... 14

ii

*SEC v. Smyth,* 420 F.3d 1225, 1233 (11th Cir. 2005) .................................................... 15

*SEC v. Solow*, 554 F. Supp. 2d 1356 (S.D. Fla. 2008), aff'd, 308 Fed. App'x 364 (11th Cir. 2009) ............................................................................................................................. 15

*SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) ....................................................................................................... 10

*United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348 (11th Cir. 2019) .............. 14

*United States v. Green*, 457 F. Supp. 3d at 1274 ................................................................. 2, 5

*Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) ........................................ 10

**Statutes**

12 U.S.C. § 2801(b) ................................................................................................................ 4

12 U.S.C. § 2803 ....................................................................................................... 3, 4, 8, 13

12 U.S.C. § 2804(b)(1) ............................................................................................................ 9

12 U.S.C. § 2804(d) ................................................................................................................ 9

12 U.S.C. § 5491(a) .............................................................................................................. 19

12 U.S.C. § 5497(a)(1) ........................................................................................... 18, 19, 20

12 U.S.C. § 5497(a)(2) .................................................................................................. 18, 20

12 U.S.C. § 5497(a)(2)(A) ..................................................................................................... 20

12 U.S.C. § 5497(a)(2)(B) ..................................................................................................... 20

12 U.S.C. § 5564(a) .............................................................................................................. 17

31 U.S.C. § 1349(a) .............................................................................................................. 20

31 U.S.C. § 1350 ................................................................................................................... 20

1 Stat. 232 ............................................................................................................................. 19

**Rules**

Fed. R. Civ. P. 54(c) ............................................................................................................. 17

Fed. R. Civ. P. 8(a)(2) ............................................................................................................ 2

**Regulations**

12 C.F.R. § 1003.4 ........................................................................................................... 3, 13

12 C.F.R. § 1003.5 .................................................................................................................. 3

12 C.F.R. § 1003.6 .................................................................................................................. 3

12 C.F.R. § 1003.5(a)(1)(i) ........................................................................... 4

12 C.F.R. § 1003.6(a) ................................................................................... 9

12 C.F.R. § 1003.6(b) ............................................................................... 5, 9

12 C.F.R. § 1003.6(b)(1) ............................................................................ 10

80 Fed. Reg. 66,128 ...................................................................................... 4

80 Fed. Reg. 66,255 .................................................................................. 4, 6

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 12 ..................................................................... 19

U.S. Const. art. I, § 9, cl. 7 ....................................................................... 17

**Other Authorities**

Congressional Budget Office, *The Accuracy of CBO's Budget Projections for Fiscal Year 2022* (Jan. 2023)……………………………………………………………………………..19

## INTRODUCTION

The Consumer Financial Protection Bureau (Bureau) brings this action to hold Defendant Freedom Mortgage Corporation (Defendant) accountable for reporting inaccurate mortgage lending data in violation of the Home Mortgage Disclosure Act (HMDA) and its implementing Regulation C. HMDA authorizes the Bureau to enforce compliance with the statute, and the Consumer Financial Protection Act of 2010 (CFPA) empowers the Bureau to enforce Federal consumer financial laws, including HMDA.

HMDA provides the public with an overview of the nation's mortgage market to assess whether financial institutions are serving the housing needs of their communities and to identify possible discriminatory lending patterns. HMDA does this by requiring lenders like Defendant to collect and report certain data regarding applications for, originations of, and purchases of home-purchase loans, home-improvement loans, and refinance loans. The law requires data to be collected and reported in identified categories, such as the amount of the covered loan and the action taken on the application, and covered institutions must certify to the accuracy and completeness of the reported data. In its Motion, Defendant concedes that it entered into the 2019 Consent Order resolving years of prior violations of HMDA and Regulation C and that it subsequently reported inaccurate 2020 data to the Bureau in February 2021. In spite of these admissions, Defendant nevertheless moves to dismiss the Bureau's Complaint. Defendant's specious arguments do not support dismissal.

First, Defendant argues that HMDA and Regulation C only require the reporting of data—whether accurate or not—when in reality the laws explicitly require accuracy. Defendant also ignores the plain language of HMDA and Regulation C to argue these laws are unconstitutionally vague as to what violates HMDA. But Regulation C clearly explains what

1

must be reported, and further explains that reporting inaccurate data violates HMDA unless the errors are "unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error." Defendant also seeks to escape liability for violating the 2019 Consent Order and to dismiss the Bureau's requested injunctive relief by arguing that injunctions requiring compliance with the law are insufficiently specific to be enforceable. But there is no confusion as to what HMDA and Regulation C require and the 2019 Consent Order mandates—the reporting of accurate mortgage lending data. Defendant's constitutional challenge to the Bureau's funding structure is similarly meritless and should be disregarded.

Defendant's Motion is devoid of compelling legal authority, and its arguments fail to withstand any degree of scrutiny let alone provide a basis for dismissal. The Bureau's Complaint sufficiently alleges facts to support its claims under HMDA, Regulation C, and the CFPA. The Motion should be denied in full.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure require that the Bureau provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Defendant's Motion must be denied if the Bureau has "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see also United States v. Green*, 457 F. Supp. 3d 1262, 1273–75 (S.D. Fla. 2020) (*citing Twombly*, 550 U.S. at 556). The Complaint is sufficient if it "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v.*

*Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks omitted). As a general rule, on a motion to dismiss, the complaint's well-pleaded factual allegations are accepted as true, and construed in the light most favorable to the plaintiff. *See, e.g., Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

## ARGUMENT

### I.   The Bureau's Complaint is Well-Pleaded and Defendant Misstates HMDA's Requirements

Defendant attempts to dismiss the Bureau's Complaint by ignoring what HMDA and Regulation C plainly require. Without support, Defendant asserts that HMDA and Regulation C permit covered lenders to report inaccurate data. Defendant also ignores the plain text of the law to argue that neither HMDA nor Regulation C state what violates HMDA. But HMDA and Regulation C are clear that they require institutions like Defendant to collect, record, and report accurate home mortgage data to the Bureau, and that reporting entities violate HMDA by reporting inaccurate data unless the errors were unintentional and made despite procedures in place to avoid such errors. 12 U.S.C. § 2803, 12 C.F.R. § § 1003.1, 12 C.F.R. § 1003.4, 12 C.F.R. § 1003.5, 12 C.F.R. § 1003.6.

The Complaint pleads sufficient facts in support of each claim for relief. It alleges in detail that Defendant violated the law by reporting extensive inaccurate data and that Defendant had deficient procedures in place to avoid reporting inaccurate data. Defendant's arguments, which rely on misstating HMDA and Regulation C, must therefore be rejected.

### A.   HMDA Requires the Reporting of Accurate Data.

Defendant ignores a plain reading of HMDA and Regulation C to argue that the law does not "require[] the reporting of perfectly accurate data." Motion at 6; *see also id.* at 8, 11. But the purpose of HMDA, as well as the text of the law, demonstrate that is not the case.

3

The purpose of HMDA is to provide the public and elected officials with "sufficient information to enable them to determine whether [covered institutions] are filling their obligations to serve the housing needs of the communities and neighborhoods in which they are located" and "assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes." 12 U.S.C. § 2801(b); 12 C.F.R. § 1003(1)(b). "Because HMDA data serve these important purposes, accurate data is essential." Consumer Financial Protection Bureau, 80 Fed. Reg. 66,128, 66,255 (October 28, 2015) (to be codified at 12 CFR pt. 1003). Consequently, entities like Defendant are required to collect, record, and report home mortgage data to the Bureau in thirty-eight enumerated categories. 12 U.S.C. § 2803; 12 C.F.R. § 1003.4 (listing categories); 12 C.F.R. § 1003.5; *see also* Complaint at ¶19 (identifying errors in reporting categories such as loans that are 'approved but not accepted' and lender credits). When submitting the required data, Defendant and other regulated entities "shall certify to the accuracy and completeness of the data submitted." 12 C.F.R. § 1003.5(a)(1)(i). Were accuracy not required by HMDA, such certification would be meaningless and the purpose of HMDA would be undermined by data that is inherently unreliable.

**B.    The Bureau's Well-Pleaded Complaint Sufficiently Alleges that Defendant Reported Inaccurate HMDA Data.**

The Bureau's Complaint alleges in detail the extent to which Defendant reported inaccurate HMDA data. "[Defendant's] February 26, 2021 submission of its HMDA data to the Bureau was filled with errors" covering over 174,000 data entries and almost twenty percent of loans. Complaint at ¶¶4, 21. Indeed, the Complaint identifies several particular errors, including "improper classification of certain loan applications as 'approved but not accepted' that were actually withdrawn," "errors in entering data related to subordinate lien loans and purchased loans," loans that should not have been reported, "inaccurate purchaser type for tens of thousands

of loans," "inaccurate calculations of rate spread," and "inaccurate data reported for lender credits." *Id.* at ¶19. The Complaint thus alleges more than "enough fact to raise a reasonable expectation that discovery will reveal evidence" that Defendant reported inaccurate HMDA data. *See Twombly*, 550 U.S. at 556; *see also United States v. Green*, 457 F. Supp. 3d at 1274-75. What's more, Defendant admits in its Motion to "inaccuracies in its originally submitted data" on February 26, 2021. Motion at 4. That admission alone should defeat the Motion.

      **C.**    **The Bureau's Well-Pleaded Complaint Sufficiently Alleges that Defendant's Errors Are Not Bona Fide and Therefore Violate HMDA.**

Defendant further ignores the text of HMDA, Regulation C, and the Complaint to argue that neither the law nor the Complaint spell out what rate of error violates HMDA or why Defendant's inaccurate submissions violated the law. *See* Motion at 2, 4, 7, 8, 10, 11. Defendant suggests that HMDA either tolerates some errors or the law is impermissibly ambiguous as to what is an acceptable error rate. *See Id.* at 2, 7, 8. Defendant is incorrect.

Regulation C expressly permits only "Bona fide errors," that is, "[a]n error in compiling or recording data for a covered loan or application" that "was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error." 12 C.F.R. § 1003.6(b). Thus, there is no ambiguity as to how many errors violate HMDA. Every error is a violation of HMDA and Regulation C unless (1) the error was unintentional and (2) the entity committing the error maintained procedures reasonably adapted to avoid such an error. *Id.* The Bureau's Complaint comports with this standard by specifically pleading that Defendant's errors were not bona fide because the company "did not maintain a compliance management system with procedures reasonably adapted to avoid HMDA errors." Complaint at ¶¶22-28. The Complaint explains in detail how Defendant's own internal audit team identified serious and extensive deficiencies in the company's compliance management system. *Id.* Both the law and

5

the Complaint are clear regarding what violates HMDA and why Defendant's errors were unlawful.

Nevertheless, Defendant attempts to confuse the issue by arguing that it is unclear what conduct violates HMDA because, in 2015, the Bureau did not amend the bona fide error provision to impose "global thresholds for the number or percentage of errors in a financial institution's data submission that would trigger compliance or enforcement action." *See* Motion at 3, 5, 8, 9; *and see* 80 Fed. Reg. 66,255. The Bureau's decision to leave HMDA's bona fide error standard unchanged demonstrates only that the Bureau preserved discretion to analyze why errors occurred and how pervasive the errors were when deciding whether "to pursue an enforcement action or other solution for *noncompliance with HMDA or Regulation C*." 80 Fed. Reg. 66,255 (cited in Motion at 3) (emphasis added); *see also Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (the Supreme Court "has recognized on several occasions over many years that an agency's decision not to prosecute or enforce…is a decision generally committed to an agency's absolute discretion."). Determining whether to pursue an action for violating HMDA and Regulation C is entirely different from determining whether violations occurred. Defendant's efforts to conflate these issues must fail.

Defendant also cites to the Bureau's 2013 Examination Procedures: HMDA Resubmission Guidelines, which describe transaction testing that Bureau examination teams conduct to validate the accuracy of reported HMDA data and which describe when institutions should be required to resubmit data.[1] Defendant argues that the existence of such guidelines is

---

[1] The Examination Procedures cited in Defendant's motion were superseded in 2018. *See* FFIEC (Federal Financial Institutions Examinations Council) HMDA Examiner Transaction Testing Guidelines (2018), https://files.consumerfinance.gov/f/documents/201708_cfpb_ffiec-hmda-examiner-transaction-testing-guidelines.pdf. Among other changes, the resubmission threshold is

evidence that the Bureau has established an acceptable HMDA error rate. *See* Motion at 8. But the fact that the Bureau may require the resubmission of corrected data does not change the fact that inaccurate data violates HMDA. The Court must reject Defendant's misplaced argument.

## II. HMDA and Regulation C's Detailed Reporting Requirements Are Not Unconstitutionally Vague

In a further effort to escape the consequences of its failure to comply with HMDA's reporting requirements, Defendant contends that, to the extent the Court (correctly) concludes that HMDA and Regulation C require covered institutions to compile and report accurate data, this requirement is impermissibly vague. *See* Motion at 9-14. In so doing, Defendant confuses the question of what compliance entails with whether noncompliance will trigger enforcement.

The void for vagueness doctrine touches on "two connected but discrete due process concerns." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A law may be impermissibly vague "[f]irst, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," and "[s]econd, if it authorizes or even encourages arbitrary and discriminatory enforcement." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 946 (11th Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Although Defendant attempts to fit its constitutional objections to HMDA and Regulation C into each vagueness bucket, its supporting arguments rely on a misunderstanding of both the governing case law and the comprehensive regulatory scheme designed to ensure accurate reporting in the mortgage market. Consistent with the Eleventh Circuit's admonition that "[c]ourts should not lightly declare laws to be void for vagueness," *League of Women Voters*, 66 F.4th at 946, the Court should reject Defendant's vagueness arguments.

---

now triggered based on the number of errors within each data field instead of the number of loans with errors.

### A.   HMDA and Regulation C Give Regulated Entities like Defendant Fair Notice that They Must Report Accurate Mortgage Data.

Defendant first asserts that HMDA and Regulation C are impermissibly vague because they "are each silent as to what level of accuracy, if any, is required by HMDA reporters like" Defendant. Motion at 10. But as explained above, HMDA and Regulation C require reporters to submit accurate data, and *any* error violates the law unless it is unintentional and occurred despite procedures reasonably adapted to avoid that type of error. *See supra* at I. In complaining that the required "level of accuracy" is unclear, Defendant confuses the relevant standards for *conduct*—i.e., the requirement to submit accurate data—with the standard for *how much misconduct*—i.e., the nature of errors in a given submission—might trigger an enforcement action. The former standard is set out in precise detail in the relevant statutes and regulations, while the latter is not relevant to constitutional vagueness and is, at any rate, "a decision generally committed to an agency's absolute discretion." *See Heckler*, 470 U.S. at 831. Defendant's first vagueness argument therefore fails.

To prevail on this argument, Defendant must establish that HMDA and Regulation C do not allow "regulated parties [to] know what is required of them so they may act accordingly." *Fox Television*, 567 U.S. at 254. Because they come with only civil penalties, HMDA and Regulation C are "unconstitutionally vague only if [they are] so indefinite as really to be no rule or standard at all." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021) (internal citations and quotation marks omitted).

HMDA and Regulation C easily pass that test: as established above, each requires covered institutions like Defendant to collect, record, and report accurate home mortgage data in enumerated and specified categories to the Bureau. *See supra* at I.A.; *see also* 12 U.S.C. § 2803 *and* 12 C.F.R. §§ 1003.4, 1003.5. Regulation C makes clear that reporting inaccurate data

violates HMDA, unless the inaccurate reporting qualifies as a bona fide error. *See supra* at I.C.; *see also* 12 C.F.R. § 1003.6(b).[2] HMDA also authorizes the Bureau (and other agencies) to bring enforcement actions to enforce compliance with HMDA and Regulation C's requirements. 12 U.S.C. § 2804(b)(1), (d); 12 C.F.R. § 1003.6(a).

Ignoring HMDA's clear requirements, Defendant again argues that "perfect data accuracy" is not required by HMDA or Regulation C and that the Bureau must therefore be trying to hold Defendant to some other, impermissibly undefined accuracy benchmark. *See* Motion at 11. But, as discussed above, this assertion is premised on wholly misreading the Bureau's 2015 rulemaking comments as well as the superseded resubmission guidelines. First, the Bureau's decision not to modify the bona fide error rule and to instead preserve traditional discretion over how or when to enforce a clear legal standard does not suggest that HMDA and Regulation C in fact condone any level of inaccurate data reporting. *See supra* at I.C. Nor is it constitutionally relevant that the Bureau found it neither necessary nor appropriate to preannounce inflexible enforcement priorities in a legislative rule. Further, establishing resubmission guidelines to obtain accurate data also does not imply that inaccurate data submissions are compliant with HMDA and Regulation C. *See supra* at I.C.

With that proper understanding of HMDA and Regulation C's requirements in mind, Defendant's efforts to analogize these regulations to the legal standard the Supreme Court found

---

[2] Defendant tries to analogize HMDA and Regulation C to the election law at issue in *League of Women Voters*, *see* Motion 12, but the challenged law in that case is entirely inapposite to HMDA or Regulation C. There, the Eleventh Circuit determined that an election law prohibiting "engaging in any activity with the . . . effect of influencing a voter" is impermissibly vague because "an individual seeking to comply with the law" cannot "anticipate whether his or her actions will have the subjective effect of influencing a voter." *See League of Women Voters*, 66 F.4th at 947. No element of HMDA or Regulation C similarly turns on the unpredictable subjective effect of the prohibited conduct.

impermissibly vague in *FCC v. Fox Television* fall flat. There, the FCC had found that broadcasters had violated a prohibition on broadcast indecency by airing "fleeting expletives" in two cases and "momentary nudity" in another. 567 U.S. at 247–49, 258. But at the time of the relevant broadcasts, FCC guidance stated that where offensive material was "passing or fleeting," that would weigh against a finding of indecency. *Id.* at 247. The Supreme Court held that the FCC's standards were unconstitutionally vague as applied in those cases because the policies in place at the time of the conduct "gave no notice" that "a fleeting expletive or a brief shot of nudity" violated the law as interpreted by the FCC. *Id.* at 254. There is no similar notice concern here. HMDA and Regulation C make crystal clear there is no safe harbor and reporting inaccurate data violates HMDA (unless the error was unintentional and occurred despite the maintenance of procedures reasonably adapted to avoid such an error, 12 C.F.R. § 1003.6(b)(1).

**B.    HMDA and Regulation C's Clear Accuracy Requirements Do Not Invite Arbitrary Enforcement.**

Defendant next contends that, because the Bureau has not preannounced enforcement priorities based on certain error percentages, HMDA and Regulation C "necessarily result in arbitrary enforcement." Motion at 13-14. But "an unconstitutionally vague law invites arbitrary enforcement" only if its substantive requirements "leave[] judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327 (11th Cir. 2022) (quoting *Beckles v. United States*, 580 U.S. 256, 266 (2017)). Courts have thus found statutes and regulations vague where, for example, they require subjective judgments about whether certain conduct is "annoying," *Coates v. Cincinnati*, 402 U.S. 611, 615–616 (1971), or "unnecessarily harassing," *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1321 (11th Cir. 2017). HMDA and Regulation C do not require any such subjective judgment; whether

data is accurate is an objective question that this Court can easily answer, and which Defendant did answer in admitting to reporting inaccurate data. *See* Motion at 4.

HMDA and Regulation C are thus far more analogous to speed limits than they are to any statute struck down on vagueness grounds. Drivers that go just a few miles per hour over the limit will not likely garner the attention of law enforcement officials, but there is no question that they are still violating the law. There is no constitutional vagueness problem with traffic authorities' choice to enforce the speed limit—whether they go after those speeding by one or twenty miles per hour, and whether they announce any enforcement threshold in advance.[3] *See Clary v. City of Cape Girardeau*, 165 F. Supp. 3d 808, 818–19 (E.D. Mo. 2016) (analogizing to speed limits in refusing to find vague a regulation that may not be perfectly enforced).

Defendant nevertheless complains that the Bureau has improperly "reserved to itself the utmost flexibility" in how to enforce HMDA and Regulation C's accuracy requirement, leaving the door open for arbitrary enforcement. *See* Motion at 13. But federal agencies will rarely have sufficient resources to bring enforcement actions to address every violation of law that occurs, and they have discretion to choose how to allocate their limited enforcement resources. As such, agencies must exercise prosecutorial discretion with their limited resources – and doing so does not create a constitutional vagueness problem.

At most, Defendant may claim to be "surpris[ed]" that HMDA and Regulation C's accuracy provisions "would be enforced against [it]." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 424 (6th Cir. 2014). But so long as the law makes the "forbidden conduct . . . clear"—

---

[3] Of course, the enforcement of clear legal prohibitions can raise other constitutional problems, such as if they are discriminatorily applied in violation of the Equal Protection Clause. But Defendant does not (and could not credibly) claim any such problem here, and those concerns are not relevant to the vagueness analysis.

as HMDA and Regulation C do—such surprise does "not establish the basis for a due process vagueness claim." *Id.*. And besides, as alleged in the Complaint and accepted as true here, any surprise would be unwarranted: in 2019, Defendant consented to entry of the 2019 Consent Order to resolve the Bureau's public enforcement action for Defendant violating HMDA and Regulation C. Among other things, that order required compliance with the provisions of HMDA and Regulation C, which mandate accurately collecting, recording, and reporting HMDA data. *See* Complaint at ¶¶17, 39-40. The Court should reject Defendant's constitutional argument.

**III.    The Complaint Sufficiently Pleads a Violation of the 2019 Consent Order and Any Challenge to the Bureau's Demand for Relief is Premature.**

Defendant wrongly argues that any injunction ordering compliance with the prescriptive requirements of a specific law or regulation is unenforceable. *See* Motion at 14-18. Based on this purported principle, Defendant asserts it cannot be held liable for violating the 2019 Consent Order and the Court cannot order compliance with HMDA or Regulation C going forward. *Id.* Again, Defendant's arguments do not match any reasonable reading of the law. Injunctions ordering parties to comply with the law are not *per se* unenforceable. Instead, injunctions must provide specific notice to an enjoined party of what conduct is prohibited. *SEC v. Goble*, 682 F.3d 934, 951 (11th Cir. 2012). Here, what is required by HMDA and Regulation C is straightforward—submitting accurate mortgage lending data in categories detailed in the statute and regulations. *See supra* at I.A. The statutory and regulatory language spell out in clear detail precisely what categories of data are required. *See id.* As such, the 2019 Consent Order provided sufficient clarity and notice to Defendant of what was required; the same applies to a prospective Court-ordered injunction to comply with HMDA and Regulation C going forward. Moreover, it is premature at the pleading stage to dismiss any requested relief before the Court has heard evidence to determine what, if any, relief is appropriate.

**A.      The Court Can Hold Defendant Liable for Violating the 2019 Consent Order.**

The Supreme Court and the Eleventh Circuit have recognized that an injunction ordering a party to comply with a specific statute is enforceable when the enjoined activity is clear. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191-95 (1949); *Goble*, 682 F.3d at 950-951. As courts have recognized in the context of Federal Rule of Civil Procedure 65, this principle is intended "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). As detailed in the Complaint, Defendant negotiated and voluntarily entered into the 2019 Consent Order, which enjoined it from violating those specific provisions of HMDA and Regulation C that require submitting accurate data and those that detail the categories of data to be submitted, such as the amount of the covered loan and the action taken by the financial institution. *See* Complaint at ¶¶17, 39; *see also* 12 U.S.C. § 2803; 12 C.F.R. § 1003.4. There can be no reasonable concern that Defendant does not know HMDA requires covered entities to report accurate data or does not know what data it has to report to the Bureau. Defendant's knowledge is shown by its submission of data in the required categories in February 2021 and its later submission of what it has asserted and attested to be accurate data in September 2021. *See* Complaint at ¶¶18-21; *see also* Motion at 4.

In its Motion, Defendant cites repeatedly to *SEC v. Goble*, but that decision from the Eleventh Circuit does not stand for the proposition that injunctions ordering compliance with the law are unenforceable. To the contrary, the court in *Goble* held that "an injunction that orders a defendant to comply with a statute may be appropriate," citing the Supreme Court's decision in *McComb* as an example. *Goble*, 682 F.3d at 950-951 (citing *McComb*, 336 U.S. at 191-95). In *McComb*, the Supreme Court upheld an order enjoining an employer from violating the

13

minimum wage, overtime, and recordkeeping provisions of the Fair Labor Standards Act in an enforcement action brought by the U.S. Department of Labor. *McComb*, 336 U.S. at 191-95. The injunction in *McComb* was permissible because—as with the Bureau's 2019 Consent Order— "the terms of the statute were specific, and the defendant clearly knew what conduct the injunction addressed." *Goble*, 682 F.3d at 951; *see also FTC v. Nat'l Urological Grp., Inc.*, 786 Fed. App'x 947, 957 (11th Cir. 2019) ("aside from concerns about clarity, there is nothing inherently wrong with an injunction that instructs a party to comply with a specific law"). The Supreme Court in *McComb* further noted that injunctions mandating general compliance with the law "are often necessary to prevent further violations where a proclivity for unlawful conduct has been shown." *McComb*, 336 U.S. at 192. So even if the Eleventh Circuit found the injunctive language at issue in *Goble* to be lacking, that decision, along with *McComb*, explain the circumstances under which an injunction ordering statutory compliance is appropriate. Those circumstances are present here as alleged in the Complaint—HMDA and Regulation C specify in detail what data must be compiled and reported accurately by lenders like Defendant.

The Eleventh Circuit also approved of an injunction akin to the 2019 Consent Order in *United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1361-62 (11th Cir. 2019). There, the court upheld injunctive provisions ordering defendants to comply with certain employment tax provisions "where the statutory terms are specific and the defendant clearly knows what conduct is prohibited or required." *Id.* at 1361-62 (citing *Goble*, 682 F.3d at 950); *see also SEC v. Keener*, 644 F. Supp. 3d 1290, 1302 (S.D. Fla. 2022) ("in some instances, injunctions enjoining specific violations of the Exchange Act are permissible, so long as they 'clearly and specifically describe permissible and impermissible conduct.'" (citing *Goble*, 682 F.3d at 952)).

Conversely, the other decisions cited by Defendant in its Motion are readily distinguishable from the 2019 Consent Order and the facts as alleged in the Complaint. In *SEC v. Smyth*, the Eleventh Circuit was concerned with an injunction issued against an individual defendant that could reach "any violation of the securities laws and regulations [the defendant] may commit," such that enforcing the injunction through contempt proceedings could run afoul of the individual's right to a jury trial and personal jurisdiction principles. *SEC v. Smyth,* 420 F.3d 1225, 1233 n.14 (11th Cir. 2005). Moreover, as this Court has noted, the discussion in *Smyth* regarding the enforceability of injunctions ordering statutory compliance is dicta and is not the law of the Eleventh Circuit. *See SEC v. Solow*, 554 F. Supp. 2d 1356, 1361 (S.D. Fla. 2008), aff'd, 308 Fed. App'x 364 (11th Cir. 2009) (entering injunction against violations of several statutes enforced by the SEC). Here, the 2019 Consent Order does not address a broad scope of potential violations but is limited only to the submission of inaccurate mortgage lending data. *See* Complaint at ¶17. In addition, the Bureau is not seeking to enforce the 2019 Consent Order through contempt proceedings and is bringing the action in the district where Defendant is headquartered. *See* Complaint at ¶8. So *Smyth* does not control here and the decision does not bear "striking similarities," as Defendant purports, to the 2019 Consent Order. *See* Motion at 15.[4]

The 2019 Consent Order fits squarely within Eleventh Circuit and Supreme Court precedent. It enjoins Defendant from violating prescriptive requirements of HMDA and Regulation C, which lay out with specificity what data must be submitted to the Bureau and that such data must be accurate. Moreover, these laws do not cover a wide variety of practices but

---

[4] Defendant also cites to *SEC v. Graham*, but there the Eleventh Circuit decided it was premature to rule on the validity of any injunction at the summary judgment stage where the district court had not yet issued an injunction or decided on the merits of the case. *Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016). This is not analogous to the 2019 Consent Order, which has already been entered on the administrative docket.

instead govern only the submission of mortgage lending data by covered entities. There can also be no dispute that Defendant knows what conduct is prohibited. Accordingly, the Court must deny Defendant's attempt to dismiss the cause of action for violating the 2019 Consent Order.

**B.      Defendant's Attempt to Dismiss Injunctive Relief as a Remedy is Premature.**

Defendant moves to dismiss the Bureau's current request for injunctive relief on the same grounds that an injunction requiring HMDA compliance prospectively is unenforceable. For the reasons discussed above, this argument must fail because the requirements of HMDA and Regulation C are clear. *See supra* at IV.B. But the Court need not reach this issue because, as the Eleventh Circuit has long recognized, it is premature to foreclose any remedies on a motion to dismiss. SEC v. *Graham*, 823 F.3d 1357 (11th Cir. 2016) at 1362 n.2. In *SEC v. Graham*, one of the cases cited repeatedly by Defendant, the court reversed the lower court dismissal of a request for injunctive relief since "it is premature to review the precise nature of the injunction because…the SEC could seek injunctive relief that would be specific and narrow enough that the parties would be afforded sufficient warning to conform their conduct." *Id.* That is because the demand for relief required under Rule 8(a)(3) "is not itself a part of the plaintiff's claim." *Rivera-Almodóvar v. Instituto Socioeconómico Comunitario, Inc.*, 806 F. Supp. 2d 503, 507 (D.P.R. 2011); *see also Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) (the demand for a judgment "is not itself a part of the plaintiff's claim"); *and Bureau of Consumer Fin. Prot. v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 59 (D.R.I. 2020) ("a motion to dismiss is not a proper vehicle for addressing a prayer for relief, which is not part of the cause of action.").[5] The Court will decide the appropriate relief based on the record following discovery, not from the face of

---

[5] Notably, none of the cases cited by Defendant disturb this well-established principle by dismissing a request for relief at the initial pleading stage.

the Bureau's Complaint. *See* Fed. R. Civ. P. 54(c) ("every . . . final judgment shall grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings").

Defendant can certainly argue at the appropriate time that the Bureau is not entitled to certain requested relief. But its effort to dismiss relief which the Bureau is authorized to seek under the CFPA, 12 U.S.C. § 5564(a), is premature at this stage and should fail.[6]

## IV.    The Bureau's Statutory Funding Mechanism is Constitutional and Provides No Grounds for Dismissal.

As its last argument, Defendant contends that the Bureau "cannot maintain this enforcement action against" Defendant because its "funding structure is unconstitutional." Motion at 18. The Court should reject this meritless argument.

The statutory mechanism Congress crafted to fund the Bureau comports with the Appropriations Clause, which provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. As the Supreme Court has long emphasized, the "command of the Appropriations Clause" is "straightforward and explicit": "'It means simply that no money can be paid out of the Treasury unless it has been appropriated by an Act of Congress.'" *OPM v. Richmond*, 496 U.S. 414, 424 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)). "[I]n other words, the payment of money from the Treasury must be authorized by a statute." *Id.*

---

[6] Defendant makes only a passing reference to the Bureau's third count, which asserts a claim under 12 U.S.C. § 5536(a)(1)(A). *See* Motion at 6, n.3. The Court should reject Defendant's attempt to dismiss Count III because the Bureau has adequately plead a violation of HMDA and Regulation C. *See supra* at I.

The Bureau's funding is so authorized. The CFPA authorizes the Bureau Director to request a transfer "from the combined earnings of the Federal Reserve System" of an "amount," up to an inflation-adjusted cap, that the Director "determine[s] . . . to be reasonably necessary to carry out the authorities of the Bureau." 12 U.S.C. § 5497(a)(1), (2). As the Second Circuit has concluded, "[b]ecause the CFPB's funding structure was authorized by Congress and bound by specific statutory provisions, . . . [it] does not offend the Appropriations Clause." *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 181 (2d Cir. 2023), *petition for cert. filed* (U.S. June 23, 2023) (No. 22-1233).

Defendant's arguments to the contrary rest entirely on the Fifth Circuit's outlier decision in *Community Financial Services Ass'n of America, Ltd. v. CFPB*, 51 F.4th 616 (5th Cir. 2022), which the Supreme Court is reviewing this Term, *see* No. 22-448 (oral argument held Oct. 3, 2023).[7] But *every* other court to consider the question, save the Fifth Circuit, has held that Congress didn't violate the Appropriations Clause when it passed a statute authorizing the Bureau to spend money from a specified source for specified purposes.[8] And that's for good

---

[7] If the Court wishes to avoid deciding this constitutional argument before the Supreme Court issues its opinion in *CFSA*, it could defer resolution of that issue while proceeding to decide the other claims raised in Defendant's motion to dismiss. *See* Fed. R. Civ. P. 12(a)(4)(A), (i) (making clear that court may postpone disposition of issues raised in Rule 12 motion). That is the approach the court overseeing another Bureau enforcement action recently took. *See CFPB v. Fifth Third Bank, N.A.*, No. 1:21-CV-262, 2023 WL 7325956, at *1 (S.D. Ohio Sept. 26, 2023).

[8] *See L. Offs. of Crystal Moroney*, 2023 WL 2604254, at *4–6; *PHH Corp. v. CFPB*, 881 F.3d 75, 95–96 (D.C. Cir. 2018) (en banc), *abrogated in part on other grounds by Seila L. LLC v. CFPB*, 140 S. Ct. 2183 (2020); *CFPB v. CashCall, Inc.*, No. 15-cv-7522-JFW, 2023 WL 2009938, at *3 (C.D. Cal. Feb. 10, 2023); *CFPB v. TransUnion*, No. 1:22-cv-1880, 2022 WL 17082529, at *5 (N.D. Ill. Nov. 18, 2022); *CFPB v. Ctr. for Excellence in Higher Educ.*, No. 2:19-cv-00877, 2022 WL 4182301, at *6 (D. Utah Sept. 13, 2022); *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-02817, 2020 WL 7043847, at *7–9 (D. Md. Nov. 30, 2020); *CFPB v. Navient Corp.*, No. 3:17-cv-101, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. Think Fin. LLC*, No. 17-cv-127, 2018 WL 3707911, at *1–2 (D. Mont. Aug. 3, 2018); *CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *21 (S.D.N.Y. Dec. 2, 2016); *CFPB v. D & D Mktg., Inc.*,

reason. As the Second Circuit recognized, *CFSA*'s reasoning and conclusion "find no support" "in Supreme Court precedent," "in the Constitution's text," or "in the history of the Appropriations Clause." *Law Offices of Crystal Moroney*, 63 F.4th at 182–83. Unsurprisingly, then, Defendant's specific arguments based on *CFSA* are all easily rebutted.

    *First*, while Defendant complains that the Bureau "does not rely on annual appropriations by Congress for funding," Motion at 19, the Appropriations Clause does not require annual appropriations. *Cf.* U.S. CONST. art. I, § 8, cl. 12. Indeed, since the Founding Era, Congress has chosen to fund important agencies and programs through sources other than annual spending bills. *See, e.g.*, Postal Service Act, 1 Stat. 232, 233–34 (1792) (funding the Post Office through postage rates). Today, less than half the federal budget is set annually. *See* Congressional Budget Office, *The Accuracy of CBO's Budget Projections for Fiscal Year 2022* at 3 (Jan. 2023), https://www.cbo.gov/system/files/2023-01/58603-Accuracy.pdf.[9]

    *Second*, Defendant notes that the Bureau receives its funding from the Federal Reserve, "which itself is outside the appropriation process." Motion at 19. But Congress set up the Bureau as a component of the Federal Reserve System, 12 U.S.C. § 5491(a), so it makes sense that the Bureau draws funding from the earnings of that system, *id.* § 5497(a)(1). And while the Federal Reserve Board is responsible for transferring the funds to the Bureau, that role is purely ministerial and in no way insulates the Bureau from congressional control.

    *Third*, Defendant claims that the Bureau is "unconstitutionally exercising the legislative power" by "determin[ing] its own annual budget." Motion at 19. Defendant here ignores the specific budgeting instructions Congress set out in the statute appropriating funds to the Bureau.

---

No. 2:15-cv-9692-PSG, 2016 WL 8849698, at *5 (C.D. Cal. Nov. 17, 2016); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014).

[9] *Available at* https://www.cbo.gov/system/files/2023-01/58603-Accuracy.pdf

19

It provides that the Bureau can draw up to $597.6 million—12 percent of the Federal Reserve's 2009 operating expenses—and then adjusts that amount annually based on a specialized measure of inflation. 12 U.S.C. § 5497(a)(2)(A), (B). The only discretion afforded to the Bureau is to draw *less than* the amount Congress made available, based on the Bureau Director's determination of the amount "reasonably necessary to carry out" its statutory authorities. *Id.* § 5497(a)(1). That limited discretion fits comfortably in a long line of "permissive" appropriations that granted the Executive "unfettered discretion" in whether and how to spend money. *Clinton v. City of New York*, 524 U.S. 417, 466 (1998) (Scalia, J., concurring in part and dissenting in part; *see also id.* at 446 (majority opinion).

Finally, even if the Court somehow found a constitutional problem with the Bureau's statutory funding mechanism, such a problem would not, as Defendant suggests, *see* Motion at 19, entitle it to dismissal of the Bureau's claims. No court has ever addressed the proper remedy for the type of Appropriations Clause violation alleged here—for the simple reason that, until the Fifth Circuit's decision in *CFSA*, no court had ever held that a duly enacted law authorizing the Executive Branch to spend money violated the Clause. But, in the most closely analogous circumstances available—where the Executive Branch spent money without authorization by a duly enacted law—the remedy has never been to unwind the government actions taken. *See* 31 U.S.C. §§ 1349(a), 1350. So, if the Bureau's funding were found unconstitutional, the appropriate remedy would be, at most, to preclude the Bureau from moving forward unless and until it obtained constitutionally appropriated funds—not to dismiss the Bureau's claims.

## CONCLUSION

For the reasons stated, there is no basis to dismiss the Bureau's Complaint. Defendant's Motion to Dismiss should be denied in full.

Dated: January 19, 2024                                    Respectfully submitted,


                                                          */s/* Emily Holness

                                                          Emily Holness
                                                Special Florida Bar ID A5503128
                                                    New York Bar No. 4947941


                                                          Hallie Ryan
                                                Special Florida Bar ID A5503127
                                                    Virginia Bar No. 85927


                                                          Joseph Lake
                                                Special Florida Bar ID A5503154
                                                  California Bar No. 246679


                                                        Stephanie Garlock
                                                Special Florida Bar ID A5503162
                                                      DC Bar No. 1779629


                                                    *Enforcement Attorneys*
                                            Consumer Financial Protection Bureau
                                                    1700 G Street, NW
                                                  Washington, DC 20552


                                            Email: emily.holness@cfpb.gov
                                              Email: hallie.ryan@cfpb.gov
                                              Email: joseph.lake@cfpb.gov
                                            Email: stephanie.garlock@cfpb.gov


                                                    *Attorneys for Plaintiff*