UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 23-81373-CV-MIDDLEBROOKS

CONSUMER FINANCIAL PROTECTION
BUREAU,

      Plaintiff,

v.

FREEDOM MORTGAGE CORPORATION,

      Defendant.
_____/

## ORDER DENYING MOTION TO DISMISS

THIS CAUSE comes before the Court upon Defendant Freedom Mortgage Corporation's Motion to Dismiss, filed December 27, 2024. (DE 17). Plaintiff responded on January 22, 2024, and the Defendant replied on January 29, 2024. (DE 31; DE 32). For the following reasons, I am going to deny the Motion.

**I.    PROCEDURAL AND FACTUAL BACKGROUND**

Because this cause comes before the Court on a Motion to Dismiss, I accept all facts in the Plaintiff's well-pleaded complaint as true and construe them in the light most favorable to the Plaintiff. *See Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1262 (11th Cir. 2004). Further, this Court favors the Plaintiff with all reasonable inferences from the allegations in the Complaint. *See Stephens v. Dep't of Health & Human Servs.*, 901 F.2d 1571, 1573 (11th Cir. 1990).

Plaintiff, the Consumer Financial Protection Bureau ("Bureau") initiated this suit against Defendant Freedom Mortgage Corporation ("Freedom") on October 10, 2023. (DE 1). Freedom is one of the nation's largest privately owned for-profit mortgage lenders. As such, it must comply with the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. § 2804(b)(1)(B), (d), and its

implementing regulation, 12 C.F.R. § 1003 ("Regulation C"). Congress enacted the HMDA in 1975 to promote transparency from institutional lenders in the home mortgage market and intended it to be a tool to correct discriminatory lending and harmful patterns of disinvestment in certain communities. *See History of HMDA*, Home Mortgage Disclosure Act FFIEC (last visited April 29, 2024), https://www.ffiec.gov/hmda/default.htm. Accordingly, the HMDA requires institutional lenders to collect and report certain data regarding applications for, originations of, and purchases of home-purchase loans, home improvement loans, and refinance loans ("Covered Loans").

In 2019, the Bureau found that Freedom had violated the HMDA by intentionally misreporting data regarding borrower race, ethnicity, and sex between the years 2014 and 2017. The Parties resolved the issues by entering a consent order, which required Freedom to pay a civil money penalty, comply with the HMDA, and undertake a few corrective actions, such as developing and improving its HMDA policies and procedures. The injunction specified that it was to remain in effect until June 2024.

Now, in the Bureau's current Complaint, it alleges that Freedom has continued to violate the HMDA. The Complaint specifically alleges that Freedom's February 26, 2021, submission of its 2020 data contained a litany of errors (DE 1 at ¶ 4), which it attributes to Freedom's "pervasive deficiencies in its policies, procedures and systems to collect and report HMDA data" and "despite knowing its systems were faulty, [failing] to implement adequate changes." (*Id.* at ¶ 5). Specifically, the Bureau alleges that it discovered approximately fifty-one data errors across seven data fields in its 159-file sample of Freedom's submission. (*Id.* at ¶ 20). As a result, it required Freedom to resubmit its 2020 HMDA data. (*Id.*). When Freedom resubmitted its 2020 HMDA data in September 2021, the revised submission included changes to almost 20 percent of all Covered Loans and included changes to over 174,000 data entries in dozens of data fields. (*Id.* at ¶ 21).

2

The Bureau alleges that these failures are attributable to Freedom's widespread, systemic issues that are so pervasive, an internal audit that Freedom personally conducted assigned its system a rating of "Needs Improvement." (*Id.* at ¶ 24). The Bureau further cites that the internal audit agency warned Freedom that their processes were incomplete and may result in undetected errors. The Bureau claims that because Freedom was subject to the 2020 consent order at the time, the errors in their 2020 data submissions were not "bona fide." (*Id.* at ¶ 28).

## II.   DISCUSSION

Freedom's Motion to Dismiss essentially alleges four grounds for dismissal. First, that the Bureau fails to state a claim for relief because the allegations are conclusory, bare-bones allegations that Freedom violated the HMDA and Regulation C. Second, the HMDA and Regulation C are unconstitutionally vague because they do not establish an error rate or accuracy standard that place institutional lenders on notice for when their reporting is subject to enforcement and because the Bureau has retained an unconstrained power to determine accuracy requirements, which they have done in an ad hoc fashion. Third, that the Bureau is attempting to enforce an "obey the law" injunction, which are generally unenforceable. And fourth, that the funding structure of the Bureau is unconstitutional, which is fatal to its claims. I address each argument in turn.

### A.   Failure to State a Claim

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the allegations in a complaint. Fed. R. Civ. P. 12(b)(6). In assessing legal sufficiency, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). That is, the complaint "must . . . contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental*

3

*Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted).

Freedom argues that the Bureau's Complaint fails to demonstrate a violation of HMDA and Regulation C on behalf of the Defendant. In support, Freedom makes the incredulous suggestion that the HMDA merely requires financial institutions to "compile and make available" 110 categories of mortgage loan data in a prescribed format. (DE 17 at 7). It argues that the statute's only cause of action is to enforce violations of this submission requirement as opposed to granting any cause of action to enforce the accuracy of such submissions. Because Plaintiff's Complaint demonstrates that Defendant did in fact submit data for 2020, Freedom maintains, the Bureau's claim fails on its face.

This argument essentially asks the Court to find that Congress enacted the HMDA for no purpose other than to have institutional lenders submit an assortment of numbers to the Bureau once a year, no matter if the data is correct or not. The logical conclusion of such a finding would be that if Freedom submits numbers every year to the Bureau on time and labels them "Data about Covered Loans," the Bureau could never plead a claim for relief against it under the current regulations. Such a result would be absurd.

Further, to the extent that Freedom argues the Bureau has pleaded nothing but conclusory allegations, I reject that as a ground for dismissal as well. The text of Regulation C requires accurate and complete data and only excuses errors that are "bona fide." The Bureau's well-pleaded Complaint states with particularity that Freedom submitted inaccurate data that did not constitute bona fide errors under the statute; it submitted over 174,000 incorrect data entries

4

regarding their Covered Loans as the result of widespread deficiencies in their HMDA-related procedures. (DE 1 at ¶¶ 21–26). The Complaint further alleges that such reporting was done while subject to the Bureau's 2019 Order. Therefore, construing all inferences in its favor and accepting the above facts as true, the Bureau has pleaded a plausible violation of the HMDA.

### B.   Unconstitutional Vagueness

The crux of Freedom's vagueness argument dovetails with its failure to state a claim argument. According to Freedom, the HMDA and Regulation C provide no ascertainable rate of error that the Bureau will allow in reporting, despite contemplating that a rate of error is likely. This omission means that institutional lenders are not placed on notice of the legally required "standard of conduct" in their reporting. Finding that the Bureau has stated a claim for relief beyond mere conclusory allegations, Freedom alleges, leaves the Court in a position of concluding that the Bureau has pleaded facts supporting a standard that the statute itself does not define. Further, Freedom contends that the vagueness of the error rate within HMDA and Regulation C invite "arbitrary enforcement—as there is no basis in the laws upon which the [Bureau] can make its enforcement decisions." (DE 17 at 14). The Parties do not identify, nor am I aware of, any case in the Eleventh Circuit determining the issue of whether HMDA and Regulation C are unconstitutionally vague. Therefore, this question appears to be one of first impression.

A statute is unconstitutionally vague under the Fourteenth Amendment if it "[(1)] fails to provide a person of ordinary intelligence fair notice of what is prohibited, or [(2)] is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citing *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). Such a standard is notoriously high; "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved but rather the

indeterminacy of what that fact is." *Williams*, 553 U.S. at 306. The Supreme Court has given examples—statutes prohibiting "annoying" conduct or "indecent" conduct are unconstitutionally vague because they are "wholly subjective judgments without statutory definitions, narrowed context, or settled legal meanings." *Id.* And in the civil context, a regulation can only be stricken for unconstitutional vagueness if it is "so indefinite as really to be no rule or standard at all." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1349 (11th Cir. 2021). Accordingly, to be unconstitutional, I must find that the HMDA and Regulation C delineate a standard for Covered Loan data submissions that is so indefinite as to leave it devoid of any meaning, rendering the Bureau free to exercise wholly subjective judgments in its enforcement. For the reasons below, I do not reach such a conclusion.

### 1. *Standard of Conduct*

Start with the text of the HMDA. The statute empowers the Bureau with "enforcement of the requirements." 12 U.S.C. § 2804(d). In exercising that power, the Bureau has enacted Regulation C, which requires a for-profit lending institution to "submit its annual loan/application register . . . to the appropriate Federal agency" and "certify to the accuracy and completeness of data." 12 § CFR 1003.5(a)(1)(i). Such language provides the standard of conduct for institutions like Defendant—they must provide data that is both "complete" and "accurate," or free from error. *See Merriam-Webster*, Accurate ("free from error"). The Defendant argues that the meaning of "accuracy" cannot be determined by the text of the statute. However, I am certain that any reasonable borrower would dispute such a premise: to be accurate, the data must be veracious and credible. Common sense regarding the meaning of Regulation C's plain text cuts Defendant's argument off at its knees.

6

I do not dispute that because "mortgage lenders must collect and report such a large array of data for each individual transaction . . ., it is no surprise that some errors in reporting will occur." (DE 17 at 3). And further, the commentary to Regulation C does generally provide an understanding that perfect data is not expected by the Bureau, which seems to account for the carve out of "bona fide errors" within the regulation. *See* Home Mortgage Disclosure (Regulation C), 80 FR 66128-01 ("[T]he Bureau accepts that some errors in data compilation and reporting are difficult to avoid altogether . . . . Decisions regarding when to pursue an enforcement action or other solution for noncompliance with HMDA or Regulation C are a matter of agency discretion.") But to ask the Court to find the statute so vague as to be standardless, because the agency has an understanding that sometimes bona fide errors will arise, asks me to "give effect to perceived legislative intent by interpreting statutory language contrary to its plain and unambiguous meaning." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1228 (11th Cir. 2001).

"Courts have no authority to alter statutory language." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1187 (11th Cir. 1997). In the case of HMDA and Regulation C, "[t]he language of the statute is entirely clear; and if that is not what Congress [or the Bureau] meant then Congress [or the Bureau] has made a mistake and Congress [or the Bureau] will have to correct it." *Conroy v. Aniskoff*, 507 U.S. 511, 528 (1993) (Scalia, J. concurring). Thus, I find that the textual requirement of an "authorized representative of the financial institution with knowledge of the data submitted shall certify to the accuracy and completeness of the data," 12 C.F.R. § 1003.5, sufficiently withstands constitutional scrutiny.

### 2. *Unconstrained Power*

According to Freedom, the "silence" of the HMDA and Regulation C "regarding required accuracy" necessarily results in ad hoc, arbitrary enforcement. (DE 17 at 14). Therefore, even if

the prohibited conduct is clear, the statute is still unconstitutionally vague. For the following reasons, I disagree.

The Due Process Clause requires that "a legislature establish minimal guidelines to govern law enforcement." *Kolender v Lawson*, 461 U.S. 352, 358 (1983) (internal citation and quotation omitted). Such minimal guidelines avoid "deleg[ating] basic policy matters to police[], judges, and juries for resolution on an ad hoc and subjective basis." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Per my above analysis, the prohibition against anything but "accurate" data is not a vague standard. Although high for those it regulates, the Bureau has established clear and unambiguous requirements. Additionally, the statute explicitly notices regulated parties that only "bona fide" errors are excused. Critically, what constitutes a "bona fide" error is not a guessing game for either the Bureau or the regulated entities; the statute defines such errors as (1) those made unintentionally "despite the maintenance of procedures reasonably adapted to avoid such an error" or (2) "incorrect entr[ies] for a census tract number" if the institution "maintains procedures reasonably adapted to avoid such an error." 12 C.F.R. § 1003.6(b). Such errors are neither subjective nor nebulous; they are "easily measured." *Grayned*, 408 U.S. at 112. Accordingly, the regulation "clearly delineates its reach in words of common understanding." *Id.* (internal citation omitted).

Freedom's argument that the agency holds unbridled enforcement discretion boils down to complaining that the agency has not preannounced its enforcement priorities. But "an agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities." *Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) (citation omitted). That the Bureau chose to bring an action against Freedom, an entity that the Complaint claims has had issues in the past of misreporting data concerning borrower race, ethnicity, and sex, (DE 1 at

8

¶ 3), does not render the Bureau's enforcement discretion unconstitutionally boundless. At best, Freedom can claim that it was "surprised by the enforcement." *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 423 (6th Cir. 2014). But such surprise "does not necessarily show that the [Defendant] did not know what was required" under the HMDA and Regulation C. *Id.* Thus, both vagueness challenges are without merit.

### C. Improper Remedy

Next, Freedom argues that Count II of the Complaint should be dismissed because the Bureau is attempting to enforce an "obey-the-law injunction," which is generally unenforceable. It notes that the Bureau seeks an order from this Court permanently enjoining Freedom "from committing future violations of HMDA" and "its implementing regulation" as well as "any other provision of Federal consumer law." (DE 1 at 9).

It is generally true that "obey-the-law" injunctions, or "injunctions that prevent defendants from violating the securities laws," are unenforceable as a matter of law. *See SEC v. Graham*, 823 F.3d 1357, 1362 n.2 (11th Cir. 2016). Such injunctions rarely describe in detail the permissible and impermissible conduct to which defendants are subject. *See* Fed. R. Civ. P. 65(d) (stating that injunctions must describe the prohibited conduct in reasonable retail). However, at this point, I decline to dismiss Count II of the Complaint. For starters, the 2019 consent order does not appear within the four corners of the Complaint. At this posture, I must make all reasonable inferences in the Bureau's favor and assume that the consent order "provided sufficient clarity and notice to Defendant [Freedom] of what was required." (DE 31 at 17).

I also find any challenge to the requested injunctive relief from this Court to be premature. *See Graham*, 823 F.3d n.2 ("It is at least possible that [plaintiff] could seek injunctive relief that would be specific and narrow enough that the parties would be afforded sufficient warning to

9

conform their conduct."). Should the Bureau's claim survive summary judgment, the Court can craft the appropriate remedy that redresses the Bureau's claims or entertain appropriate challenges to the scope of the injunction from Freedom.

### D.  Unconstitutional Funding Structure

Lastly, Freedom argues that the funding structure of the Bureau is unconstitutional, which means that this enforcement action fails at its outset. In support, Defendant cites the Fifth Circuit's holding in *Cmty. Fin. Servs. Ass'n of Am. V. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 637 (5th Cir. 2022). In that case, the Fifth Circuit found in favor of the exact argument that Defendant is now advancing. *Id.* Subsequent to the Fifth Circuit's holding, the Second Circuit reached the opposite result. *See Consumer Fin. Prot. Bureau v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 182 (2nd Cir. 2023). The Supreme Court has granted certiorari on the Fifth Circuit case, held oral argument on October 3, 2023, and will determine the issue this term.

For now, I am more persuaded by the reasoning in the Second Circuit. The Appropriations Clause provides, "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Such a provision means that "the payment of money from the Treasury must be authorized by statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990); *see Knote v. United States.* 95 U.S. 149, 152 (1877) ("Moneys once in the treasury can only be withdrawn by an appropriation by law."). The current funding structure is explicitly directed by statute, *see* 12 U.S.C. § 5497(a)(1) ("[T]he Board of Governors shall transfer to the Bureau from the combined earning of the Federal Reserve System, the amount determined by the Director to be reasonably necessary to carry out the authorities of the Bureau under Federal consumer financial law."), and I decline to find it an unconstitutional funding structure until the Supreme Court weighs in on the matter.

### III. CONCLUSION

For all the foregoing reasons, Defendant's Motion to Dismiss (DE 17) is **DENIED**.

**SIGNED** in Chambers at West Palm Beach, Florida, this ___ day of May, 2024.

DONALD M. MIDDLEBROOKS
UNITED STATES DISTRICT JUDGE

Cc: attorneys of record