# Exhibit 7

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF FLORIDA


In the matter of:          )

CONSUMER FINANCIAL         )   Case No.

PROTECTION BUREAU,         )   9:23-CV-81373-DMM

    Agency,                )

v.                         )

FREEDOM MORTGAGE CORP.,    )

    Respondent,            )


    The deposition of CYNTHIA BERMAN

commenced, pursuant to notice, reported by

Jennifer Corb, a Court Reporter and Notary

Public, at the U.S. Attorney's Office, 615

Chestnut Street, Suite 1250, Philadelphia,

Pennsylvania, on April, 15, 2024 at 10:05  a.m.

```
 1                  A P P E A R A N C E S

 2

 3   HALLIE RYAN, ESQUIRE

 4   JOSEPH LAKE, ESQUIRE

 5   Consumer Financial Protection Bureau

 6   1700 G Street, NW

 7   Washington, DC  20552

 8       COUNSEL FOR CFPB

 9

10   MITCHEL H. KIDER, ESQUIRE

11   TIMOTHY P. OFAK, ESQUIRE

12   Weiner Brodsky Kider PC

13   1300 19th St NW, 5th Fl

14   Washington, DC  20036

15       COUNSEL FOR FMC

16

17

18

19

20

21

22

23

24

25
```

```
                                                         Page 3
 1                        I N D E X

 2

 3   WITNESS: CYNTHIA BERMAN

 4   EXAMINATION

 5       By Attorney Ryan                      7 - 179

 6   CERTIFICATE                                   179

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 4

```
  1                       EXHIBIT PAGE

  2                                              PAGE

  3    NUMBER       DESCRIPTION                IDENTIFIED

  4    Exhibit 1    Notice of Deposition           8

  5    Exhibit 2    Attachment to NOD              8

  6    Exhibit 3    Consent Order                 27

  7    Exhibit 4    ███████████████████           45

  8    Exhibit 5    ██████████████

  9                 ████████                      53

 10    Exhibit 6    ████████████████

 11                 █████████████████             72

 12    Exhibit 7    ██████████████████████        86

 13    Exhibit 8    ████████████████████         102

 14    Exhibit 9    ███████████████████████

 15                 ██████████                   107

 16    Exhibit 10   ████████████████████

 17                 █████████                    111

 18    Exhibit 11   ████████████████████

 19                 ███████████████              114

 20    Exhibit 12   ██████████████████           117

 21    Exhibit 13   ████████████████████

 22                 ██████████████               117

 23    Exhibit 14   ████████████████████

 24                 █████████                    128

 25    Exhibit 15   ████████████████████         142
```

Page 5

```
 1                      EXHIBIT PAGE (cont'd)

 2                                             PAGE

 3    NUMBER       DESCRIPTION              IDENTIFIED

 4    Exhibit 16   ████████████████         142

 5    Exhibit 17   ██████████               151

 6    Exhibit 18   ████████████████████

 7                 ████████████             157

 8    Exhibit 19   ██████████████████       161

 9    Exhibit 20   █████████████████

10                 ██████████████           165

11                 █████████████

12    Exhibit 21   ██████████████████

13                 █████                    167

14    Exhibit 22   ██████████████████

15                 ██████                   168

16    Exhibit 23   ████████████████████

17                 ██████████               171

18

19

20

21

22

23

24

25
```



```
                                                          Page 6
 1                         OBJECTION PAGE

 2

 3    ATTORNEY                          PAGE

 4    KIDER        40, 46, 54, 109, 116, 122, 132, 160, 164,

 5                 171, 177

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 7

```
 1
 2                      S T I P U L A T I O N
 3     --------------------------------------------------------
 4     It is hereby stipulated and agreed by and between
 5     counsel for the respective parties that reading,
 6     signing, sealing, certification and filing are not
 7     waived.)
 8     --------------------------------------------------------
 9                    P R O C E E D I N G S
10     --------------------------------------------------------
11                      CYNTHIA BERMAN,
12     CALLED AS A WITNESS IN THE FOLLOWING PROCEEDING, AND
13     HAVING FIRST BEEN DULY SWORN, TESTIFIED AND SAID AS
14     FOLLOWS:
15                          ---
16                       EXAMINATION
17     BY ATTORNEY RYAN:
18     Q. Good morning, Ms. Berman.
19     A. Good morning.
20     Q. My name is Hallie Ryan.  I'm from the Consumer
21     Financial Protection Bureau and I'll be asking you
22     questions today.
23  Please state your full name for the record.
24     A. Cynthia Ann Berman.
25     Q. Have you ever been deposed before?
```

1    A. I have not.

2    Q. Are you represented by counsel today?

3    A. I am.

4   ATTORNEY RYAN:

5   Would they please state their names for

6    the record?

7   ATTORNEY KIDER:

8   Mitch Kider.

9   ATTORNEY OFAK:

10  Timothy Ofak.

11  ATTORNEY RYAN:

12  Okay.

13  If I could mark this is Exhibit 1.  And

14   this Exhibit 2.

15   BY ATTORNEY RYAN:

16   Q. Does this look familiar to you?

17   A. Yes.

18   Q. What is it?

19   A. One is the notice of deposition and the other is

20   the attachment to it.

21                          ---

22  (Whereupon, Exhibit 1, Notice of

23  Deposition, was marked for

24  identification.)

25  (Whereupon, Exhibit 2, Attachment to NOD,

Page 9

1   was marked for identification.)

2                                            ---

3   BY ATTORNEY RYAN:

4   Q. And in the attachment, Exhibit 2, you'll see a

5   list of topics.  Are you prepared to testify about

6   these topics today?

7   A. Yes, ma'am.

8   Q. What have you done to prepare?

9   A. We met with counsel and we reviewed at a high

10   level what you'd be asking.

11   Q. How long did that meeting last?

12   A. Several hours.

13   Q. Over one day, two days?

14   A. Most of it was one day.  There was a brief meeting

15   that took an hour on a separate day.

16   Q. Are you using a memory aid today?

17   A. No.

18   Q. Did you also meet with anyone for your mortgage?

19   A. No.

20   Q. Did you meet or talk with anybody about this

21   deposition outside of the present with your attorneys?

22   A. No.

23   Q. Did you talk with Mr. Stanley Middleman about the

24   deposition today?

25   A. I have not.

Page 10

1    Q. I want to make sure you understand how we will

2       proceed today.  I'm going to lay out a series of

3       questions.  You're to answer them as completely and

4       accurately as you can.

5    Do you understand that you've just taken an oath

6       to tell the truth?

7    A. I do.

8    Q. Is there any reason you cannot testify truthfully

9       today?

10   A. No.

11   Q. Are you on any medication that would affect your

12      ability to testify?

13   A. No.

14   Q. If you do not hear a question, please let me know

15      and I will repeat it.  If you do not understand a

16      question, please tell me and I will rephrase it in a

17      way that you can understand.

18   The court reporter will take down everything we

19      say today, so please answer my questions audibly.  Head

20      nods and uh-huhs don't come through clearly, so please

21      give verbal responses.  Additionally, only one of us

22      can speak at one time, so the court reporter is able to

23      get everything we say. So even if you anticipate the

24      answer to a question or the rest of a question, please

25      let me finish asking it and I'll do the same for you

1    with your responses.

2    If you need a break at any time, please let me

3    know and I'll try and find a convenient stopping point,

4    just not while question is pending.

5    During the deposition, your attorneys may object

6    to certain questions that I ask.  Unless your attorney

7    instructs you not to answer, you are required to answer

8    my question.

9    Do you understand that the testimony you provide

10   today may be used at trial?

11   A. I do.

12   Q. After the deposition today, you will have the

13   opportunity to read the transcript and make any

14   corrections that are necessary.  But please know that

15   the Bureau will be able to comment on any changes that

16   you make in court.

17   Do you understand these rules?

18   A. Yes.

19   Q. Do you have any questions?

20   Today throughout the deposition, when I refer to

21   Freedom, I will mean the Freedom Mortgage Corporation.

22   When I refer to HMDA, I will mean the Home Mortgage

23   Disclosure Act.  And when I refer to LAR, I will need

24   the loan application register that contains HMDA data.

25   What is your position at Freedom Mortgage?

1    A. I'm the chief compliance officer on regulatory

2    counsel.

3    Q. And how long have you been working at Freedom?

4    A. Twelve years.

5    Q. What did you do before working at Freedom?

6    A. I was a bank regulatory attorney at Banks Mortgage

7    Company, the Office of Thrift Supervision, and a large

8    law firm.  So my entire career I worked in the

9    industry.

10   Q. Great.  And where did you go to school after high

11   school?

12   A. University of Pennsylvania, undergraduate and

13   Villanova Law School.

14   Q. When did you graduate from law school?

15   A. 1979.

16   Q. Are you currently barred?

17   A. Yes, in the state of --- in the Commonwealth of

18   Pennsylvania.

19   Q. I have one of those, too.  In Virginia a couple.

20   Let's talk through your various positions of

21   employment.

22   A. Okay.

23   Q. Where after law school did you start working?

24   A. The first job in the industry was at Manufacturers

25   Hanover Trust, which was at the time a very large money

Page 13

1     center bank.  And I focused first on consumer loans,

2     such as mortgage loans and auto loans.

3     Q. And what was your position there?

4     A. Associate counsel, I think.  I didn't read my

5     resume before I came here, but that sounds --- that

6     wasn't it, it was close to that.

7     Q. Okay.

8     And how many years were you there?

9     A. For five years.  I can't remember exactly.  Maybe

10    between four and five years.

11    Q. Okay.

12    And where did you go after that?

13    A. Fidelity Bank, which was in Philadelphia, and it

14    was a depository institution, so I stayed in the

15    consumer and retail banking area of the legal

16    department.  But I was able to add to my experience

17    depository products such as DDAs, savings accounts,

18    credit cards.

19    Q. And what was your position there?

20    A. Associate counsel.  I'm sorry.  I can get you my

21    resume if you'd like.

22    Q. That's no problem.

23    Did you work on any HMDA related matters there

24    that you recall?

25    A. I don't recall.

Page 14

1    Q. Where did you work after that?

2    A. Another money center bank in New Jersey, UJB

3    Financial.  And I did work in the same area, retail

4    banking and consumer loans.

5    Q. Did you work on any HMDA related matters there?

6    A. Again, I don't remember.

7    Q. About how many years were you there?

8    A. Three or four years.

9    Q. And where did you go after that?

10   A. I went to work at what was at the time a very

11   exciting area.  It was called smart card development.

12   It was the debit card area, which is at the time it was

13   called a MAC card in this area.  It was a joint venture

14   by four money center banks.  And then the research and

15   development was focused on the smart card which is now

16   what we see in every chip, every credit card, every

17   metro card.

18   Q. What was your position there?

19   A. Counsel.  I'm sorry, I don't know the exact title

20   that I had at each company.

21   Q. Did you work in any other HMDA related matter

22   there?

23   A. Not there, no.

24   Q. And how long were you there?

25   A. Three years, I think.

Page 15

1    Q. And where did you go after that?

2    A. I went to Blank Rome, a law firm.  And I

3    absolutely did work on HMDA matters there.  I worked in

4    the financial services department of the company.

5    Q. You did work ---?

6    A. Yes.

7    Q. I just want to make sure I heard you right.

8    A. Yes.

9    Q. Okay, you did.  What were the years that you were

10   the Blank Firm?

11   A. I'd have to get you my resume.  I'm so sorry, I

12   didn't ---.

13   Q. Approximate?

14   A. Like two years, but I don't remember the dates.

15   Q. Okay.

16   And where did you go after that?

17   A. I went to American Business Financial Services

18   which was a client of Blank Rome, and it focused on

19   mortgages there and again did work on HMDA.

20   Q. Was that a mortgage lender?

21   A. It was a mortgage lender, and also other types of

22   credit.

23   Q. Okay.

24   What was your position there?

25   A. Counsel.

Page 16

1    Q. And how many years were you there?

2    A. Four years.

3    Q. And where did you go after that?

4    A. I went to Transunion where the focus was on credit

5    reporting.  We did not deal with HMDA there.

6    Q. And how many years were you there?

7    A. I'm sorry, I don't remember.

8    COURT REPORTER:

9    Could you speak up, please?

10   ATTORNEY RYAN:

11   Oh, I'm sorry.

12   BY ATTORNEY RYAN:

13   Q. Ballpark?  One year, five years?

14   A. Three years.

15   Q. Okay.

16   A. Then I went to the Office of Thrift Supervision.

17   I went to the other side.

18   Q. And how many years were you there?

19   A. Two years.

20   Q. And what was your position?

21   A. Counsel.

22   Q. And what did you work on while you were there?

23   A. I worked on whatever was --- all kinds of orders

24   and topics that were covered by the --- that were under

25   the authority of the OTS.  We had some very big

Page 17

1    institutions in that division. I was in the northeast

2    division and so I had a lot of big matters pending.

3    Q. Was HMDA under the delegated authorities?

4    A. I can't remember.

5    Q. And where did you go after that?

6    A. I went to another mortgage company.  I'll have to

7    get you the name of it.

8    Q. Okay.

9    How long were you there?

10   A. A couple of years.

11   Q. Okay.

12   And ---?

13   A. Franklin Credit.  I'm sorry, it took me a minute.

14

15   Q. Great.

16   Did you work in any HMDA related matters there?

17   A. Yes.

18   Q. And where did you go after that?

19   A. A small bank.  I'll have to get you the name of

20   that.  I was only there for a year and I went there

21   just for a short period.  I needed to be close to home.

22   Q. Okay.

23   Did you work on any HMDA related matters there?

24   A. I did not.

25   Q. Okay.

Page 18

1   What was your position?

2     A. Counsel.

3     Q. And after that?

4     A. I went to Freedom Mortgage.

5     Q. Okay.

6   And what year was that?

7     A. 2011.

8     Q. Have you had the same job title since you started?

9     A. No, I started out as vice president, then senior

10    vice president and executive vice president.

11    Q. When did you receive those promotions?

12    A. I think --- I'll have to check my resume.  I'm so

13    sorry, but I think I was vice president for five years

14    and then a senior vice president --- how many years do

15    we have left?  I think I've been an executive vice

16    president for three years.  I have to check.  I'm so

17    sorry.  I didn't prepare.

18    Q. No problem.  It's just to the best of your

19    recollection.

20    A. It's not something I focus on.

21    Q. Throughout your time at Freedom Mortgage, have you

22    always worked on HMDA related matters?

23    A. I've worked on HMDA related matters, yes.

24    Q. Okay.

25  Have you always been within the compliance

Page 19

1    department?

2    A. I've always been within the legal department,

3    which, and I've always been in charge of compliance.

4    And so the answer is technically yes, but we've

5    expanded the compliance department over the years that

6    I've been with the company.

7    Q. Okay.

8    So just so I understand, you've always been the

9    head of the clients of the compliance department, but

10   your title has received promotion ---

11   A. Correct.

12   Q. --- potentially as the company has grown?

13   Okay, great.

14   Who do you report to now?

15   A. I report to the Chief Corporate Risk Officer,

16   Suzanne Shuck.

17   Q. Okay.

18   And who did she report to?

19   Stanley Middleman, the CEO and president.

20   Q. Do you receive work from anyone else or directives

21   from anyone else?

22   A. I receive --- I don't typically receive work from

23   either of them.  My job involves ensuring that the

24   company remains compliant.  So my work is collaborative

25   with executives in the business, providing regulatory

Page 20

1    guidance and implementing policies, procedures,

2    training to ensure that we are compliant.

3    Q. Do Ms. Shuck or Mr. Middleman direct you to do

4    certain tasks or implement certain directive?

5    A. Yes.  They have generally delegated to me the

6    implementation of the compliance management system,

7    which involves all of the elements that I mentioned

8    previously.  And I submit reports to the office of the

9    President, Mr. Middleman, Ms. Shuck, Mr. Molitor, and

10   others, monthly.

11   Q. How often do you meet with Ms. Shuck?

12   A. Sometimes daily, but at least weekly.  No less

13   than weekly.

14   Q. Okay.

15   Do you have a standing meeting with her?

16   A. Yes.

17   Q. Okay.

18   And what about with Mr. Middleman?

19   A. I don't have a standing meeting with him, but I

20   have carte blanche to call him whenever I think it's

21   appropriate.

22   Q. Okay.

23   About how often do you do that?

24   A. Occasionally.

25   Q. Ballpark?  Once a week?

Page 21

1    A. No, not once a week.

2    Q. Once a month?

3    A. A few times a year.  I interact with him in a

4    group setting with the office of the president members.

5     So this would be separate from that that I'm talking

6    about.

7    Q. Okay.

8    And are you a member of the Office of the

9    President?

10    A. I am not

11    Q. Okay.

12    Do you attend the Office of the President

13    meetings?

14    A. The monthly meetings, yes, I do.

15    Q. Okay.

16    Do you give presentations during those meetings?

17    A. I do.

18    Q. Every one?

19    A. Yes

20    Q. Okay.

21    Are those presentations written?

22    A. There's a deck that I submit.  The style that

23    we've adopted is, a lot of it is oral.

24    Q. Do the decks provide an outline for the oral

25    presentation that you give?

Page 22

1   A. Yes, for some of the topics.

2   Q. But not all of the topics?

3   A. Not necessarily.

4   Q. You mentioned you give updates to the Office of

5   the President during the monthly meetings to Mr.

6   Middleman quarterly.  In addition to that ---?

7   A. Yeah, I wouldn't say quarterly.  I would say as

8   needed.  You know, I might just call him to let him

9   know something is going well.

10  Q. Okay.

11  A. Fortunately, I can give him good news a lot of

12  times.

13  Q. Do you call him to give him bad news?

14  A. If necessary, I absolutely do.

15  Q. What are the types of decisions that you are given

16  discretion over?

17  A. That's an interesting question.  I don't work

18  independently that way.  I would discuss any decisions

19  with the chief risk officer and the chief legal officer

20  because what I do is so highly regulated.  So I may

21  have the authority, but I don't exercise it.  You know,

22  I might --- I have a staff, so, you know, on particular

23  issues that arise, interpretations of a law or conduct

24  of testing of a certain type, I would make that

25  decision.  I would update Suzanne Shuck when I meet

Page 23

1    with her regularly.

2    Q. If you had a disagreement about something, who

3    would have the ultimate authority to make a decision?

4    A. Suzanne Shuck or Stanley Middleman.

5    Q. And what types of issues do you tend to escalate

6    to Ms. Shuck?

7    A. Let's see.  I keep her closely apprised of HMDA

8    and our progress in compliance with HMDA.  There's been

9    so much activity leading up to this moment in time that

10   we frequently discuss this topic.  I also keep her

11   apprised of other exams that the CFPB is conducting and

12   other states are conducting, new projects that the

13   business is interested in, new products, some minor

14   issues that may arise.  I keep her very well apprised

15   of what we're doing in compliance.

16   Q. And you mentioned you have weekly meetings with

17   her?

18   A. At least?

19   Q. At least?

20   A. Yeah

21   Q. All right.  Okay.

22   A. I can --- she's always available to me.

23   Q. Has there ever been a time when you were told you

24   should have escalated an issue, but you didn't?

25   A. No.

Page 24

1    Q. And what sorts of issues do you escalate to Mr.

2    Middleman?

3    A. Escalate is an interesting word.  I keep him

4    apprised of key matters that are going on.  So all the

5    CFPB exams, obviously.  Well, not obviously.  All of

6    the events surrounding HMDA and the situation, the

7    litigation, upcoming changes in the law, upcoming

8    announcements of the CFPB or one of our investors in

9    the secondary market, which are Fannie, Freddie.

10   Whatever he may ask.  Sometimes he asks about something

11   and I investigate that and report back to him.

12   Q. You've mentioned this a little bit, but what are

13   the legal issues or statutes under your purview?

14   A. All the federal consumer financial protection laws

15   and regulations, most of which are implemented by the

16   CFPB. Do you want me to list them?

17   Q. That'd be great.

18   A. Okay, let's see.

19   Q. All the ones you can remember.

20   A. Okay.  Truth of lending, RESPA, ECOA, equal

21   credit, fair credit, Fair Debt Collection Practices

22   Act, HOEPA. Truth of lending contains a lot of them,

23   the implementing regulations.  How much would you ---

24   how far would you like to take it?

25   Q. That's great.

Page 25

1    A. Okay.

2    Q. That's great.

3  And in your role, do you directly manage anyone?

4    A. Yes, I manage.  I have six direct reports and then

5      several of those folks have direct reports.

6    Q. Who are the six direct reports?

7    A. Regulatory counsel.  Do you want their names?

8    Q. That'd be great.

9    A. Okay.  Sharon McMahon, David McGeorge, James

10     Keurek, Darlene Taylor, Jim Weigand, Catherine Panasik,

11     Mark Sigment, and then I also have a junior person who

12     reports to me directly who helps with exams.  Susan

13     Colburn.  I think that was more than six.

14   Q. That was eight.  Do you also indirectly manage

15     anyone?  You mentioned each of these ---?

16   A. Oh, and I forgot.  I'm so sorry, I forgot Mitzi

17     Migault, her name is Doreen Migault.  I'm so sorry, I

18     forgot her.

19  Do I indirectly manage people?  I do as necessary.

20     I tend to let my managers manage their own teams.  I

21     try to stay in the background and only get involved if

22     they need me.  If they ask for me or if somebody

23     reporting to them wants my involvement.

24   Q. And how big is your full compliance team?

25   A. Right now it's about 25 people.  It was as much --

Page 26

1    - it was as large as 50 people.  But with the change in

2    the interest rates and the economic changes, we

3    downsized some people.

4    Q. During the summer to 2019 to February 2021, how

5    big was your compliance team?

6    A. I'll check for you, but it was definitely in

7    expansion mode.

8    Q. So if it changed during that time, that's fine.

9    Maybe a range, approximately?

10   A. Maybe 35, let's just say.

11   Q. Have you received any formal training while at

12   Freedom?

13   A. In terms of management?  Yeah, I take management

14   courses online that are offered through HR.

15   Q. And you mentioned you had significant HMDA

16   experience prior to coming to Freedom.  What have you

17   done while at Freedom to develop your HMDA expertise?

18   A. I take webinars, attend conferences, work with

19   outside counsel.  Especially when HMDA was revised

20   effective 2018, I was very active with the MBA and

21   attending their courses.  We actually had --- Brodski

22   give us presentations on the new HMDA, and I've been

23   diligent about attending and participating in webinars

24   on the topic.

25   Q. And with your experience and knowledge in HMDA,

Page 27

1    did you design Freedom's HMDA compliance management

2    system?

3    A. I did, yes, long with outside counsel and others.

4

5    Q. Did you make the final decisions about what

6    components were part of that program?

7    A. I would say along with others, I did

8    Q. Okay.

9    Who were the others?

10   A. And the Office of the President, Suzanne Shuck,

11   mostly in her role as chief corporate risk officer.

12   Q. Okay.

13   This is Exhibit 3.

14   A. This is the consent order.

15   Q. Correct, that was going to be my first question.

16   Do you recognize this?

17   A. Yes, it is the consent order that Freedom entered

18   into with the CFPB in June of 2019.

19                         ---

20   (Whereupon, Exhibit 3, Consent Order, was

21   marked for identification.)

22                         ---

23   BY ATTORNEY RYAN:

24   Q. And you were employed at Freedom ---

25   A. Correct.

1    Q. --- when this happened?

2    A. I was.

3    Q. What steps, if any, did Freedom take in late 2019

4    and 2020 to comply specifically with paragraph 2019?

5    Sorry, 29 of the consent order.  It's on page ---

6    there's no page numbers on this.  Oh, page nine.

7    A. Page nine?

8    ATTORENY KIDER:

9    --- page.

10   ATTORNEY RYAN:

11   At the top.  I don't know why they put it

12   at the top.

13   ATTORNEY KIDER:

14   They're asking you about paragraph 29, so

15   take your time and read it.

16   THE WITNESS:

17   Okay

























Page 41

1    ATTORNEY KIDER:

2    I'm going to object to that.  That's a

3      pretty ambiguous question.  I'm not quite sure what you

4      were asking.

5    ATTORNEY RYAN:

6    On what grounds?  Just ambiguity.

7    ATTORNEY KIDER:

8    Ambiguity, yeah.

9      BY ATTORNEY RYAN:

10     Q. Go ahead.

11   ATTORNEY KIDER:

12   Do you understand it?

13   THE WITNESS:

24     BY ATTORNEY RYAN:

25     Q. Did Freedom hire any additional new people during

Page 42

1    this period?

2    A. We did.  We hired two, both of whom had

3    considerable experience.  Jeff Robb and Brigid Brooks.

4    And then Tracy Hatt-Doering was the third one who had

5    extensive regulatory experience before she came to us,

6    and for a considerable period of time ran the ---

7    managed compliance, the HMDA compliance function.

8    Q. Okay.

9    When were each of these individuals brought on?

10   A. Jeff was brought on in 2019.  Brigid was brought

11   on initially because Laura Clark was going on maternity

12   leave and she was brought on to keep things

13   administratively moving in the progress of implementing

14   the consent order.

15   Q. So when approximately?

16   A. I'm sorry, I don't remember exactly.  Either late

17   2019 or 2020.  I just can't remember.  I'm sorry.

18   Q. Okay.

19   And what about Tracy Hatt-Doering?

20   A. Tracy came on board during COVID.  So that would

21   have been in 2020.

████  ████████████████████████████████████████████████

████  ████████████████████████████████  ██████████████

████  ████████████

████  ██████████████████  ████████  ██████████████████



Page 44



21    ATTORNEY RYAN:

22    I'm not wearing a watch.  Will somebody

23      keep track for me?

24    ATTORNEY KIDER:

25    It's almost an hour.  It's five of 11:00.

Page 45

1   ATTORNEY RYAN:

2   Okay.

3     BY ATTORNEY RYAN:

4     Q. How are you doing?  Do you need a break?

5     A. No, I'm fine, thanks.

6     Q. Okay.

7   ATTORNEY KIDER:

8   Unless you need a break.

9   ATTORNEY RYAN:

10  No, I'm good.  Just I neglected to wear a

11    watch today.

12  THE WITNESS:

13  Me too.  I know the feeling.

14  ATTORNEY RYAN:

15  This is Exhibit 4, I believe.

16                          ---

17    (Whereupon, Exhibit 4, Email Chain 2/4/20

18    "Catch Up", was marked for

19    identification.)

20                          ---

21    BY ATTORNEY RYAN:

22    Q. Do you recognize this document?

23    A. Yes.  Well, I actually do not, but I'm familiar

24    with this --- no, I don't recognize it in particular,

25    but it seems like something that would have occurred.

Page 46

1   Q. Any reason to doubt that this is an accurate copy

2   of an email?

3   A. There is not any reason to doubt it.  Thank you

4   for rephrasing that.

5   Q. Of course.  I'm going to start with the last email

6   that starts on the bottom of the first page and goes

7   under the second page.  That's an email from Ms. Suzy

8   Shuck, who you've mentioned before.  That's the same

9   person?

10  A. That is the same person.







19   ATTORNEY RYAN:

20   If we are going to take a break, it is a

21      good time to do that.  So why don't we go ahead and

22      take the first break?

23                              ---

24   (WHEREUPON, A SHORT BREAK WAS TAKEN.)

25                              ---

Page 50

1    BY ATTORNEY RYAN:

2    Q. Did Freedom submit HMDA data to the Bureau for

3    loans or applications with action taken date in 2020?

4    A. Yes.

5    Q. When did Freedom submit that data?

6    A. February 25, I believe.

7    Q. And who was responsible for that submission within

8    Freedom?

9    A. I was responsible.

10    Q. Who actually submitted it?

11    A. Oh, Mike Young.

12    Q. Describe the process, an overview is fine, of how

13    Freedom submits HMDA data.

14    A. Okay, so it's a long process.  It starts with the

15    ongoing, continual running of QuestSoft, and that

16    happens continually and the reports happen weekly.  And

17    I don't know how familiar you are with that function,

18    that software.  But what happens is you can program ---

19    you can ask for reports, so the output is a report

20    whenever you --- we ask for it with validity and

21    quality edits.  And then whomever Mike reported to was,

22    I believe it was Ron Lucante in 2020, would go through

23    the items with Mike, and Brigid was also --- Brigid

24    Brooks was also involved at that point.  And they would

25    go through and address the root cause, working with the

1    business people.  And if anything were not cleared,

2    they would let me know and we would investigate it

3    further to make sure that the information was

4    corrected.

5    Q. And in your role as chief compliance officer, did

6    you approve the 2020 submission?

7    A. I should have.  If I did --- you know, I can't

8    remember, but it was my responsibility to do so.

9    Q. You don't remember if you approved it?

10   A. Well, according to our standard procedure, I would

11   have, but I don't have an exact memory of that year.

12   Q. And in your role as the chief compliance officer,

13   you are the person ultimately responsible for ensuring

14   the data reported is accurate.

15   A. Correct.

16   Q. We talked a little bit about this, but I want to

17   talk in detail about the compliance management system

18   for ensuring compliance with HMDA that Freedom had in

19   place during 2020.  And at the time that Freedom

20   submitted its 2020 LAR to the Bureau.  Did that change

21   --- and again, we've talked about this a little bit,

22   but over the course of, for instance, during --- let me

23   start over.

24 Did it change during the 2020 year and what were

25   the components of it at each time?

Page 52

1    A. It changed because in that it became more robust.

2    There was more focus on ensuring the accuracy of it.

3    And so I think that's the way it changed.

4    Q. Okay.

5    And what would you say are the components of the

6    HMDA compliance management system?

7    A. The compliance policy, the HMDA policy, the HMDA

8    data points policy.  There are some implementing

9    procedures in each line of business.  HMDA data

10   collection.  There was a LAR construction, I forget the

11   name of the procedure, but it addressed the particulars

12   of constructing the LAR.  Certainly the training

13   component was a big component of it, and the different

14   ways that we monitored and tested the data.

15   Q. And let's talk about the different ways that you

16   monitored and tested the data.  What were those?

17   A. We relied first and foremost on the QuestSoft

18   automated software reporting, testing and reporting,

19   because we --- in that particular year we had 779,000

20   entries, 77 million pieces of data.  So it was very

21   effective for us to use an automated system generating

22   reports weekly to test the data.

23   Q. Any other component to the monitoring and testing?

24   A. We had the telephonic component reviewing the

25   telephone calls.  We also had very robust quality

Page 53

1    assurance, quality control functions that included a

2    review and validation of a lot of the elements that are

3    in the HMDA LAR and we've discussed those a bit.

4    Q. Anything else?

5    A. We had a data governance team which was

6    implemented over time, but it had begun to work and it

7    was a team that was part of it, and they looked at the

8    data and reviewed the data to ensure that it was

9    accurately reported.

10   Q. Anything else?

11   A. That's all I can think of right now.  Thank you.

12   ATTORNEY RYAN:

13   This is Exhibit 5.

14                              ---

15   (Whereupon, Exhibit 5, Supplemental

16   Answers to Interrogatories, was marked

17   for identification.)

18                              ---

19   THE WITNESS:

20   Thank you.

21   ATTORNEY RYAN:

22   Off the record.

23                              ---

24   (WHEREUPON, A PAUSE IN THE RECORD WAS HELD).

25                              ---

Page 54

1    BY ATTORNEY RYAN:

2    Q. I'll give you as much time as you need.  We're

3    going to look at this a couple times, but I'm going to

4    look at page 11 for right now.

5    A. Okay.

6                              ---

7    (WHEREUPON, A PAUSE IN THE RECORD WAS HELD).

8                              ---

9    THE WITNESS:

10   Okay.

11   I think I'm ready.

12    BY ATTORNEY RYAN:

13    Q. Okay.

14   And I'm sorry.  It's going to be Interrogatory

15   numbers --- I'm sorry.  First, do you recognize this

16   document?

17    A. Yes.

18    Q. What is it?

19    A. It's a Response to Interrogatories.  It's the

20   Interrogatories from the CFPB and Freedoms responses.

21    Q. Starting on the very bottom of page ten,

22   Interrogatory six, the Bureau asked about various tests

23   and reviews done of covered loan files.  And I just

24   want to compare what you said here versus just connect

25   the dots based on what you just told me.  So in the

Page 55

```
 1    middle of that paragraph, subject to the foregoing
 2    objections, Freedom states that prior to October 2021,
 3    Freedom leveraged third party HMDA compliance software
 4    on all HMDA reportable data elements, which
 5    continuously evaluated data based on a set of
 6    conditional and logical rules.  Does that mean
 7    QuestSoft?
 8    A. Yes.
 9    Q. Okay.
10   And then three sentences later, additionally
11    embedded in Freedom's data quality control were ongoing
12    tests of covered loan data elements.  Is that the
13    quality assurance call monitoring you were talking
14    about?
15    A. It's not just that.  It's the quality assurance
16    and quality control that I talked about regarding all
17    of the different elements of production alone
18    manufacturing process that include issues for TELA
19    compliance, the APR issues for ECOA and for
20    underwriting the AUS, automated underwriting credit
21    score.  All of those elements that are required to be
22    reported for HMDA compliance are also required for our
23    compliance with the host of other consumer protection
24    regulations that are applicable for Freedom.  So
25    that's.  It was very comprehensive.
```

Page 56

1    Q. Great.  Okay, great.

2    ATTORNEY KIDER:

3    Done with this for now?

4    ATTORNEY RYAN:

5    For now, yes.  To the side.  We'll

6      probably refer to it later.

7    THE WITNESS:

8    It's very interesting.

9      BY ATTORNEY RYAN:

10   Q. I'd like to talk a little bit in more detail about

11      QuestSoft.  Can you describe what the QuestSoft tests

12      are?

13   A. I can only tell you that it's a very detailed set

14      of rules that addresses all the different elements that

15      are HMDA reportable.

16   Q. What sorts of things do they test for?

17   A. I'm not --- I can't --- I can only tell you that

18      the --- like, I'm not the right person to talk about

19      the software.  It tests the validity of the information

20      that we input and looks at the output.  So that, you

21      know, if --- I'll just use a really simple example.  If

22      the loan is in California and the zip code is in

23      Pennsylvania, that would be flagged.

24   Q. When did Freedom start using the QuestSoft

25      program?

Page 57

1    A. We used a different system and that --- I believe

2    in 2019, but I'm not certain.  I have to check that.

3    Q. Okay, so sometime after 2019.

4    A. Yeah.  And we like it because it addresses all the

5    HMDA reportable elements.

6    Q. Okay.

7    Was it used throughout the entire 2020 year?

8    A. Yes.

9    Q. Okay.

10   Do you know the difference between validity and

11   quality edits?

12   A. I know that validity edits have to be clear.  They

13   have to do with what I just described to you.  There's

14   no, the data would make no sense without it, whereas

15   quality is a little softer and needs to be cleared.

16   But there's other secondary issues.

17   Q. Were you involved in the decision to use QuestSoft

18   as the primary testing tool?

19   A. Yes.

20   Q. Did you attend meetings with the vendor

21   representatives?

22   A. Yes.

23   COURT REPORTER:

24   Wait for her --- Wait for her to finish.

25   THE WITNESS:

Page 58

1   I'm sorry.

2   BY ATTORNEY RYAN:

3   Q. Did you attend meetings with the vendor

4   representatives?

5   A. Yes.

6   Q. About how many meetings did you attend with them?

7   A. About a dozen.  About 12.

8   Q. Okay.

9   Were there other representatives involved from

10   Freedom in those meetings?

11   A. Yes.  Laura Clark was involved.  Mike Young, I

12   believe, Ron Lucante, who's no longer with the company,

13   someone from IT, I can't remember who, but they would

14   be the ones to explain --- somebody from IT could

15   explain to you more fully what happens in the system.

16   I can just look at the output and tell you that it's

17   what we wanted.  It's what we wanted to achieve.

18   Q. In your capacity as a 30(b)(6) witness today, did

19   you talk with any of those representatives who knew

20   more details about this program ---

21   A. Yes.

22   Q. --- learn more?

23   A. Not recently, no, I haven't.  Not since --- not

24   recently, no.  Not in connection with this matter.

25   Q. Okay.

Page 59

1   Do you know if QuestSoft was able to detect if a

2    loan or application was missing from the LAR?

3    A. No, I don't see how that would have been possible.

4    Q. Okay.

5   Why is that not possible?

6    A. Well, QuestSoft looks at the information that's

7    input, so it wouldn't know what information wasn't

8    input.

9    Q. Was QuestSoft able to detect if a loan or

10   application on the LAR was not actually a HMDA

11   reportable loaner application?

12   A. No, because again, it captured data from our

13   system of record.  And so if information in the system

14   of record show that something was an application,

15   QuestSoft would have pulled it in.

16   Q. Who was responsible for running the QuestSoft

17   reports in 2020?

18   A. Mike Young.

19   Q. And you mentioned this before, but how often were

20   they running throughout 2020?

21   A. Weekly.

22   Q. What would Freedom do if a validity edit was

23   triggered?

24   A. Well, first, Mike Young would identify it and then

25   work with likely his manager and Brigid Brooks and the

Page 60

1    business people to figure out the root cause and then

2    correct it if it were appropriate.  We would submit a

3    ticket to IT, information technology, to make the

4    correction in the system of record.

5    Q. And what would Freedom do if a quality edit was

6    triggered?

7    A. Something similar.  We would look at all the edits

8    to try to figure out the root cause if it were

9    something like there's an abbreviation of avenue

10    instead of the full word.  We would correct that or

11    determine that it didn't need to be corrected.  We

12    would try to correct it, of course, just because, you

13    know, we want the LAR to go through and be accepted by

14    the CFPB smoothly, but that would be our approach.

15    Q. Were these procedures in any written policies or

16    procedures that Freedom maintained throughout 2020?

17    A. I don't believe in 2020 there was a written

18    procedure, but it was definitely, the procedure was

19    always done that way.

20    Q. Did you receive the QuestSoft reports?

21    A. I did.

22    Q. How often?

23    A. I received them throughout the year before each

24    quarterly filing, when we started filing quarterly, and

25    then in the last months leading up to the annual

Page 61

1   filing.

2   Q. And who sent those to you?

3   A. Mike Young.

4   Q. Did you review them?

5   A. Yes.

6   Q. What would you review them for?

7   A. The validity and quality edits and to see if they

8   were cleared.  And if not, I would meet with him.

9   Q. Did you know --- did you understand at the time

10   the difference between validity and quality edits?

11   A. The way I just described it to you, yes.

12   Q. Okay.

13   Did you at the time, have an understanding of the

14   specific edits, for instance, the logic applied in each

15   edit?

16   A. I don't understand the question.

17   Q. That's okay.  Other than seeing whether or not a

18   validity or quality edit was triggered, did you

19   understand at the time why that edit would have been

20   triggered?

21   A. Yes.

22   Q. Okay.

23   So you were able to read the reports and decipher

24   the logic ---

25   A. Oh, yes.

Page 62

1    Q. --- that was on the reports?

2    A. Yes.

3    ATTORNEY KIDER:

4    Okay, wait until she's done with the

5     question.

6    THE WITNESS:

7    I'm sorry, I'm sorry, I'm getting ---.

8    BY ATTORNEY RYAN:

9    Q. Did anyone else receive the QuestSoft reports in

10    2020?

11    A. Yes.  Other members of the HMDA compliance team.

12    So it would have been Ron Lucante, Brigid Brooks, Mike

13    Young and me.

14    Q. Did anyone else review the QuestSoft reports

15    before the LAR was submitted on February --- in

16    February 2021?

17    A. All of the people I just mentioned.

18    Q. Did Freedom submit its 2020 LAR with quality

19    edits?

20    A. What does that mean?

21    Q. When Freedom submitted its LAR to the Bureau, were

22    quality edits triggered in the submission?

23    A. They were cleared before the submission.

24    Q. Okay.

25    So Freedom verified that each of those edits was

Page 63

1    correct, or that the ---.

2    A. Freedom verified that the HMDA data was correct.

3    Yes.

4    Q. If we could open the Exhibit 5 again.  If you

5    could look at page four.  This is --- this table is

6    part of a supplemental answer to Interrogatory number

7    two, which asks, identify by data field each error in

8    the initial HMDA LAR including, but not limited to the

9    dates the errors were identified and describe the

10   reasons for the errors, the dates the reasons for the

11   errors were identified, and any actions you took to

12   address the errors prior to submitting the revised HMDA

13   LAR.  On page four, Freedom has admitted to 2,366

14   errors in the action taken data field.  Was this error

15   detected by QuestSoft?

16   A. It was not.

17   Q. Was this the sort of error that Freedom was --- or

18   that, excuse me, QuestSoft was designed to detect?

19   A. No.

20   Q. Before Freedom submitted its 2020 LAR did you know

21   that QuestSoft was unable to detect this type of error?

22   A. I didn't know that this.  I knew that QuestSoft

23   could only detect information within the --- that was

24   fed into it.  That was that QuestSoft couldn't

25   determine whether or not a field was populated

Page 64

1    correctly.  I'm sorry.  Yes, I knew it.  Why don't I

2    just answer your question?

3    Q. Thank you.  Freedom has admitted --- I'm sorry.

4    Next page.  Let's see.  Okay.

5  On page six, type of purchaser.  Freedom has

6    admitted to 49,042 errors in the type of purchaser data

7    field.  Was this error ---?

8  ATTORNEY KIDER:

9  I'm going to ask the witness to read

10    Interrogatory and the answer before you take questions.

11    Start on page, I think it was on page three.  You have

12    it?

13  THE WITNESS:

14  Yes.

15  ATTORNEY KIDER:

16  I think it's important that she have a

17    sufficient amount of time to read that all.

18  ATTORNEY RYAN:

19  Of course.

20  ATTORNEY KIDER:

21  Okay.

22  Make sure you're on the right page there.

23  THE WITNESS:

24  You want me to look at three?

25    BY ATTORNEY RYAN:

Page 65

1    Q. Yes.  We're interrogatory number two, which is on

2    page --- starts on page three.

3    ATTORNEY KIDER:

4    Yes, Interrogatory number two starts on

5    page three.  I want you to read that because these

6    questions are coming along.  Okay?  And then she can

7    continue with her questions.

8    ATTORNEY RYAN:

9    Of course.  We absolutely want you to

10   understand.

11   THE WITNESS:

12   Okay.

13   BY ATTORNEY RYAN:

14   Q. Looking at page six, the row type of purchaser,

15   here Freedom has admitted to 49,042 errors in the type

16   of purchaser field.  Was this error detected by

17   QuestSoft?

18   A. So I'm not sure I agree that it was an error.  It

19   was a change because we were capturing information from

20   a particular point in time.  It was the correct

21   information, but the information changed later.  This

22   data point has to do with the investor, the purchaser

23   of the loan on the secondary market.  So that would

24   have been Fannie Mae, Freddie Mac, FHA, et cetera.  And

25   the information that we submitted in the initial LAR

Page 66

1    was correct.  It was correct as of a point in time.

2    And that point in time changed.  So to say it was

3    incorrect isn't really accurately portraying what

4    happened.  And then QuestSoft wouldn't have identified

5    that.  But our data governance team did identify it and

6    correct it.

7    Q. Okay.

8    When Freedom submitted its HMDA LAR February 2021,

9    was this change detected by QuestSoft?

10   A. No.

11   Q. Was the QuestSoft program designed to detect

12   errors or changes like this?

13   A. No.

14   Q. And before Freedom submitted its HMDA LAR in

15   February 2021, did you know that QuestSoft was unable

16   to detect this type of error or change?

17   A. Yes.

18   Q. The row right below that, the rate spread row,

19   Freedom has admitted to 49,235 errors in the rate

20   spread field.

21   ATTORNEY KIDER:

22   I object to the form of your question and

23   the characterization of admitting to errors.  If you

24   want me to elaborate, I can, but I wouldn't say Freedom

25   has admitted to errors.

Page 67

1    BY ATTORNEY RYAN:

2    Q. Supplemental answer.  Freedom incorporates its

3    previous answer in addition, et cetera.  Additionally,

4    Freedom states that the following data fields were

5    changed in the revised HMDA LAR because of the errors

6    identified below, as described more fully in Freedom's

7    responses to the CID, as cited below.  Was this error

8    as described in the table detected by QuestSoft?

9    A. No, it was not.

10   Q. Was the QuestSoft program designed to detect this

11   error?

12   A. No, it was not.

13   Q. And on February 25th or 26th, whichever day

14   Freedom submitted its HMDA LAR, did you know that

15   QuestSoft was unable to detect this error?

16   A. Yes.

17   Q. The row that says lender credits.  In this table,

18   Freedom admits to 12,474 errors in the lender credits

19   data field.  Was this error detected by QuestSoft?

20   A. It was not.

21   Q. Was QuestSoft designed to detect this error?

22   A. It was not.

23   Q. And when Freedom submitted its 2020 LAR, did you

24   know that QuestSoft was unable to detect this error?

25   A. This type of error?  Yes.

Page 68

1   Q. And the following page, page eight, debt to income

2   ratio row.  Freedom, here in this table, admits to

3   17,120 errors in the debt to income ratio data field.

4   Was this error detected by QuestSoft?

5   A. It was not.

6   Q. Was the QuestSoft program designed to detect this

7   error?

8   A. It was not.

9   Q. And when Freedom submitted its 2020 LAR in

10  February 2021, did you know that QuestSoft was unable

11  to detect this error?

12  A. I did.

13  Q. Immediately below that, combined loan to value.

14  In this row, Freedom admits to 2,894 errors in the

15  combined loan to value ratio data field.  Was this

16  error detected by QuestSoft?

17  A. It was not.

18  Q. Was QuestSoft designed to detect this error?

19  A. It was not.

20  Q. And when Freedom submitted its 2020 LAR in

21  February of 2021, did you know that QuestSoft was

22  unable to detect this error?

23  A. Yes.

24  Q. Immediately below that, the row for property

25  value.  Here, Freedom admits to 2,111 errors in the

Page 69

1    property value data field.  Was this error detected by

2    QuestSoft?

3    A. No.

4    Q. Was QuestSoft designed to detect this error?

5    A. No.

6    Q. And when Freedom submitted its 2020 LAR in

7    February of 2021, did you know that QuestSoft was

8    unable to detect this error?

9    A. Yes.

10   Q. Freedom has also admitted to 3,767 errors caused

11   by subordinate lien loan applications that did not

12   reflect the information collected by loan officers, for

13   the first lien loan.  Was this error detected by

14   QuestSoft?

15   A. I believe that was.  I have to go back and check.

16   I know it's referenced here generally, but I believe

17   that would have been because there were inconsistencies

18   between the first and second lien.

19   Q. Okay.

20   Do you remember if it triggered validity edits for

21   this error?

22   A. I don't remember specifically.

23   Q. Do you remember if it triggered quality edits?

24   A. I don't remember specifically, but if you like, I

25   can find this.

Page 70

1    Q. Do you remember anything about how QuestSoft

2    detected this error?

3    A. It would have been because there's an

4    inconsistency.  And again, this is my educated guess.

5    I have to go back and check.

6    Q. Sure, no problem.  I'd like to turn now to the

7    call monitoring specifically for the race, sex,

8    ethnicity information in HMDA.  When did Freedom first

9    implement this program?

10   A. Freedom's been recording its calls between the

11   consumer applicant and the loan originator for as long

12   as I work there, which is 12 years.  And during that

13   time, there was a compliance monitoring program.  So I

14   can't say specifically how long, but I can again check

15   for you.

16   Q. No problem.  And what was the purpose of this call

17   monitoring program?

18   A. It was always to ensure compliance.

19   Q. What specifically was Freedom monitoring for?

20   A. The terms of the loan that were presented to the

21   consumer, the manner in which the loan originator spoke

22   with the consumer, ensuring that the statements made by

23   the loan originator were accurate and weren't in any

24   way distorting that loan terms.

25   Q. Did the monitoring include monitoring for correct

Page 71

1    HMDA data?

2    A. Yes, I believe it did.

3    Q. Do you remember what data field?

4    A. I do not.

5    Q. Do you know how the calls were selected for

6    monitoring?

7    A. They were random.

8    Q. And during the June 2019 through 2020 period, who

9    was in charge of that program?

10   A. Well, Suzanne Shuck was in charge of HMDA, the

11   monitoring program for that specific --- I don't know.

12   I'm sorry, I can find out.  I don't know who would have

13   been in charge of call monitoring for that entire time.

14   Q. This is during 2019 and 2020.

15   A. Oh, I'm sorry, I thought you meant sooner.  Oh,

16   the people --- the person in charge of call monitoring

17   was James Messina.

18   Q. Okay.

19   Was he under your compliance in the organization

20   of the company?  Did he report to you?

21   A. No, he reported into business executives, sales

22   executives, but he generated reports.

23   Q. And what role did you play in the call monitoring,

24   if any?

25   A. I reviewed the reports.

Page 72

1    Q. Were you involved at all in the creation of the

2    program, in deciding what they were going to monitor

3    for?

4    A. Yes.

5    Q. Whenever that happened prior to 2019?

6    A. Yes.

7    Q. How often did you receive the results from the

8    call monitoring?

9    A. We had meetings monthly, and so at that point, he

10   would share the reports with me.

11   Q. Do you review them?

12   A. Yes, with him.

13   Q. What did you review them for?

14   A. The rate of compliance overall, the number of

15   calls that he and his team listened to, and the

16   results.  The compliance measures.

17   ATTORNEY RYAN:

18   I'd like to mark this as Exhibit 6.

19                          ---

20   (Whereupon, Exhibit 6, Government

21   Monitoring Call Monitoring QA Results

22   Data, was marked for identification.)

23                          ---

24   THE WITNESS:

25   Thank you.

Page 73

1    ATTORNEY KIDER:

2    Thank you.

3    BY ATTORNEY RYAN:

4    Q. Does this document look familiar to you?

5    A. The document does not.  But the individual --- the

6    information does, yes.

7    Q. Is this the type of report that you would have

8    received?

9    A. Yes.

10   Q. Okay.

11   Do you have any reason to doubt that you wouldn't

12   have reviewed this document?

13   A. I had no reason.

14   Q. Can you describe what this document is?

15   A. It shows the results of the call monitoring in

16   different periods of time.

17   Q. The Bates pages are a little wonky.  There's two

18   Bates numbers.  The one we're looking for is the top

19   one.  So Bates page 14.  So this third page of the

20   document.

21   A. Okay.







Page 76



















Page 86

3   ATTORNEY RYAN:

4   You could go ahead --- I'd like to mark

5     this document Exhibit 7.

6                          ---

7     (Whereupon, Exhibit 7, Email Chain

8     2/18/21 "Call Center", was marked for

9     identification.)

10                         ---

11  THE WITNESS:

12  Thank you.

13    BY ATTORNEY RYAN:

14    Q. Go ahead and take your time to read this document.

15    You did not receive this email, but do you have any

16    reason to doubt that this is an accurate representation

17    of emails between Ms. Brigid Brooks and Ms. Clark?

18    A. I don't.

19    Q. Did either Ms. Clark or Ms. Brooks ever raise

20    these concerns with you?

21    A. No.

22    Q. Did you share these concerns with the --- with

23    your knowledge of the results of the reports?



Page 88

15  Q. When did Freedom add more people to monitor the

16  calls?

17  A. Freedom always had a good number of people.  I can

18  get you specific information about the numbers, but I

19  don't have that information in my head.

20  Q. Did Jeremy ever raise to you that he wasn't

21  receiving the call monitoring reports on time?

22  A. He did not.

23  Q. Or that the reports were not timely?

24  A. He did not.

25  Q. Sorry, one more.  Was there a reduction in staff

Page 89

1    at any point during 2020 with the call monitoring

2    efforts?

3    A. Not in 2020.  In 2021, when the rates started to

4    increase and production dropped.  But I don't --- it

5    wasn't this soon.  It was later in 2021.  And I don't

6    even know if it was 2021 or 2022.  I'm sorry.  2021 was

7    a banner year.  I believe 20 --- no, I'm sorry.  2021

8    was a very, very heavy year in originations because the

9    interest rates were historically low and that's the

10   year in which we had 779,000 entries.  Calendar year

11   2021 was also a very high volume year and the interest

12   rates were still low, as I recall.  So when she's

13   talking about --- I don't understand why she thinks we

14   had staff reduction.  I'll be happy to go back and

15   look, but I don't know if we had staff reductions until

16   later.  The staff reductions were in response to the

17   rapid and dramatic change in the market to keep the

18   company afloat.  It wasn't a reflection of the lack of

19   importance of compliance.  It was across the board.

20   Q. Do you remember, given the increase in volume in

21   2020 and 2021, did Freedom staff up its call monitoring

22   efforts at all?

23   A. I don't recall exactly, but I know that the entire

24   division staffed up, increased its staffing.

25   ATTORNEY KIDER:

Page 90

1    What time are you thinking about breaking

2      for lunch?

3    ATTORNEY RYAN:

4    I have --- maybe like ten more minutes.

5      Does that sound good to everybody?  Actually, you know

6      what?  Now is probably good time.

7                              ---

8      (WHEREUPON, A SHORT BREAK WAS TAKEN.)

9                              ---

10   BY ATTORNEY RYAN:

11   Q. I have a few follow-up questions Just to clarify,

12     a few of the things that you said earlier.  Regarding

13     QuestSoft, you said your knowledge of the particulars

14     there was a little limited.  Who would know more at

15     Freedom about how those --- what the specific tests

16     are?

17   A. Laura Clark and Mike Young and --- yeah.

18   Q. And do you still use the QuestSoft?

19   A. Yes.

20   Q. Okay.

21   Again, we did talk about this, but the quality

22     assurance testing, I'm still trying to understand

23     exactly how that ensures that HMDA data is accurate.

24     Can you explain that again?

25     A. Sure.  The data that is tested by our quality

1    assurance team and also by our quality control team is

2    information that is HMDA reportable.

3    Q. Can you give me a few examples?

4    A. Sure.  I think we've already talked about APR.  We

5    can talk about, let's see, loan amount.  Well, we know

6    action taken has some issues.  All of the data fields

7    that you listed are HMDA reportable.

8    Q. Is this program, is it a computer program like

9    QuestSoft?

10    A. No, it's manual.  It's done manually by people who

11    have specific directions on what to test.

12    Q. So they look at --- they're listening to the

13    calls?

14    A. No, they're looking at the loan files.  They're

15    not listening to the calls at this point.  That's a

16    separate group.  We have a separate group whose only

17    focus was call --- listening to the calls.  We call it

18    call monitoring, but it's listening to the recorded

19    calls, not live monitoring.

20    But there's another group in quality assurance,

21    and there are a couple of different groups, several

22    throughout the company, that review the information in

23    the loan file that is HMDA reportable.  So starting

24    with loan amount, the loan purpose, the income of the

25    borrower, the credit report, the credit score, all of

Page 92

1    those items that are listed.  If I can just look at ---

2    we can go through a loan purpose, construction method,

3    loan amount, action type.

4  All of this information is reviewed either for

5    compliance or for credit by the credit quality control

6    team because it needs to be both compliant and it needs

7    to meet the credit criteria of each loan program.  So

8    each loan is put through that kind of a process

9    manually.  And that's why I'm so confident that the

10   information that we report has such a high accuracy

11   rate.

12   Q. What are they --- they look at the loan file and

13   are they looking for consistencies within the loan file

14   or do they compare it to something else?

15   A. They compare it to what's in the system.

16   Q. Lakewood ---

17   A. Yes.

18   Q. --- is the system?  Okay.  So they look at the

19   application --- maybe it's a paper application or an

20   online application ---.

21   A.  Or an electronic loan file.  We store everything

22   in an electronic directory.  It's called EDMS,

23   electronic directory management system or document

24   management system.

25   Q. And they compare it to what's in Lakewood?

1    A. Yes.

2    Q. Okay.

3  And those are to ensure that there is consistency

4    between the two of those.

5  Is that right?

6    A. Correct.  So that the information is --- that

7    information in our system is accurate and it's --- yes,

8    there's consistency.  That's correct.

9    Q. Okay.

10  And then, so there's a program that makes sure

11    that the information from EDMS to loan files is what's

12    kept in Lakewood, which is Freedom's ---

13    A. Loan origination system.

14    Q. --- loan origination system.

15    A. Yes.  It's not a program, it's a function.  It's a

16    function that is conducted manually by human beings.

17    Q. Okay.

18  And the HMDA data is taken from Lakewood.

19  Is that correct?

20    A. Yes.  That is correct.

21    Q. Okay.

22  Is there any program that compares and makes sure

23    that the information in Lakewood is what is the

24    information on the HMDA LAR?

25    A. It's one and the same.  There wasn't --- the

Page 94

1      information from Lakewood is what is used.

2      Q. That the correct information is pulled from

3      Lakewood onto the HMDA LAR.

4      A. That's data governance.  That would be -- again,

5      it's a function, not a program.  It's the function of

6      data governance to review the information that's

7      populated in the LAR, make certain that it traces back

8      to the appropriate point in the loan origination

9      system.

10     Q. Okay.

11     Do they have --- do they do this comprehensively

12     on a regular basis?

13     A. Yes, they update it.  You know, it's a daily

14     dashboard.  They update it daily.

15     Q. What is the dashboard?

16     A. It shows all the items that they reviewed and any

17     questions about whether or not it's the right

18     information that we need for HMDA.

19     Q. Okay.

20     So data governance is a team within IT, you said.

21     Right?

22     A. Yes.

23     Q. Okay.

24     About how many people work for them?

25     A. I think half a dozen.  Like six or so.

Page 95

1    Q. Are there written policies and procedures that

2    describe this review?

3    A. Yes, there is a written procedure.

4    Q. Okay.

5    Was it in place during 2020?

6    A. I believe it was, yes.  I'm getting all my years

7    mixed up, but yes.  Yes.

8    Q. Okay.

9    It'd be important to know ---

10   A. I know.

11   Q. --- if it was the case that if it was in place in

12   2020.  Did they look at every single HMDA data field?

13   A. Yes.

14   Q. On a regular basis to ensure that the correct data

15   was being pulled into the HMDA LAR?

16   A. Yes.

17   Q. Were those results documented?

18   A. I believe so, yes.

19   Q. Okay.

20   Do you remember what those were called?

21   A. No.

22   Q. Did you receive them?

23   A. No.  A representative of my team met with data

24   governance no less than weekly.

25   Q. Who was that?

Page 96

1     A. At different times, it was different people.  It

2     was Tracy Hatt-Doering, and now it's Laura Clark, even

3     though she's not a direct member of my team.

4     Q. During 2020?

5     A. It would have been Tracy.  Well, no, she wasn't

6     here yet.  I have to go back and check.

7     Q. Okay.

8  But you never saw the results of this?

9     A. I never saw the results of it, no.

10    Q. Did you instruct them to do it or this was

11    something they've always done.  Was this a new program

12    that you instructed them to do this?

13    A. The data governance function was newly formed

14    during 2019, and then it expanded and became more

15    robust during 2020.  I could have my years wrong there,

16    too.  I'm sorry.  I could have my year --- it could be

17    --- could have been 2020 and 2021.  I'll have to check.

18    I'm sorry.

19    Q. So you don't know for sure?

20    A. I don't know for sure right now.  I apologize.

21    Q. Okay.

22  So do you know for sure that data governance had

23    done this check before you submit, before Freedom

24    submitted the 2020 LAR to the Bureau in February of

25    2021?

Page 97

1    A. No.

2    Q. Do you know, were they doing --- in addition to

3    the review from the loan file into Lakewood and

4    possibly data governance doing the look from Lakewood

5    into the HMDA LAR, was there anybody doing a comparison

6    between the HMDA LAR and the loan files?  Doing any

7    sort of monitoring there?

8    A. That would have been covered, but that would have

9    been part of what happened after QuestSoft report was

10   run and the validity edits revealed certain issues.

11   Then at that point, the compliance team and the

12   business team would have reviewed the loan files.

13   Q. Okay.

14   You also mentioned the dashboard, the HMDA

15   dashboard.  When did the dashboard start being used by

16   Freedom?

17   A. You know, I'm getting my dates mixed up and I

18   don't want to give you misinformation.  I'm really

19   sorry.

20   Q. Sure.

21   A. I don't know why I can't ---.

22   Q. Sure.  Okay.

23   We're going to move on from there.  What is the

24   data to doc program?

25   A. A sampling of files is taken, and the data in the

Page 98

1    system is compared to the loan files.

2    Q. Who was in charge of creating this program?

3    A. Well, Brigid Brooks was instrumental in creating

4    it.

5    Q. What were the necessary steps that Freedom took to

6    stand up this program?

7    A. We identified the appropriate people to be members

8    of the team, and we gave them access to the EDMS and

9    the other systems that they needed, and they needed to

10   have access to Lakewood, so we gave them appropriate

11   right to see the data in Lakewood so that they could

12   compare the two.

13   Q. Any other steps that needed to be taken to create

14   the program?

15   A. There was a procedure that was put into place and

16   formally documented, and they needed to be trained.

17   Q. When did these necessary steps get completed?

18   A. It was after the filing of the 2020 LAR, but I'm

19   getting --- I'm sorry, I have to go back and check.

20   Q. Okay.

21   Did you play a role in the creation of that

22   program?

23   A. I knew it was happening.  I delegated it.

24   Q. Okay.

25   To Ms. Brooks.

Page 99

1    A. To Ms. Brooks.  And then later, Tracy Hatt-Doering

2    became involved.

3    Q. Do you remember when the policies and procedures

4    were finalized for the program?

5    A. I don't.

6    Q. Did you review them?

7    A. Yes.

8    Q. Were you in charge of approving them?

9    A. Yes.

10   Q. How many people worked for the program?

11   A. Four at the time.  The last couple of years it was

12   four.

13   Q. And you talked about this a little bit.  But how

14   does the program identify inaccuracies in HMDA data?

15   Or how does it ensure accuracy in HMDA data?

16   A. So much like the other types of quality control

17   and quality assurance reviews that take place by human

18   beings.  Comparing the information in the loan

19   origination system to the information on the loan

20   documents.  Individuals compare the two and identify

21   discrepancies.  In this case, they're focused on HMDA

22   compliance.

23   Q. Did you receive the results of the program?

24   A. I received --- I discussed the results of the

25   program with Tracy when the --- when the program was

Page 100

1    more mature.  I made sure that I was in the loop on all

2    of the findings.  Yes.

3    Q. Did Ms. Hatt-Doering or Ms. Brooks tell you if

4    they were identifying errors in the files that they

5    were reviewing?

6    A. Ms. Hatt-Doering did, yes.

7    Q. Okay.

8    Ms. Brooks?

9    A. She didn't communicate much to me.  No.

10   Q. About how many times did you hear about the

11   program identifying errors?

12   ATTORNEY KIDER:

13   If you know, you can answer.

14   THE WITNESS:

15   Every week I had a standing meeting with

16   Ms. Hatt-Doering and every week we discussed all the

17   areas of her responsibility.

18   BY ATTORNEY RYAN:

19   Q. How many times did you hear about the program

20   identifying errors?

21   ATTORNEY KIDER:

22   I'm going to object on speculation.  If

23   you know the answer, you can answer.

24   THE WITNESS:

25   I don't know the exact amount of time.

Page 101

1    BY ATTORNEY RYAN:

2    Q. That's fine.

3    A. There are so many numbers you're asking me.

4    Q. If the program identified an error that Ms. Hatt-

5    Doering or Ms. Brooks thought was a systemic error,

6    what would Freedom do with that information?

7    A. Freedom would investigate their root cause.

8    Freedom being compliance.  Ms. Hatt-Doering, in

9    particular, would work with the appropriate business

10   people, business partners, we call them, and identify

11   the root cause.  If it involved technology, we would

12   loop in somebody from IT.  And if the correction

13   involved technology, we would submit a ticket to the IT

14   department to have the information or the mechanism

15   corrected.  If it involved training, we would have

16   involved the training department to draft training and

17   we would communicate the training change.

18   Q. Was there any program like this during 2020?

19   A. Not a specific adopt or data to doc program.  But

20   keep in mind that we were using a very, very robust

21   HMDA compliance software and we had very comprehensive

22   quality assurance and quality control testing of all

23   the data elements, all of them that were reported.

24   So there wasn't a specific group within the

25   compliance team that was called data to doc.  But, for

Page 102

1    example, Mike Young was engaging in this sort of

2    activity every time he found the validity exception.

3    So I think it's misleading just to give you a yes or no

4    answer.

5    Q. How often were the sample --- or the data to doc

6    samples done?

7    A. There was an ongoing role of the four people in

8    that group.  So when you say how often it was done, all

9    the time.

10   Q. About how many loans per month or ballpark is

11   fine, whatever you remember.

12   A. It was a limited number of loans, which is one of

13   the reasons that it's much --- maybe a couple of

14   hundred a month.

15   Q. And besides yourself, did anyone else see the

16   results of the data to doc program?

17   A. Yes, Laura Clark saw them.  Suzy Shuck --- Suzanne

18   Shuck saw them.

19   ATTORNEY RYAN:

20   I'd like to mark this Exhibit 8, I think

21   we're on.

22                         ---

23   (Whereupon, Exhibit 8, Second Response to

24   January CID, was marked for

25   identification.)

Page 103

1                          ---

2      BY ATTORNEY RYAN:

3      Q. I'm going to switch gears a little bit.  I am

4      going to be asking you take as much time as you need to

5      review.  I am going to ask you about some things on

6      page seven.

7      ATTORNEY KIDER:

8      Cindy, you can look over as much of the

9      document as you may need to in order to answer

10     questions.

11     THE WITNESS:

12     Okay.

13     BY ATTORNEY RYAN:







```
23   ATTORNEY KIDER:

24   We're not doing this again.

25   ATTORNEY RYAN:
```

1    I'd like to mark this Exhibit 9.

2                                    ---

3     (Whereupon, Exhibit 9, Email 1/14/22

4     "HMDA Items for the Week of 1/10", was

5     marked for identification.)

6                                    ---

7     BY ATTORNEY RYAN:

8     Q. Okay.

9    Do you recall this email?

10    A. I don't.

11    Q. Do you have any reason to doubt that you received

12    it based on the fact you're CC'd?

13    A. I don't.







█ ████████████████████████████

█ ████████   ████████████████████

█ ██████████████

█ ████████████████████████

█ ██████████████████████████████

█ ████████████████████████

█ ██████

```
 8    Q. In 2020, as a matter of company policy, did

 9    Freedom consider property value in making a decision

10    whether or not to originate a conventional mortgage

11    loan?

12    A. I believe so, yes.  It depends on the loan

13    program, just to be very specific.

14    Q. Okay.

15  Were there any conventional loan programs in which

16    Freedom did not consider property value?

17    A. I'd have to go back and check.  I don't know, off

18    the top of my head.

19    Q. What is a property inspector waiver?

20    A. A property inspection waiver is used in place of

21     --- it's an interesting term, but it's used in place

22    of an appraisal.

23    Q. How does that work if you know?

24    A. I don't remember.

25    Q. Okay.
```

Page 112

1    ATTORNEY RYAN:

2    This is Exhibit, what are we on?

3    COURT REPORTER:

4    Ten.

5    ATTTORNEY KIDER:

6    Thank you.

7                               ---

8    (Whereupon, Exhibit 10, Email Chain

9    2/25/21 "HDMA FMC 2020 LAR", was marked

10   for identification.)

11                              ---

12    BY ATTORNEY RYAN:

13    Q. Okay.

14   Do you recall receiving this email?

15    A. I don't.

16    Q. Do you have any reason to doubt this authenticity?

17    A. I don't.

18    Q. Okay.

██   ████████████████████████████████████████████

██     ████████████████████████████████████████████████

██     ████████████████████████████████████

██     ████████████████████

██     ████████████

██   ████████████████████████████████████████

██     ██████████████   ████████████████████████████



5    Q. Okay.

6    ATTORNEY RYAN:

7    Number 11.

8    THE WITNESS:

9    Thank you.

10   ATTORNEY RYAN:

11   I've got one more.  It comes with an

12     attachment.

13   THE WITNESS:

14   Thank you.

15                          ---

16   (Whereupon, Exhibit 11, Email 7/23/21

17   "PIW Reporting Property Value and CLTV",

18   was marked for identification.)

19   (Whereupon, Exhibit 12, Attachment to

20   Exhibit 11 Email, was marked for

21   identification.)

22                          ---

23    BY ATTORNEY RYAN:

24    Q. Do you recollect this document?

25    A. I don't recollect either of them.

Page 115

1      Q. Okay.

2   Do you have any reason to doubt their authenticity

3      or that you received this document?

4      A. No.

5      Q. Do you remember reviewing the attachment that Ms.

6      Brooks sent to you?

7      A. I don't.

8      Q. Do you remember her raising this issue?

9      A. Not specifically, no.

10     Q. Okay.

11  In your capacity as the chief compliance officer,

12     if Ms. Brooks had raised an issue like this, what would

13     you typically have done with that information?

14     A. I would've researched it myself, and frankly,

15     first figured out what she was, what issues she was

16     identifying here and correct it.  If it were bad,

17     correct it.

18     Q. Did you do that here?

19     A. I don't remember specifically what was involved

20     here.

Page 116





Page 118

1   ATTTORNEY KIDER:

2   Object calls for speculation.  She said

3     for each one she says she doesn't know if it's true or

4     not.

5   ATTORNEY RYAN:

6   Okay.  Mark this as Exhibit 12.

7   COURT REPORTER:

8   Thirteen (13).

9   ATTORNEY RYAN:

10   Or 13, I'm sorry.  Thank you.

11   THE WITNESS:

12   Thank you.

13                              ---

14   (Whereupon, Exhibit 13, Email 1/12/2022

15   "HDMA Change Needed – Property Value",

16   was marked for identification.)

17                              ---

18    BY ATTORNEY RYAN:

19    Q. You are not in this email, but this is an email

20     from Tracy Hatt-Doering to Ms. Brooks, Mr. Young, Mr.

21     Ford on January 12, 2022.  Do you have any reason to

22     doubt its authenticity?

23    A. Not the authenticity, but the content.  You know,

24     people say --- people use my name sometimes, whether or

25     not it was accurate.



Page 119

1    Q. So ---

2    A. I'm sorry, go ahead.



Page 120

14     Q. I'm going to go back to, where is it.  Number

15     five, the supplemental interrogatory responses.  It's

16     number five or Exhibit 5.  And I'm going to ask you

17     specifically about the rate spread entry in the table.

18      It's on page six.

19     A. Okay.

20     Q. Just by way of background, can you, do you know

21     what rates --- what the rate spread calculation is?

22     A. I do.

23     Q. Okay.

24   Can you tell me?

25     A. Sure.  It's the difference between the rate

Page 122

1     offered to the borrower for the loan and the rates

2     offered at that moment in time to the most highly

3     qualified credit worthy borrowers getting similar types

4     of loans.

5     Q. Is that the first rate offered to the borrowers at

6     the APR?

7     A. Yes.

8     Q. And is the most qualified average rate?  Is that

9     the APOR?

10    A. Yes.

11    Q. A-P-O-R described here.  Freedom states that ---

12    go back to the table here.  The following data ---

13    Freedom states that the following data fields were

14    changed in the revised HMDA LAR because of the errors

15    identified below as described more fully in Freedom's

16    responsive as cited below.  And under the reason for

17    the change in the rate spread, Freedom gives three

18    reasons.

19  The first is that the rates rate was not

20    calculated based on the APR last disclosed to the

21    borrower during the reported period and the comparable

22    transactions APOR as of the date the loan's interest

23    rate was set.  Can you tell me when did Freedom first

24    learn about these errors?

25    A. I believe this is one that we learned about during

Page 123

1    the exam conducted by the CFPB.

2    Q. Does Freedom know when this miscalculation began?

3

4    ATTTORNEY KIDER:

5    Objection to the term miscalculation.

6    You can answer if you know.

7    ATTORNEY RYAN:

8    I can rephrase.

9    ATTTORNEY KIDER:

10   Okay.

11   BY ATTORNEY RYAN:

12   Q. Does Freedom know when it began calculating the --

13   - or calculating the rate spread not based on the APR

14   last disclosed to the borrower?

15   A. So I think that's a mischaracterization of what

16   happened.  What happened is there were instances where

17   there was an additional --- let me just sit back for a

18   moment.  It takes a number of weeks to manufacture a

19   mortgage loan.  It goes from the conversations between

20   the loan advisor and the consumer that we talked about

21   earlier, and then the application goes to processing

22   for additional documentation.  Then it goes to

23   underwriting, where the credit worthiness is

24   established and the ability to repay is established.

25   And then eventually it goes --- there are final

Page 124

1    disclosures, and during that period of time, things

2    happen.  There are people, they're human beings.

3    Sometimes they want more money or less money, or they

4    add a borrower, or they delete a borrower, a co-

5    borrower.  So it's a very dynamic situation, and the

6    rate could change up until the last moment.

7    Sometimes people decide they want to, quote

8    unquote, buy down their interest rate or their APR by

9    paying points.  Other times they want the least amount

10   that they can to bring to closing.  So that factors in.

11    Sometimes there's a situation where in order to keep a

12   deal from going to our competitor, we offer the

13   consumer like a $500 lender credit, or there's an extra

14   fee that popped up at the end that would be --- that we

15   offer to cover with a lender credit.

16   So all of that factors into the rate that can

17   happen very close to closing of the loan.  And so that

18   can happen after the point in time when we pull the

19   information from the system of record Lakewood onto the

20   LAR.  And that's what the situation was caused by.  It

21   wasn't incorrect information, it was just information

22   that was later updated.

23   Q. Okay, understood.

24   What did Freedom do to fix these inaccuracies?

25   A. We put stops into Lakewood that would prevent the

1    disclosure of an --- the issuance of another closing

2    disclosure to a consumer without having the data

3    grabbed by the HMDA, by the HMDA, by QuestSoft.  Sorry.

4    Q. Okay, sure.

5   Did the quality assurance and quality control

6    monitoring, was that capable of ensuring that the last

7    APR last disclosed to the borrower was on the HMDA LAR?

8    A. Yes, it would have been.

9    Q. How did it do that?

10   A. The quality assurance, it would have looked at the

11   information in the system and the information on the

12   last disclosed CD.

13   Q. In Lakewood?  It would have compared the CD to

14   Lakewood?

15   A. Yes.

16   Q. Did it look at the HMDA LAR?

17   A. Lakewood and HMDA LAR are one in the same.  The

18   HMDA LAR gets the information from Lakewood.  So there

19   wouldn't be a distinction between the information in

20   Lakewood and the information in the LAR, except when we

21   grabbed it --- when we pulled the information from

22   Lakewood onto the LAR at an incorrect time.  We're not

23   the last disclosure given to the borrower.

24   Q. So these errors were, you were reporting rates

25   that later changed.  Is that what these errors are?  Is

Page 126

1    that what Freedom is saying?

2    A. Yes.

3    Q. How did it know?

4    A. QuestSoft didn't know, the manual reviews --- you

5    asked if the manual reviews were capable, that human

6    beings reviewing, were capable of figuring that out.

7    Human beings reviewing the information in Lakewood and

8    the information on the electronic loan documents would

9    have seen the mismatch.

10   Q. Were these loans that were not --- were these

11   errors just for loans that were not closed yet?

12   A. They wouldn't have been.  These loans would not

13   have been closed at this point, but the loans could

14   have absolutely closed.  I'm not sure I understand.

15   Q. So I guess I'm confused.  The APR can change up

16   until closing, right?

17   A. Yeah.

18   Q. And the last disclosed APR at closing on the

19   closing disclosure?

20   A. Yeah.

21   Q. Is that the only APR kept in Lakewood?

22   A. No.  There, well, that's a question I'll have to

23   go back and look.  The last CD has to be given in

24   advance of the closing, right.  And so the information

25   that was captured and --- the rate could have changed

Page 127

1    after the point at which the data was pulled into the

2    HMDA QuestSoft.

3    Q. But that would have meant that it wasn't a closed

4    loan, is that right?

5    A. Well, at that point, it wasn't a closed loan.

6    Q. So Freedom was rate spreads for loans that weren't

7    closed yet?

8    A. It depends on the disposition in some cases, it

9    depends.  There are different points in time at which

10   the rate may have changed.  We may have changed the

11   rate.  We may have under disclosed the rate and had to

12   do a corrective CD post-closing of probably 950,000

13   entries.

14   Q. Okay.

15   Okay.  The second reason that Freedom gives is

16   that due to differences in the integrated rounding

17   formulas between Lakewood and Encompass, resulting in

18   relatively minor rate spread discrepancies.  What is

19   Encompass?

20   A. Encompass is a loan origination system that was

21   used by our traditional retail business, which

22   originated about 7,000 of the entries that were on the

23   2020 LAR.

24   Q. Okay.

25   So can you tell me a little bit more about this?

Page 128

1    The cost --- what happened here?

2    A. Freedom was, Freedom's LOS is Lakewood Proprietary

3    Loan Origination System that we built, we developed and

4    we modified.  Encompass is a third party system that's

5    maintained by that third party.  There were differences

6    in rounding up, rounding down the number of decimal

7    points.

8    Q. So how big of those differences, like, let me

9    rephrase that.  How big of a difference would be

10   included in a rounding there?  Like, how big could we

11   expect these differences to be?

12   A. Half a percentage point, right.  Either up or

13   down.  It wouldn't be any more than that.

14   Q. And then thirdly, in some instances, the APOR used

15   for with a rate spread calculation was slightly

16   different than the value and effect of the time the

17   interest rate on the loan was set.  Can you tell me a

18   little bit more about that?

19   A. I would like to look at the response to

20   interrogatory number 25.  Thank you.

21   ATTORNEY RYAN:

22   Exhibit 14.

23   THE WITNESS:

24   Thank you.

25                                  ---

Page 129

1    (Whereupon, Exhibit 14, Supplement to

2    First Response January CID, was marked

3    for identification.)

4                                    ---

5    THE WITNESS:

23    Q. Okay.

24    Did the CFPB direct Freedom to resubmit its HMDA

25    data to correct these errors?

Page 130

1    A. No.

2    Q. Did Freedom, in fact, resubmit the HMDA data to

3    correct these errors?

4    A. Yes, we did.

5    Q. I apologize if I've asked this before, but I don't

6    remember the answer.  What steps did Freedom take to

7    fix these errors?

8    A. Well, this particular mapping issue would have

9    been corrected by the HMDA compliance team working with

10   the folks in IT to change the mapping, to move it to

11   the right point in time.

12   Q. Do you know approximately when that happened?

13   A. I'd have to check.

14   ATTTORNEY KIDER:

15   Just let us know when it makes good time

16   for a break.

17   ATTORNEY RYAN:

18   Okay.

19   BY ATTORNEY RYAN:

20   Q. You mentioned that Mr. Young and Mr. Ford

21   conducted regular checks to make sure that the mapping

22   of this data was correct.  Do you have any information

23   about why this error wasn't caught in those checks?

24   A. No.

25   ATTORNEY RYAN:

Page 131

1    Okay, we can go ahead and take a break

2      now.

3    ATTTORNEY KIDER:

4    Great.  Thanks.

5                        ---

6      (WHEREUPON, A SHORT BREAK WAS TAKEN.)

7                        ---

8      BY ATTORNEY RYAN:

9      Q. Okay.

10   Will you take a look at the supplemental

11     interrogatory responses again, the table?  Page six.

12     I'd like to talk about the type of purchaser errors.

13     It also reasons also refers to the PID response.  We're

14     going to want to look at the March 30th response that

15     you have.  It's probably that, yeah, March 30th, pages

16     nine and ten.

17     A. Okay.







Page 134







Page 138











███████████████████████████████

████████

3   ATTORNEY RYAN:

4   Exhibit 15.

5   COURT REPORTER:

6   Fifteen (15).

7   ATTORNEY RYAN:

8   Exhibit 16.

9   ATTTORNEY KIDER:

10   What number is it, 16?

11                           ---

12   (Whereupon, Exhibit 15, Response to

13   Information Request, was marked for

14   identification.)

15   (Whereupon, Exhibit 16, CFPB FUR 14 and

16   responses, was marked for

17   identification.)

18                           ---

19   BY ATTORNEY RYAN:

20   Q. Okay.

21   Do you recognize these exhibits?

22   A. Generally I do.

████████████████████████████

██████████████████████████████

███████████████████████████████







Page 147

13    Q. All right.

14    How are doing?

15    A. We're doing okay.

16    ATTTORNEY KIDER:

17    Do you need a break?

18    THE WITNESS:

19    No, I'm fine, thank you.  Do you want a

20    break?

21    ATTORNEY RYAN:

22    No, I'm good, thanks.

23    ATTTORNEY KIDER:

24    Let me play us this off the record.

25    That's all right.

Page 148

1    BY ATTORNEY RYAN:

2    Q. Okay.

3    I'm going to go back to Exhibit 5.

4    A. I think that's your favorite.

5    Q. I think so too.







Page 151

14   Q. When Freedom submitted its 2020 HMDA LAR.  Were

15   you aware of errors in Freedom HMDA LAR?

16   A. No.

17   Q. On February 26th in Freedom submitted HMDA LAR,

18   was anyone employed by Freedom aware of any errors?

19   A. Not to my knowledge, no.

20   Q. Did anyone employed by Freedom raise their

21   suspicion that there may have been errors in the HMDA

22   LAR to you?

23   A. Not that I recall.

24   ATTORNEY RYAN:

25   Exhibit 17.

Page 152

```
 1                            ---

 2    (Whereupon, Exhibit 17, Chat Screenshot,

 3    was marked for identification.)

 4                            ---

 5      BY ATTORNEY RYAN:

 6      Q. Do you recall these Teams chat?

 7      A. I do not.

 8      Q. Do you know if these Team chats were with you?

 9      A. It appears that they were.  Well, I don't know, do

10      I?  Why doesn't it say who the other party is?

11      Q. Because metadata doesn't print out.

12      A. Usually it does.  It shows a picture of both

13      people.  Like there's a little picture of each person.

14    ATTTORNEY LAKE:

15    This is how the document was produced to

16      us by Freedom.

17    THE WITNESS:

18    Well, the guest of Freedom is the other

19      party I guess.

20      BY ATTORNEY RYAN:
```







Page 156



19   Q. Did Ms. Brooks make an HR complaint at one point?

20

21   A. Yes, she did.

22   Q. What was that complaint about?

23   A. She complained.  She complained about her manager.

24   Q. Who was her manager?

25   A. Tracy Hatt-Doering.

Page 157

1    Q. Do you remember what the complaint was about?

2    A. Again, there were a lot of things that Brigid

3    suggested.  She apparently told HR, you know, different

4    things.  I don't recall.  I wasn't privy to what she

5    told HR.

6    Q. And Ms. Brooks left Freedom?

7    A. Of her own volition.

8    Q. When did you leave?

9    A. I believe October of last year.

10    Q. And Brigid was, Brigid Brooks was one of the HMDA

11    specialists that you had brought on during 2020 and

12    2021?

13    A. Yes.  Yes.

14    Q. Okay.

15    ATTTORNEY KIDER:

16    Let's take a break.  Okay.

17                     ---

18    (WHEREUPON, A SHORT BREAK WAS TAKEN.)

19                     ---

20    ATTORNEY RYAN:

21    Exhibit 18.

22    THE WITNESS:

23    Thank you.

24    ATTORNEY RYAN:

25    This one has an email header.

Page 158

1    THE WITNESS:

2    I know.

3    ATTTORNEY KIDER:

4    All right.  Take your time and read it

5      over.

6                              ---

7    (Whereupon, Exhibit 18, Email 3/16/2021

8    "Ron's Failure" with Chat screenshot, was

9    marked for identification.)

10                             ---

11   BY ATTORNEY RYAN:

12   Q. Do you recollect this email?

13   A. I don't recollect it in particular, but I don't

14     doubt it --- I don't doubt its legitimacy.







Page 162

10    Q. Okay.

11    ATTORNEY RYAN:

12    I'd like to mark this as Exhibit 19.

13    ATTTORNEY KIDER:

14    Are we done with this one?

15    ATTORNEY RYAN:

16    Yes.

17    THE WITNESS:

18    Thank you.

19    ATTORNEY RYAN:

20    And here we go.

21    ATTTORNEY KIDER:

22    Thanks.

23                                   ---

24    (Whereupon, Exhibit 19, Quality Error

25    Summary Report, was marked for

Page 163

1   identification.)

2                              ---

3   BY ATTORNEY RYAN:

4   Q. I've already introduced Exhibit 10 with bates

5   number 3052.  Exhibit 19

6   A. Is this the one?

7   Q. Yes.  Exhibit 19 is one of the attachments in the

8   zip file from the QuestSoft summary reports on April

9   10th.

10  A. We're going way back here.  That may be the one

11  exhibit that I don't have.  Yes, I do have it.

12  Q. This page get emails are ten.

13  A. Okay, you want ten, just ten?  Or ten and eleven.

14  Q. Just ten.

Page 164





Page 166

█ ████████████████████████

█ ████████████

█ ███████████ ████████████████ ██████████

█ ████████████ ██████████████████

█ ███████████████████████████████

█ ████████████████ ████████████████████

█ ███████████████

8    BY ATTORNEY RYAN:

9    Q. Switching gears a little bit, do you recall an

10   internal HMDA audit that was conducted in 2018 to 2019?

11   A. Yes.

12   Q. What role did you play in the audit?

13   A. Actually, yes, I do.  I generally do.  I was the

14    --- I was, I answered questions.

15   Q. Did you provide documents, answer requests from

16   the audit team?

17   A. It depends on what the requests were.  I don't

18   remember specifically.

19   ATTORNEY RYAN:

20   I'll label this document Exhibit 20.

21                              ---

22   (Whereupon, Exhibit 20, Email Chain

23   10/30/2019 "HMDA Draft Report-

24   Management Responses due 10/29/19", was

25   marked for identification.)

Page 167

```
 1                          ---

 2     BY ATTORNEY RYAN:

 3     Q. Okay.

 4  Do you recognize this email?

 5     A. I don't remember it.

 6     Q. Do you have any reason to doubt that you received

 7     these emails?

 8     A. I don't.

 9     Q. Okay.
```



Page 168

███████████████████████████████████████████   ██

███████████████████████████

███████████████████

4    ATTORNEY RYAN:

5    I'd like to mark this Exhibit 21.

6                              ---

7    (Whereupon, Exhibit 21, Email Chain

8    11/21/2019 (EX 20 update), was marked

9    for identification.)

10                             ---

11   THE WITNESS:

12   Is there a report?

13   ATTORNEY RYAN:

14   Yes, we're going to get to that.

15   THE WITNESS:

16   Okay.

17     BY ATTORNEY RYAN:

18     Q. Do you recognize these emails?

19     A. Not specifically, but specific.

20     Q. Any reason to doubt that they're authentic?

21     A. No.

22     Q. Okay.

███████████████████████████████████

████████████████████████████████████████████

███████████████████████   █████████████████

Page 169

11    ATTORNEY RYAN:

12    I'd like to mark this Exhibit 22.

13                                    ---

14    (Whereupon, Exhibit 22, Email Chain

15    11/20/2019 (EX update 2), was marked

16    for identification.)

17                                    ---

18    BY ATTORNEY RYAN:

19    Q. Okay.

20    Do you recall this email?

21    A. I do not specifically.

22    Q. Any reason to doubt its authenticity?

23    A. No.

24    Q. Okay.

13   ATTTORNEY KIDER:

14   Yeah, I don't want you to talk about any

15      conversations with him because it's subject to the

16      attorney/client privilege.

17   THE WITNESS:

18   Okay.

19   ATTTORNEY KIDER:

20   So I'm going to instruct him not to talk

21      about any conversations she had with him.

22   ATTORNEY RYAN:

23   Is it your position at all conversations

24      with Mr. Moliter, including ones that were about the

25      amount of time spent with auditors covered by

1    attorney/client privileges?

2    ATTTORNEY KIDER:

3    Yes.

4    BY ATTORNEY RYAN:



Page 172

12  ATTORNEY RYAN:

13  Okay.

14  I'd like to introduce Exhibit 23, it is.

15                            ---

16  (Whereupon, Exhibit 23, Attachment to

17  Exhibit 21 - HMDA Audit Draft Report, was

18  marked for identification.)

19                            ---

20   BY ATTORNEY RYAN:

21   Q. This is the attachment to Exhibit 20.

22   A. All right.

23   Q. Okay.

24  I am going to start on page six.

25   A. Okay.

Page 173

1      Q. Do you recognize those documents?

2      A. No, not specifically.

3    ATTTORNEY KIDER:

4    Are you asking her if she recognizes page

5      six?

6    ATTORNEY RYAN:

7    I'm just asking for a foundation for the

8      document.  So does she recognize the document in

9      general?

10   ATTTORNEY KIDER:

11   The document.

12   THE WITNESS:

13   I don't recognize it specifically, but it

14     looks like a format that was used at the time.

15     BY ATTORNEY RYAN:



Page 174



Page 176







Page 179



24   Q. Knowing what you know now about Freedom's

25   compliance system as it was at the time, would you

```
                                                    Page 180

 1     still have said today that it's satisfactory?

 2     A. Yes.

 3   ATTORNEY RYAN:

 4   Okay, let's go off the record.

 5                         *  *  *  *  *  *  *  *

 6              EXAMINATION CONCLUDED AT 5:03 P.M.

 7                      *  *  *  *  *  *  *  *

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 181

1                    E R R A T A   P A G E

2       Pursuant to Rule 30(e) of the Federal Rules of Civil
        Procedure, any changes in form or substance which you
3       desire to make to your deposition testimony shall be
        entered upon the deposition with a statement of the
4       reasons given for making them.

5


6       To assist you in making any such corrections, please
        use the form below.  If supplemental or additional
7       pages are necessary, please furnish same and attach
        them to this errata sheet.
8
        I, the undersigned, Cynthia Berman, hereby certify under
9       penalty of perjury that I have read the foregoing
        deposition and that said deposition is true and
10      accurate, with the exception of the changes noted
        below, if any.
11

12      Page / Line /          Change        /    Reason

13      ____ / ____ / _____ / _____

14      ____ / ____ / _____ / _____

15      ____ / ____ / _____ / _____

16      ____ / ____ / _____ / _____

17      ____ / ____ / _____ / _____

18      ____ / ____ / _____ / _____

19      ____ / ____ / _____ / _____

20      ____ / ____ / _____ / _____

21      ____ / ____ / _____ / _____

22      ____ / ____ / _____ / _____

23      ____ / ____ / _____ / _____

24      ____ / ____ / _____ / _____

25      ____ / ____ / _____ / _____

```
                                              Page 182

 1    Page / Line /          Change         /    Reason

 2    ____ / ____ / _____ / _____

 3    ____ / ____ / _____ / _____

 4    ____ / ____ / _____ / _____

 5    ____ / ____ / _____ / _____

 6    ____ / ____ / _____ / _____

 7    ____ / ____ / _____ / _____

 8    ____ / ____ / _____ / _____

 9    ____ / ____ / _____ / _____

10    ____ / ____ / _____ / _____

11    ____ / ____ / _____ / _____

12    ____ / ____ / _____ / _____

13    ____ / ____ / _____ / _____

14    ____ / ____ / _____ / _____

15    ____ / ____ / _____ / _____

16    ____ / ____ / _____ / _____

17

18                          _____
                            Cynthia Berman
19

20    Sworn to and subscribed before me

21    _____,

22    Notary Public, this _____ day of

23    _____, 2024.

24    My commission expires: _____

25
```

Page 183

```
 1

 2

 3

 4                        CERTIFICATE

 5

 6   I hereby certify, as the stenographic reporter,

 7      that the foregoing proceedings were taken

 8      stenographically by me, and thereafter reduced to

 9      typewriting by me or under my direction; and that

10      this transcript is a true and accurate record to the

11      best of my ability.

12      Dated the 16th day of April, 2024

13

14

15

16   Jennifer Corb,

17   Court Reporter

18

19

20

21

22

23
```