# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

Case No. 9:23-cv-81373- MIDDLEBROOKS-MATTHEWMAN

CONSUMER FINANCIAL PROTECTION BUREAU
     Plaintiff,

vs.

FREEDOM MORTGAGE CORPORATION,
     Defendant.

_____/

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW IN SUPPORT THEREOF

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 1

LEGAL STANDARD ............................................................................................................. 5

ARGUMENT .......................................................................................................................... 5

    I.    FREEDOM'S WIDESPREAD ERRORS IN ITS 2020 LAR VIOLATED HMDA AND
    REGULATION C ............................................................................................................ 6

       A.  It is Undisputed that Freedom's 2020 HMDA LAR Contained Errors. ............................ 6

       B.  The Evidence is Conclusive that Freedom's 2020 HMDA Errors Were Not Bona Fide. 7

           1.   Freedom Admits that the Root Causes of Many of Its Errors Stem from Specific Gaps
           in its HMDA Compliance Policies and Procedures ............................................................ 9

           2.   The Deficiencies of Freedom's Compliance Management System Are Definitive and
           Indisputable ........................................................................................................................ 11

    II.   FREEDOM'S CONDUCT VIOLATED THE 2019 ORDER ............................................... 15

    III.  THE COURT SHOULD GRANT INJUNCTIVE RELIEF AND A CIVIL MONEY
    PENALTY ....................................................................................................................... 16

       A.  Injunctive Relief ............................................................................................................. 16

       B.  Civil Money Penalty ...................................................................................................... 17

CONCLUSION ...................................................................................................................... 18

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). ....................................................... 5

*Anderson v. United Parcel Serv.*, 506 F. Supp. 2d 1215 (S.D. Fla. 2007) .................................. 5

*Arnold v. Bayview Loan Servicing*, 659 Fed. App'x 568, 571 (11th Cir. 2016)........................... 8

*Brown v. Marquette Sav. & Loan Assoc.*, 686 F.2d 608 (7th Cir. 1982)..................................... 9

*Canady v. Wisenbaker Offices, P.C.*, 372 F. Supp. 2d 1379 (N.D. Ga. 2005) ............................. 8

*CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043, 2021 WL 4077110 (C.D. Cal. Aug. 10, 2021)...................................................................................................................... 16

*CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022) .................... 16

*CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859, 2021 WL 11552529 (N.D. Ga. Oct. 20, 2021) ...................................................................................................... 16

*Hall v. Skipper*, 808 Fed. App'x 958 (11th Cir. 2020) ....................................................... 5

*Knighten v. Palisades Collections, LLC*, 721 F. Supp. 2d 1261 (S.D. Fla. 2010)......................... 8

*Light v. Seterus, Inc.*, No. 18-62291-CIV, 2019 WL 5208840 (S.D. Fla. May 20, 2019)............. 8

*Lynn v. Fort McClellan Credit Union*, No. 1:11-CV-2904, 2013 WL 5707372 (N.D. Ala. Oct. 21, 2013 ...................................................................................................................... 8

*Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574 (1986)................................. 5

*Mirabal v. Gen. Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976)................................. 9

*Owen v. I.C. Sys.*, 629 F.3d 1263 (11th Cir. 2011)........................................................... 8

*Palmer v. Ameribanq Mortgage Grp., LLC*, No. 05-2023, 2010 WL 3933273 (E.D. Pa. Oct. 6, 2010)...................................................................................................................... 8

*Prescott v. Seterus, Inc.*, 635 Fed. App'x 640 (11th Cir. 2015) ........................................... 9

*Skanes v. FedEx*, 734 Fed. App'x 671 (11th Cir. 2018) ..................................................... 5

*Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246 (3d Cir. 1980) ............................................. 9

*United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348 (11th Cir. 2019) .............. 15

*Valdes v. Accounts Receivable Res., Inc.*, 544 F. Supp. 3d 1313 (S.D. Fla. 2021) ...................... 8

**STATUTES**

12 U.S.C. § 2803 .................................................................................................. 2

12 U.S.C. § 2803(a) ......................................................................................... 15, 16

12 U.S.C. § 2803(b) ............................................................................................ 15

12 U.S.C. § 2803(h) .................................................................................................. 6, 15, 16

12 U.S.C. § 2804(a) ............................................................................................................... 2

12 U.S.C. § 2804(b) ............................................................................................................... 2

12 U.S.C. § 5481(12) ............................................................................................................. 5

12 U.S.C. § 5481(12)(K) ...................................................................................................... 14

12 U.S.C. § 5481(14) ...................................................................................................... 14, 16

12 U.S.C. § 5536(a)(1)(A) ........................................................................................... 5, 14, 16

12 U.S.C. § 5565(c) ..................................................................................... 2, 16, 17, 18

15 U.S.C. § 1640(c) ............................................................................................................... 7

15 U.S.C. § 1692k(c) ............................................................................................................. 8

**RULES**

Fed. R. Civ. P. 56(a) .............................................................................................................. 5

**REGULATIONS**

12 C.F.R. § 1003.4 ............................................................................................................. 2, 6

12 C.F.R. § 1003.4(a) ..................................................................................................... 15, 16

12 C.F.R. § 1003.4(a)(7) ....................................................................................................... 2

12 C.F.R. § 1003.4(a)(8)(i) .................................................................................................. 11

12 C.F.R. § 1003.4(a)(9) ....................................................................................................... 2

12 C.F.R. § 1003.4(a)(28) ..................................................................................................... 2

12 C.F.R. § 1003.4(b) ..................................................................................................... 15, 16

12 C.F.R. § 1003.5 ................................................................................................................. 2

12 C.F.R. § 1003.5(a) ....................................................................................................... 6, 15

12 C.F.R. § 1003.5(a)(1)(i) ................................................................................................... 2

12 C.F.R. § 1003.5(a)(1)(ii) .................................................................................................. 2

12 C.F.R. § 1003.6(b) ............................................................................................................ 2

12 C.F.R. § 1003.6(b)(1) ....................................................................................................... 7

12 C.F.R. § 1003.6(b)(2) ....................................................................................................... 6

12 C.F.R. § 1083.1 ............................................................................................................... 17

**OTHER AUTHORITIES**

Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128 (Oct. 28, 2015) .................... 2, 7

## INTRODUCTION

In June 2019, Defendant Freedom Mortgage Corporation (Freedom), one of the nation's largest mortgage originators, agreed to the entry of a consent order with the Consumer Financial Protection Bureau (Bureau) for violations of the Home Mortgage Disclosure Act (HMDA) and its implementing Regulation C (2019 Order). The 2019 Order found that Freedom had violated HMDA and Regulation C by intentionally misreporting mortgage loan data to the Bureau from 2014 to 2017, and prohibited Freedom from violating specific provisions of HMDA and Regulation C related to the collection, recording, and reporting of HMDA data. But Freedom's violations of HMDA and Regulation C did not cease. Less than two years later, in early 2021, Freedom's annual submission of 2020 HMDA data contained over 150,000 errors.

The Bureau moves this Court for summary judgment on all three counts in its Complaint because there is no genuine dispute about the facts that establish Freedom's liability. Indeed, the facts underlying the Bureau's counts are based almost entirely on Freedom's own statements. First, Freedom admits to submitting, in February 2021, a Loan/Application Register (LAR) with thousands of inaccurate data entries across dozens of data fields. Second, evidence obtained from Freedom lays bare the procedural gaps, systemic deficiencies, and missing controls that together caused the widespread errors in its 2020 HMDA reporting. Notably, two internal audits at Freedom—one completed in 2019 and the other in 2022—leave no doubt that Freedom lacked the appropriate controls and procedures to avoid the errors that pervaded its 2020 HMDA reporting. By such evidence, Freedom's widespread errors were not "bona fide" within the meaning of Regulation C's "bona fide error" exception, and therefore each such error violated HMDA and Regulation C. Finally, Freedom violated the Consumer Financial Protection Act of 2010 (CFPA), because its error-filled HMDA reporting violated its obligation under the 2019 Order to avoid further violations of key provisions of HMDA and Regulation C.

## BACKGROUND

HMDA, first enacted in 1975 and amended several times since, responds to Congress's concerns about discriminatory lending and harmful patterns of community disinvestment by mortgage lenders. HMDA serves as a sunshine law, requiring mortgage companies to report data about their lending activities to the government and to make the data available for public disclosure. HMDA and its implementing Regulation C require that qualifying lenders collect and report certain specific and distinct data regarding applications for, originations of, and purchases

1

of "covered loans," which include home-purchase loans, home-improvement loans, and refinance loans.[1] The required data, which lenders submit in a LAR, include data for each loan for 48 data points such as the amount of the loan,[2] the address and value of the property,[3] and the ethnicity, race, and sex of the applicant or borrower.[4] Lenders covered by Regulation C must submit these data on an annual basis—specifically, by March 1 following the calendar year to which the data relate.[5] Lenders with at least 60,000 covered loans and applications in a year— including Freedom—must also submit quarterly LARs the following year.[6]

Through these reporting requirements, members of the public—along with policymakers, regulators, and researchers—can use HMDA data to identify lending patterns, detect discrimination, and assess the extent to which communities' housing finance needs are being met.[7] Because the reliability of HMDA data is so crucial, Congress tasked the Bureau and other financial regulators with enforcing its requirements, including through the imposition of civil money penalties in the event of a violation of HMDA or Regulation C.[8] Regulation C excuses "bona fide" errors, which it defines as those made unintentionally "despite the maintenance of procedures reasonably adapted to avoid such an error."[9] But lenders are otherwise in violation of the law for all errors made in the absence of procedures reasonably adapted to avoid them. As the Bureau's 2015 HMDA Final Rule amending Regulation C makes clear, "The accuracy of HMDA data depends on good operational and validation processes."[10]

Freedom has repeatedly violated HMDA and Regulation C since at least 2014. In June 2019, Freedom consented to entry of the 2019 Order, in which the Bureau found that Freedom had violated HMDA and Regulation C by misreporting race, ethnicity, and sex data in its LARs for 2014, 2015, 2016, and 2017.[11] The 2019 Order prohibited Freedom from violating specific

---

[1] 12 U.S.C. § 2803; 12 C.F.R. §§ 1003.4, 1003.5.
[2] 12 C.F.R. § 1003.4(a)(7).
[3] 12 C.F.R. § 1003.4(a)(7), (28).
[4] 12 C.F.R. § 1003.4(a)(9).
[5] 12 C.F.R. § 1003.5(a)(1)(i).
[6] 12 C.F.R. § 1003.5(a)(1)(ii).
[7] *See Mortgage Data (HMDA)*, CFPB, https://www.consumerfinance.gov/data-research/hmda.
[8] 12 U.S.C. § 2804(a), (b); 12 U.S.C. § 5565(c).
[9] 12 C.F.R. § 1003.6(b).
[10] Home Mortgage Disclosure (Regulation C), 80 Fed. Reg. 66128, 66255 (Oct. 28, 2015).
[11] SOF ¶¶ 9–12.

provisions of HMDA and Regulation C in the future,[12] and set forth other compliance-related requirements, including the submission of a compliance plan for the Bureau's non-objection, though Freedom's Board retained ultimate responsibility for ensuring that Freedom complied with the Order.[13]

In October 2019, Freedom's own internal audit division completed its review of Freedom's HMDA compliance program, concluding that the program "needs improvement."[14] Freedom's audit division found numerous errors in Freedom's 2018 HMDA LAR submission, and among other recommendations, advised that Freedom conduct "transaction testing for samples of reportable loans"[15] and "[d]evelop policies and procedures that provide sufficient information to guide the lines of business to be compliant with all applicable provisions of HMDA."[16] Freedom's Chief Compliance Officer Cynthia Berman rejected most of the recommendations from that 2019 audit, including the recommendation that Freedom regularly test samples of HMDA data against loan and application documents.[17]

Approximately a year-and-a-half later, on February 26, 2021, Freedom submitted to the Bureau its annual LAR for 2020 HMDA data, reporting on approximately 779,000 HMDA-covered loans and applications for the year.[18] In May 2021, the Bureau's Office of Supervision initiated a HMDA examination and began reviewing a sample of LAR data, checking it against underlying covered loan documentation—or "transaction testing"—in connection with an examination of Freedom's 2020 HMDA data reporting and compliance management systems.[19] Based on a random sample of 159 files (in accordance with publicly-available guidelines from the Federal Financial Institutions Examination Council (FFIEC)),[20] Bureau examiners identified

---

[12] SOF ¶ 15 (requiring that Freedom "not violate Section 304(a), (b), or (h) of the Home Mortgage Disclosure Act, 12 U.S.C. § 2803(a), (b), and (h), or Sections 1003.4(a)-(b) or 1003.5(a) of Regulation C, 12 C.F.R. §§ 1003.4(a)-(b), 1003.5(a)[.]").
[13] SOF ¶¶ 16–17.
[14] SOF ¶¶ 55–56.
[15] SOF ¶¶ 59–61.
[16] SOF ¶ 64.
[17] SOF ¶¶ 65–66.
[18] SOF ¶¶ 21–22.
[19] SOF ¶¶ 67–68.
[20] SOF ¶ 68. The FFIEC is an interagency body that develops principles and standards for the examination of financial institutions by various federal agencies, including the Bureau. *About the FFIEC*, FFIEC, http://www.ffiec.gov/about.htm.

3

51 errors across seven data fields in Freedom's 2020 HMDA LAR submission (Action Taken, Ethnicity, Race, Sex, Type of Purchaser, Rate Spread, and Lender Credits).[21] The examiners concluded that Freedom's HMDA procedures remained "seriously deficient," and identified ineffective training, monitoring, and procedural deficiencies as the root cause for the numerous errors it identified.[22] Examiners also found that management oversight—both by the Chief Compliance Officer who administered Freedom's HMDA compliance program and by its Office of the President—was practically nonexistent.[23]

When Freedom ultimately submitted a revised LAR in September 2021, it changed a significant amount of data, including correcting errors in those data fields identified by the Bureau, along with dozens of others, including the Debt-to-Income Ratio, Interest Rate, Total Loan Costs, and Credit Score data fields.[24] All told, Freedom corrected over 150,000 entries.[25] In this litigation, Freedom has admitted that its 2020 LAR included at least 155,420 errors spanning 47 separate data fields.[26]

In late 2021, Freedom's internal audit division again reviewed Freedom's HMDA compliance program, with a review period of Sept. 1, 2020 to Aug. 1, 2021—a period that covered Freedom's 2020 HMDA LAR submission in February 2021.[27] The internal audit team identified many of the same procedural deficiencies that Freedom's 2019 audit and that the Bureau's exam had uncovered.[28] Indeed, according to Freedom's internal audit division's report from March 2022, "key aspects of the creation and review of the [company's] HMDA LAR" were missing from Freedom's procedures entirely.[29] Freedom's internal audit division found numerous inaccuracies in reported HMDA data based on a sample of 2021 HMDA Data that

---

[21] SOF ¶ 69.
[22] SOF ¶ 72.
[23] SOF ¶ 73.
[24] SOF ¶¶ 39–40.
[25] SOF ¶¶ 40–41.
[26] SOF ¶ 40.
[27] SOF ¶¶ 74–75.
[28] SOF ¶¶ 76–96.
[29] SOF ¶ 88.

internal audit had tested,[30] and also found that, during the review period, Freedom *still* had "no HMDA LAR review process in place to identify inaccuracies."[31]

## LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32] Only factual disputes that "might affect the outcome of the suit under governing law" are material, whereas "[f]actual disputes that are irrelevant or unnecessary will not be counted."[33] Once the moving party has made such showing, the nonmoving party must provide specific facts showing that there is a genuine issue for trial—not just "metaphysical doubt as to the material facts"[34] or "unsubstantiated assertions."[35]

## ARGUMENT

The facts are clear that Freedom violated HMDA and Regulation C (Count I) when it failed to collect, record, and report accurate information regarding its 2020 mortgage lending. Freedom also violated its 2019 Consent Order with the Bureau, as that Order prohibited further violations of HMDA and Regulation C (Count II).[36] And because violations of federal consumer financial law, including HMDA and Regulation C, are violations of the CFPA, Freedom also violated the CFPA (Count III).[37] Because there is no genuine dispute over material facts bearing on these claims, this Court should grant summary judgment to the Bureau on all three counts.

---

[30] SOF ¶ 82.

[31] SOF ¶ 79; *see also* SOF ¶ 83 ("The internal review and LAR entry confirmation process was enacted, but not yet mature at the time of this review. Testing identified that although certain checklists, guidance and reports used to confirm HMDA reportable data exist, the overall process was inconsistently executed, operationalized and executed.").

[32] Fed. R. Civ. P. 56(a).

[33] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[34] *Anderson v. United Parcel Serv.*, 506 F. Supp. 2d 1215, 1222 (S.D. Fla. 2007) (quoting *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[35] *Hall v. Skipper*, 808 Fed. App'x 958, 959 (11th Cir. 2020); *see also Skanes v. FedEx*, 734 Fed. App'x 671, 673 (11th Cir. 2018) ("[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion.").

[36] SOF ¶ 15.

[37] 12 U.S.C. §§ 5536(a)(1)(A), 5481(12)(K).

## I.     FREEDOM'S WIDESPREAD ERRORS IN ITS 2020 LAR VIOLATED HMDA AND REGULATION C

HMDA and Regulation C require lenders to collect, record, and submit accurate data.[38] When a lender submits inaccurate data for any required data point, it necessarily fails to submit the required data. Every inaccurate data point is therefore a violation of the corresponding Regulation C requirement unless it is a "bona fide error," i.e., an error that is unintentional and that occurs despite procedures reasonably adapted to prevent it.[39] There is no dispute in this case that Freedom is subject to the requirements of HMDA and Regulation C, and there is no dispute Freedom submitted more than 150,000 inaccurate data entries in its 2020 HMDA LAR. Each one of these errors corresponds to a specific legal requirement that Freedom failed to meet. Because the record before this Court conclusively establishes that Freedom's compliance management system was deficient, lacking procedures reasonably adapted to avoid its errors, Freedom's errors were not bona fide, and each error violates HMDA and Regulation C.

### A.     It is Undisputed that Freedom's 2020 HMDA LAR Contained Errors.

HMDA and Regulation C require mortgage lenders to collect, record, and report dozens of different data points, relating to applicants' and borrowers' demographic information and financial circumstances, the terms of the loans they are issued, and whether those loans enter the secondary market.[40] Regulation C plainly requires that these data are both "complete" and "accurate," meaning "free from error."[41]

Freedom admits that its 2020 HMDA LAR submitted to the Bureau contained errors.[42] Freedom reported 778,750 covered loans or applications for 2020, and submitted its LAR describing them on February 26, 2021.[43] Seven months later, Freedom resubmitted its LAR with widespread changes.[44] Freedom admits that it resubmitted its LAR in order to correct 155,420

---

[38] Dkt. 62 at 4; *see* 12 U.S.C. § 2803(a), (b), (h); 12 C.F.R. § 1003.4(a), (b); § 1003.5(a).

[39] The same section describes a second kind of bona fide error, specific to the reporting of census tract numbers, that is not relevant here. *See* 12 C.F.R. § 1003.6(b)(2).

[40] *See* 12 C.F.R. § 1003.4 (a).

[41] Dkt. 62 at 6 (noting this "[c]ommon sense" reading of "Regulation C's plain text").

[42] SOF ¶¶ 39–40.

[43] SOF ¶ 22.

[44] SOF ¶¶ 40–41.

errors in its original submission.[45] Thus, there is no genuine dispute of material fact about whether Freedom committed prima facie violations of HMDA and Regulation C.

     **B.**    **The Evidence is Conclusive that Freedom's 2020 HMDA Errors Were Not Bona Fide.**

     An error in reporting data for a covered loan or application is a violation of HMDA and Regulation C unless (a) the error was unintentional, and (b) the error "occurred despite the maintenance of procedures reasonably adapted to avoid such an error."[46] The bona fide error exception does not suggest that a certain number of errors is acceptable for avoiding liability under HMDA and Regulation C.[47] Rather, as the Bureau's 2015 HMDA Final Rule explains:

> The accuracy of HMDA data depends on good operational and validation processes. Financial institutions have primary responsibility for these processes; the institutions must develop and maintain appropriate compliance management systems that are reasonably designed to ensure the accuracy of the data.[48]

     Courts have not had occasion to analyze Regulation C's bona fide error exception. But two other federal consumer financial laws—the Fair Debt Collection Practices Act (FDCPA) and the Truth in Lending Act (TILA)—contain bona fide error defenses that define the term with nearly identical language as Regulation C's, and courts have considered those defenses.[49] The

---

[45] SOF ¶¶ 40–41.

[46] 12 C.F.R. § 1003.6(b)(1).

[47] *See* 80 Fed. Reg. at 66255 ("The Bureau has concluded that it should not establish in Regulation C global thresholds for the number or percentage of errors in a financial institution's data submission that would trigger compliance or enforcement action. . . . The current provision on bona fide errors . . . provides appropriate flexibility for regulators to exercise judgment in assessing compliance violations.").

[48] *Id.* ("Decisions regarding when to pursue an enforcement action or other solution for noncompliance with HMDA or Regulation C are a matter of agency discretion. Each of the agencies that has authority to enforce HMDA can develop internal procedures and guidelines for citing a financial institution for inaccurate data. For example, the Bureau makes its HMDA examination guidelines available publicly, so that financial institutions understand, and can develop internal processes to meet, expectations for HMDA data accuracy."); *see also* Interagency Consumer Laws and Regulations: Home Mortgage Disclosure Act (last updated Dec. 17, 2021), https://files.consumerfinance.gov/f/documents/cfpb_hmda-procedures-exam-manual_2022-09.pdf; CFPB Examination Procedures: Compliance Management Review (Aug. 2017), https://files.consumerfinance.gov/f/documents/201708_cfpb_compliance-management-review_supervision-and-examination-manual.pdf.

[49] 15 U.S.C. § 1640(c) (excepting violations that were "not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid any such

Eleventh Circuit has, for instance, characterized the FDCPA's bona fide error provision as a "narrow carve-out to the general rule of strict liability[.]"[50] In another case, the Eleventh Circuit explained that an error "must be objectively reasonable" to qualify as bona fide under the FDCPA.[51] And in a 2010 decision, a court in this district ruled that a bona fide error did not exist where defendants were on notice of their erroneous conduct but continued it anyway.[52] Relatedly, another court in this district recently rejected a bona fide error argument where the error occurred repeatedly.[53]

With respect to TILA's "bona fide error" exception, "[f]ederal courts that have addressed this affirmative defense have repeatedly held that, in order to be entitled to its protection, the defendant must have and maintain procedures which serve as 'a safety catch or rechecking mechanism.'"[54] That line of reasoning followed from the Seventh Circuit's analysis in an early TILA case:

> [T]he statute requires a higher burden than merely good faith compliance. In other words, Congress required more than just the maintenance of procedures which were designed to provide proper disclosure calculations. Rather, it required procedures designed to avoid

---

error"); 15 U.S.C. § 1692k(c) ("A debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."). The language in those statutes addressing what qualifies as a bona fide error is nearly identical to Regulation C's bona fide error exception, and thus is relevant here.

[50] *Owen v. I.C. Sys.*, 629 F.3d 1263, 1271 (11th Cir. 2011); *see also Valdes v. Accounts Receivable Res., Inc.*, 544 F. Supp. 3d 1313, 1319 (S.D. Fla. 2021) ("The bona fide error defense is a limited exception to the general rule of strict liability under the FDCPA.").

[51] *Arnold v. Bayview Loan Servicing*, 659 Fed. App'x 568, 571 (11th Cir. 2016).

[52] *Knighten v. Palisades Collections, LLC*, 721 F. Supp. 2d 1261, 1269–70 (S.D. Fla. 2010) ("The bona fide error affirmative defense allowed under the FDCPA is not available to debt collectors who were on notice as to the unlawfulness of their lawsuits, but still continued to litigate."); *see also Canady v. Wisenbaker Offices, P.C.*, 372 F. Supp. 2d 1379, 1384 (N.D. Ga. 2005) (rejecting the FDCPA bona fide error defense, and granting plaintiff's motion for summary judgement, where defendant was put on notice it was acting based on inaccurate information and proceeded anyway).

[53] *Light v. Seterus, Inc.*, No. 18-62291-CIV, 2019 WL 5208840, at *9 (S.D. Fla. May 20, 2019) ("The purported violations in this case are not consistent with a simple clerical error; they involve 150 calls over a span of almost a year.").

[54] *Lynn v. Fort McClellan Credit Union*, No. 1:11-CV-2904, 2013 WL 5707372, at *5 (N.D. Ala. Oct. 21, 2013) (quoting *Palmer v. Ameribanq Mortgage Grp., LLC*, No. 05-2023, 2010 WL 3933273, at *11 (E.D. Pa. Oct. 6, 2010)).

and prevent the errors which might slip through procedures aimed at good faith compliance.[55]

Freedom's widespread errors in its 2020 LAR resulted from systemic and persistent deficiencies in its HMDA compliance management system and, consequently, do not fall within this type of limited exception.

        1.      **Freedom Admits that the Root Causes of Many of Its Errors Stem from Specific Gaps in its HMDA Compliance Policies and Procedures**

Freedom's own attributed root causes of the errors in its 2020 HMDA LAR confirm that they arose in the absence of procedures reasonably designed to prevent them. These were not even close to one-off, "clerical or factual mistakes."[56] Instead, it is clear that Freedom's high-level compliance officials knew that its procedural gaps had resulted in—and, just as importantly, failed to correct—data inaccuracies in the days leading up to the submission of its 2020 HMDA data. The "primary" procedure used by Freedom in 2020 to monitor the accuracy of its HMDA data was a third-party software called QuestSoft.[57] Freedom's 30(b)(6) witness, Chief Compliance Officer Cynthia Berman, testified that QuestSoft was not designed to, and in fact did not, detect the errors later discovered in Freedom's 2020 HMDA LAR, including the 2,366 admitted errors in the "action taken" field,[58] the 49,092 admitted errors in the "purchaser type" field,[59] or the 12,747 admitted errors in the "lender credits" field,[60] among others.[61] Freedom's representative also testified that it knew QuestSoft was unable to detect these errors when Freedom submitted its 2020 HMDA data.[62] It is undisputed that QuestSoft was only able to identify errors apparent from the data itself—for example, logical inconsistencies between two

---

[55] *Mirabal v. Gen. Motors Acceptance Corp.*, 537 F.2d 871, 878 (7th Cir. 1976), *overruled in part on other grounds*, *Brown v. Marquette Sav. & Loan Assoc.*, 686 F.2d 608, 615 (7th Cir. 1982); *see also Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 251 (3d Cir. 1980) ("The [procedures prong of the TILA bona fide error defense] has been construed strictly by the courts to require that a special system be established to assure that no initial errors occur, and that a checking mechanism be maintained to catch any errors that slip through the system.").

[56] *Prescott v. Seterus, Inc.*, 635 Fed. App'x 640, 646 (11th Cir. 2015).

[57] SOF ¶ 24.

[58] SOF ¶ 29.

[59] SOF ¶ 30.

[60] SOF ¶ 31.

[61] SOF ¶¶ 32–33.

[62] SOF ¶¶ 29–33.

data fields.[63] Freedom understood that QuestSoft could not perform other monitoring functions outside the four corners of the LAR itself, such as testing whether a loan or application was missing from the LAR, whether a loan or application was on the LAR but should not be reported, or whether the underlying loan data that Freedom had entered into its system of record was accurate.[64]

Others at Freedom, including Senior Director of HMDA Compliance Brigid Brooks, raised concerns about the need for HMDA data monitoring beyond the QuestSoft tool.[65] In a mid-February 2021 message, Brooks explained to Berman that Freedom had not conducted a "data to doc review"—i.e., transaction testing that would compare LAR data with underlying loan files—to "find[] the errors that QuestSoft cannot."[66] When Brooks noted that she was aware of errors in the LAR,[67] Berman responded: "[A]t this point, let's do the best we can for 2020 submissions."[68] That statement was made almost two years after the 2019 Order had been entered.

In addition, Freedom's own root cause analyses of the errors reveal systemic deficiencies as a driving force of erroneous reporting of HMDA data.

Freedom admits to the following reasons for its errors:

- **Mismatched information between loan files with the same borrower or applicant:** Freedom admitted that it did not ensure that borrowers who applied for multiple loans had the same information across their applications and loans.[69] Appropriate recordkeeping software processes that Freedom later put in place could have prevented the 3,765 errors across 32 data fields in its 2020 HMDA LAR.[70] Freedom admitted that these errors resulted from deficient controls,[71] and that nothing in its compliance systems was designed to prevent them.[72]

---

[63] SOF ¶ 27.

[64] SOF ¶¶ 27–28; *see* SOF ¶ 28 ("Q: Do you know if QuestSoft was able to detect if a loan or application was missing from the LAR? A [Freedom]: No, I don't see how that would have been possible.").

[65] SOF ¶¶ 34–35.

[66] SOF ¶ 35.

[67] SOF ¶ 34.

[68] SOF ¶ 36.

[69] SOF ¶ 42.

[70] SOF ¶ 43.

[71] SOF ¶ 44 ("In some cases, the controls . . . needed improvement for that particular issue.").

[72] SOF ¶ 45.

- **Missing Loan Purchaser information:** Freedom admitted that it had no system in place to timely update its system of record when loans were sold.[73] Freedom admitted that it submitted inaccurate loan purchaser information for nearly 50,000 loans in its 2020 HMDA LAR,[74] and that members of its Data Governance team identified the missing information prior to the submission of the 2020 HMDA LAR.[75]

- **Incorrect Description of Action Taken:** Freedom admitted that over 2,300 loans were incorrectly categorized as having been approved by Freedom but not accepted by the borrower, when in fact it was the borrower who withdrew the application, which are distinct reporting options.[76] Correction of this error also required correction of data related to seven other data fields.[77] Freedom's written policies did not provide internal guidance on when to select "approved but not accepted" or "withdrawn."[78]

- **Data mapping errors causing thousands of errors related to Debt-to-Income Ratio and Lender Credits reporting:** Freedom attributed thousands of errors in its 2020 HMDA LAR, including in the "lender credits" and "debt-to-income ratio" fields, to problems of "data mapping."[79] Data mapping errors, which relate to inaccurate matching of data from one data set to another, are inherently a systems and recordkeeping software failure.

Freedom should have identified and addressed these systemic and procedural failures and implemented more than threadbare monitoring *before* it submitted its 2020 HMDA LAR to the Bureau. But, by its own words, Freedom failed to identify the errors and did not take any action to correct its LAR submission until after the Bureau's Office of Supervision performed its own review of Freedom's 2020 HMDA data and HMDA compliance management systems in the spring of 2021.

      **2.**      **The Deficiencies of Freedom's Compliance Management System Are Definitive and Indisputable**

Freedom's compliance management system also fundamentally failed to act as a safety catch on the accuracy of Freedom's HMDA data. The serious problems with Freedom's HMDA compliance date to at least 2014.[80] As described in the 2019 Order, the Bureau found that, due to deficiencies in its recordkeeping software that blocked the entry of certain necessary data,

---

[73] SOF ¶¶ 48–49.
[74] SOF ¶ 46.
[75] SOF ¶ 47.
[76] SOF ¶ 50; *see* 12 C.F.R. § 1003.4(a)(8)(i).
[77] SOF ¶ 51.
[78] SOF ¶ 52.
[79] SOF ¶¶ 53–54.
[80] SOF ¶¶ 11–12.

Freedom instructed its loan officers to work around this problem by simply entering inaccurate data into its system, which were then reported in Freedom's HMDA LAR.[81] The Bureau found that those errors did not qualify as "bona fide errors," both because they were intentional *and* because Freedom lacked procedures reasonably designed to avoid them.[82]

Notwithstanding that 2019 Order, Freedom's HMDA compliance continued to be plagued by systemic deficiencies. In an internal audit issued October 17, 2019, Freedom's audit division concluded that the company's "HMDA processes, procedures, and controls Need[] Improvement."[83] "Needs improvement," the audit explained, means that "[t]he overall system of internal control and risk management may have isolated or multiple deficiencies across business activities."[84] As part of its review, the audit division found numerous errors in a sample taken from Freedom's 2018 LAR.[85] Freedom's audit division recommended that Freedom supplement its routine monitoring by "includ[ing] transactional testing for samples of reportable loans," "create and maintain a HMDA LAR Data Matrix" to assist with testing and auditing, and "[d]etermine whether additional compliance oversight is needed."[86]

Freedom's management largely rejected these recommendations.[87] Despite its audit division's findings and recommendations, Freedom would not take the basic recommended step of reviewing samples of HMDA data and comparing them with underlying loan documentation.[88] Rather, Freedom's management posited that the errors identified by the audit primarily resulted from "the age of applications and loans considered in the testing," and otherwise declined to make substantial changes to its HMDA data monitoring procedures.[89] As a result, Freedom entered the collecting, recording, and reporting periods for 2020 HMDA data having identified—but not fixed—procedural gaps and failures that it knew, or should have known, could cause systemic inaccuracies on its forthcoming LAR.

---

[81] SOF ¶ 13.
[82] SOF ¶ 14.
[83] SOF ¶¶ 55–56.
[84] SOF ¶ 57.
[85] SOF ¶¶ 58–59.
[86] SOF ¶¶ 60–62.
[87] SOF ¶¶ 65–66.
[88] SOF ¶¶ 37–38, 66.
[89] SOF ¶¶ 65–66.

In early 2022, Freedom's internal audit division completed another review of the company's HMDA compliance program, covering the period when it submitted its 2020 data.[90] That 2022 audit laid bare the depths of Freedom's compliance failures affecting the LAR submission at issue in this case.[91] A slide deck summarizing findings remarked: "At the time of the audit, there was no HMDA LAR internal review process in place that would identify data inaccuracies or inconsistencies."[92]

The final audit report from March 2022 again issued Freedom's HMDA compliance an overall rating of "Needs Improvement."[93] The final audit report included the "high risk" finding that Freedom's "HMDA LAR review process is incomplete,"[94] and auditors again found numerous errors in a sample of Freedom's 2021 LAR across a range of data fields.[95] Regarding this high risk finding, Freedom's March 2022 audit report observed that "Incomplete LAR processes may result in undetected errors on the annual HMDA LAR, require LAR resubmission and may result in additional regulatory scrutiny and penalties."[96]

Freedom's March 2022 audit report also made several "moderate risk" findings. First, fundamental steps were missing entirely from Freedom's HMDA procedures, including "key aspects of the creation and review of the HMDA LAR."[97] Auditors explained that this gap was significant because Freedom's "[f]ailure to maintain complete procedures and rel[iance] on one key employee for completion of the HMDA LAR may result in the inability for the HMDA LAR filing data to be aggregated accurately for submission."[98]

---

[90] SOF ¶¶ 74–75.
[91] SOF ¶¶ 76–96.
[92] SOF ¶ 79.
[93] SOF ¶ 76.
[94] SOF ¶¶ 78, 80; *see also* SOF ¶ 81 ("[High-risk findings] represent[] a recommendation requiring prompt remediation management. . . . The recommendation, if left uncorrected, considerably exposes the Company to financial reporting errors, monetary fines and penalties, reputation damage, loss of business, or increased regulatory scrutiny. These recommendations include significant violations of Company policy, improper accounting procedures, major deficiencies in data or system integrity, availability, or confidentiality, violations of regulations and significant deviations from the expected error rate on sample testing.").
[95] SOF ¶ 82.
[96] SOF ¶ 84; *see* SOF ¶ 82 (recounting internal audit team's "data field testing" that found 24 "apparent inaccuracies" in a sample of 80 LAR entries).
[97] SOF ¶¶ 87–88.
[98] SOF ¶ 89.

Next, Freedom's internal audit division found gaps in management oversight of Freedom's HMDA activities, explaining that "HMDA management reporting is inconsistent in form, content, documentation and in its articulated escalation protocols."[99] Former Internal Audit Director Amanda Kenny, who both managed and took part in the review, testified that she could find no documentation at all of any HMDA reporting to Freedom's Office of the President.[100] That was because Chief Compliance Officer Berman, who was responsible for reporting to the president on HMDA compliance matters, made only verbal updates.[101] Finally, the audit division found additional HMDA-related failures not directly related to accuracy issues including that: "the controls over monitoring and testing of other HMDA controls, such as posting of disclosures [required by Regulation C] lapsed."[102]

In response to the audit division's high-risk finding that the "LAR review process is incomplete," Freedom's management explained that, in October 2021, Freedom implemented a "doc-to-data review program."[103] This program involves routinely comparing a sample of LAR data to Freedom's system of record or underlying loan documentation[104]—a first for the company.[105] Management also said it was working on filling in the gaps the audit had identified in Freedom's HMDA procedures and reporting structure, and that it planned to be finished doing so by June 30, 2022.[106] Whatever effects these changes ultimately had, they came too late. Instead, Freedom compiled and submitted its 2020 HMDA LAR—containing at least 155,420 distinct reporting errors—despite major procedural gaps that it already knew, or should have known, were likely to cause widespread reporting errors. As a result, Freedom's reporting errors violated HMDA and Regulation C, and summary judgment in favor of the Bureau is appropriate as to Counts I and III.[107]

---

[99] SOF ¶ 93.
[100] SOF ¶ 94. Freedom's president is the only member of its Board of Directors. SOF ¶ 4.
[101] SOF ¶¶ 94–95.
[102] SOF ¶ 91.
[103] SOF ¶ 85.
[104] SOF ¶ 86.
[105] SOF ¶¶ 37–38.
[106] SOF ¶¶ 90, 96.
[107] Under the CFPA, a covered person's violation of a "Federal consumer financial law," which includes enumerated consumer laws and rules thereunder, violates the CFPA. 12 U.S.C. §§ 5536(a)(1)(A), 5481(14). The CFPA defines "enumerated consumer laws" to include the HMDA

## II.     FREEDOM'S CONDUCT VIOLATED THE 2019 ORDER

Paragraph 29 of the 2019 Order prohibited Freedom from further violation of the key sections of HMDA and Regulation C at issue in this case.[108] Specifically, Paragraph 29, in relevant part, ordered that Freedom "may not violate Section 304(a), (b), or (h) of [HMDA], 12 U.S.C. § 2803(a), (b), and (h), or Sections 1003.4(a)-(b) or 1003.5(a) of Regulation C, 12 C.F.R. §§ 1003.4(a)-(b), 1003.5(a)[.]"[109]

Freedom voluntarily agreed to entry of the 2019 Order and all of its provisions, including Paragraph 29 quoted above.[110] In so doing, Freedom agreed that the Order would be "fully enforceable by the Bureau," and waived any "right to seek any . . . judicial review of the Consent Order."[111] Freedom cannot now shirk obligations the company previously agreed to undertake.

Even putting that waiver aside, Paragraph 29 of the 2019 Order is enforceable against Freedom. "An injunction that orders a defendant to comply with a statute" is enforceable "where the statutory terms are specific and the defendant clearly knows what is prohibited or required."[112] That is the case here. HMDA and Regulation C set forth in painstaking detail the information that covered lenders are required to report. In particular, Regulation C requires the reporting of up to 48 distinct data points,[113] captured in up to 110 specified data fields.[114] And the FFIEC publishes annually a plethora of guidance for HMDA filers, including a detailed instruction guide to facilitate lenders' reporting of the required data points.[115] There is thus no

---

and Regulation C. 12 U.S.C. § 5481(12)(K), (14). Hence, by virtue of its violations of HMDA and Regulation C, as described above and in Count I, Freedom also violated the CFPA, as described in Count III.

[108] SOF ¶ 15 (citing 12 U.S.C. § 2803(a), (b), and (h) (requiring lenders to maintain, itemize, and submit certain data); 12 C.F.R. § 1003.4(a)–(b) (specifications for data points); *id.* § 1003.5(a) (requiring regular reporting to the Bureau)).

[109] SOF ¶ 15.

[110] SOF ¶ 9.

[111] SOF ¶¶ 19–20.

[112] *See United States v. Askins & Miller Orthopaedics, P.A.*, 924 F.3d 1348, 1362 (11th Cir. 2019).

[113] 12 C.F.R. § 1003.4(a)–(b)

[114] FFIEC, HMDA Filing Instructions Guide, https://ffiec.cfpb.gov/documentation/fig/overview.

[115] FFIEC, *A Guide to HMDA Reporting: Getting It Right!* (2020), https://www.ffiec.gov/hmda/pdf/2020guide.pdf.

question that the "[laws] with which Defendant[] must comply are specific, and . . . they are well aware of the conduct the injunction addresses."[116]

Freedom violated the 2019 Order when it submitted its 2020 HMDA LAR with widespread errors in violation of those HMDA and Regulation C provisions. Freedom's noncompliance with its obligations under that 2019 Order also constitutes a violation of the CFPA.[117] Summary judgment in favor of the Bureau is appropriate on Count II.

## III.   THE COURT SHOULD GRANT INJUNCTIVE RELIEF AND A CIVIL MONEY PENALTY

### A.   Injunctive Relief

A permanent injunction is appropriate where there is "some reasonable likelihood of future violations."[118] Here, Freedom's repeated violations of HMDA and Regulation C suggest a reasonable likelihood they may reoccur in the future. Even if Freedom attempts in good faith to make improvements to its HMDA compliance program, the record in this case shows that improvements at Freedom come slowly, if at all.

The Court should fashion relief to ensure that Freedom comes into compliance with the law fully and promptly: specifically, with Section 304(a), (b), and (h) of HMDA, 12 U.S.C. § 2803(a), (b), and (h), and Sections 1003.4(a)-(b) and 1003.5(a) of Regulation C, 12 C.F.R. §§ 1003.4(a)-(b), 1003.5(a). This should include requirements to (1) develop and implement policies, procedures, and controls reasonably adapted to detect and prevent errors in HMDA data reporting; (2) record and maintain consumer and loan data in a manner designed to ensure the accuracy and completeness of required submissions to the Bureau under HMDA and Regulation C; and (3) on a quarterly basis, submit accurate HMDA data to the Bureau in accordance with Regulation C. A permanent injunction is the proper tool to do so.

---

[116] *Askins & Millers Orthopaedics, P.A.*, 924 F.3d at 1362 (finding the Internal Revenue Service's proposed injunction requiring compliance with law "passes muster").

[117] 12 U.S.C. § 5536(a)(1)(A); *see also* 12 U.S.C. § 5481(14) (defining "Federal consumer financial law" to include an "order prescribed by the Bureau").

[118] *See CFPB v. Chou Team Realty LLC*, No. 8:20-cv-00043, 2021 WL 4077110, at *5 n.6 (C.D. Cal. Aug. 10, 2021), *aff'd sub nom. CFPB v. Nesheiwat*, No. 21-56052, 2022 WL 17958636 (9th Cir. Dec. 27, 2022); *see also CFPB v. Universal Debt & Payment Sols., LLC*, No. 1:15-CV-0859, 2021 WL 11552529, at *3 (N.D. Ga. Oct. 20, 2021) ("The Non-Defaulted Defendants' unlawful conduct justifies permanent injunctive relief.").

**B.      Civil Money Penalty**

For any person who violates Federal consumer financial law, the CFPA requires the imposition of a civil money penalty "[f]or any violation" of its provisions.[119] By Freedom's own admissions, there were at least 155,420 errors in Freedom's initial 2020 HMDA LAR submission. Each error represents a separate failure by Freedom to comply with a specific and distinct requirement under Regulation C. The Bureau recommends a penalty of $20 million, which is appropriate when taking into account Freedom's tens of thousands of violations of HMDA and Regulation C, and consideration of the statutory factors in 12 U.S.C. § 5565(c)(3).

The CFPA provides for three tiers of penalties based on the level of scienter: up to $7,034 per day for any violation; up to $35,169 per day for each reckless violation; and up to $1,406,728 per day for each knowing violation.[120] Here, Freedom's conduct in the lead up to its 2020 HMDA LAR submission, following multiple, explicit warnings from the Bureau and its own internal audit division, establishes that the company was at least reckless in its noncompliance with HMDA and Regulation C. The record before the Court establishes that Freedom consciously chose not to implement the procedures reasonably designed to avoid the errors in its LAR.

By the end of 2019, Freedom knew it had repeatedly made widespread errors in its prior HMDA data. It knew it had substantial compliance gaps that could cause more errors in the future. From its internal auditors, it knew what steps it could take to shore up its compliance systems to improve its HMDA reporting accuracy. The company simply declined to take them. Assuming a conservative calculation that each violation lasted only one day,[121] and applying second-tier penalties for reckless conduct to each of Freedom's 155,420 violations of HMDA and Regulation C, the statutory maximum penalty exceeds five billion dollars.

The other statutory factors in 12 U.S.C. § 5565(c) generally weigh in favor of a significant penalty. As one of the largest lenders in the nation, Freedom has sizable financial resources, and it has demonstrated minimal good faith.[122] In fact, Freedom ignored its own audit division's findings prior to submitting its 2020 HMDA LAR, failing time and again to develop

---

[119] 12 U.S.C. § 5565(c)(2)(A).
[120] *See* 12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1 (2024).
[121] The CFPA provides that a penalty be imposed "for each day during which such violation . . . continues." 12 U.S.C. § 5565(c)(2).
[122] *Id.* § 5565(c)(3)(A).

the oversight, policies, procedures, controls, and monitoring needed to avoid HMDA reporting errors. And while Freedom submitted a revised HMDA LAR on September 30, 2021, to correct the errors in its initial LAR submission, it did so only after the Bureau examiners' findings during its HMDA compliance examination. Perhaps most significant is Freedom's history of violating HMDA and Regulation C, which, as detailed in the 2019 Order, stretches back to at least 2014.[123]

Freedom's submission of inaccurate HMDA data increases the risk that lending discrimination and community underinvestment go undetected. A penalty of $20 million—which represents a per-violation penalty far below the statutory maximum at even the lowest penalty tier—is appropriate here and commensurate with Freedom's reckless conduct, financial resources, and history of failing to comply with HMDA and Regulation C.

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment for the Bureau on all counts.

Dated: May 16, 2024                                          Respectfully Submitted,

/s/ Emily Holness
Emily Holness
Special Florida Bar ID A5503128
New York Bar No. 4947941

Charles Eric Mothander
Special Florida Bar ID A5503180
DC Bar No. 1032539

Hallie Ryan
Special Florida Bar ID A5503127
Virginia Bar No. 85927

Joseph Lake
Special Florida Bar ID A5503154
California Bar No. 246679

Samuel Weinstock
Special Florida Bar ID A5503195
Maryland Bar No. 2211290261

---

[123] *Id.* § 5565(c)(3)(D).

18

*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW Washington, DC 20552

Email: emily.holness@cfpb.gov
Email: charles.mothander@cfpb.gov
Email: hallie.ryan@cfpb.gov
Email: joseph.lake@cfpb.gov
Email: samuel.weinstock@cfpb.gov

*Attorneys for Plaintiff*

19

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2024, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, which will provide automatic notice to the below listed counsel of record.

Herman J. Russomanno III
RUSSOMANNO & BORRELLO, P.
Museum Tower – Penthouse 2800
150 West Flagler Street
Miami, Florida 33130
Telephone: (305) 373-2101
Facsimile: (305) 373-2103
Herman2@russomanno.com

Mitchel H. Kider
Timothy P. Ofak
Charles Cooper
Joseph Katz
WEINER BRODSKY KIDER PC
1300 19th Street NW, Fifth Floor
Washington, DC 20036
Tel: (202) 628-2000
Fax: (202) 628-2011
kider@thewbkfirm.com
ofak@thewbkfirm.com
cooper@thewbkfirm.com
katz@thewbkfirm.com

/s/ Emily Holness
Emily Holness
Special Florida Bar ID A5503128
New York Bar No. 4947941